**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK,<br><br>         Plaintiff,<br><br>    v.<br><br>CHAD F. WOLF, *in his official capacity as Acting Secretary of Homeland Security*; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARK A. MORGAN, *in his official capacity as Acting Commissioner of United States Customs and Border Protection*; and UNITED STATES CUSTOMS AND BORDER PROTECTION,<br><br>         Defendants. | CIVIL ACTION NO.<br><br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**INTRODUCTION**

1.     This lawsuit challenges the federal government's unconstitutional and unlawful decision to prohibit New York residents from enrolling or re-enrolling in the U.S. Department of Homeland Security's Trusted Traveler programs as political retribution for the State's enactment of legislation that the federal government disfavors.

2.     The creation of "a single system for speeding qualified travelers" was a key recommendation of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission").  Congress later codified this recommendation as a statutory mandate through the Intelligence Reform and Terrorism Prevention Act of 2004, which directed the Department of Homeland Security ("DHS") to "establish an international registered traveler program . . . to expedite the screening and processing of international travelers, including United

States Citizens and residents, who enter and exit the United States."  8 U.S.C. § 1365b(k)(3)(A).

3.      Consistent with this statutory mandate, U.S. Customs and Border Protection ("CBP") has implemented and administers a number of Trusted Traveler programs to expedite processing for pre-identified, pre-approved, lower-risk populations traveling internationally.  As CBP has explained, "[t]hese programs provide modified screening for pre-approved members, improve security by increasing efficiencies in allocating screening resources, and facilitate legitimate trade and travel."[1]

4.      Defendants' decision to ban all New York residents from enrolling or re-enrolling in the Trusted Traveler programs not only defies this Congressional mandate and disregards the recommendations of the bipartisan 9/11 Commission, but also profoundly jeopardizes public safety for New Yorkers and all travelers.  Defendants have intentionally made us less safe.

5.      On June 17, 2019, the New York Legislature enacted the Driver's License Access and Privacy Act (the "Green Light Law"), which took effect on December 14, 2019.  Based on the Legislature's view that a state resident's citizenship and immigration status are irrelevant to the decision of whether to issue him or her a driver's license, the Green Light Law, similar to laws in many other jurisdictions, instructs New York's Department of Motor Vehicles ("DMV") to issue driver's licenses to all eligible state residents without regard to citizenship or immigration status.  To ensure that those residents newly eligible for driver's licenses under the Green Light Law will come forward to apply for them, the Law also bars the release of applicants' personal information to federal immigration authorities except where disclosure is pursuant to a lawful court order or judicial warrant.  *See* Ch. 37, 2019 N.Y. Laws.

---

[1] U.S. Customs & Border Prot., *Trusted Traveler Programs Fact Sheet* (Jan. 2018), https://www.cbp.gov/sites/default/files/assets/documents/2018-Jan/fieldops-trusted-traveler-fact-sheet-201510.pdf.

6.     By disregarding immigration status and protecting applicant and license-holders' personal privacy, the Green Light Law increases the number of licensed and insured drivers on the State's roads, furthering the State's interest in public safety and economic growth.

7.     As required by the Green Light Law, on December 14, 2019, the New York DMV restricted access to certain DMV data by CBP.

8.     On February 4, 2020, in his State of the Union address, President Trump criticized state and local governments that have elected not to participate in the current federal administration's immigration enforcement priorities, citing in particular "New York's sanctuary policies," and falsely claiming that "[i]n sanctuary cities, local officials order police to release dangerous criminal aliens to prey upon the public instead of handing them over to ICE to be safely removed."[2]

9.     The same day, following the State of the Union address, Acting Secretary of Homeland Security Chad F. Wolf issued a public statement that likewise criticized state policy choices that deviated from this administration's federal immigration priorities, and threatened action against state and local jurisdictions that did not fall in line: "President Trump sent a strong message to these leaders who play politics with public safety: If you will not protect your people, we will.  DHS will soon announce measures to counter dangerous state and local laws that prohibit coordination with DHS law enforcement officers."[3]

10.     The next day, DHS followed through on that threat.  By letter to the New York DMV dated February 5, 2020, Acting Secretary Wolf announced that DHS was immediately

---

[2] President Donald J. Trump, State of the Union Address (Feb. 4, 2020), https://www.nytimes.com/2020/02/05/us/politics/state-of-union-transcript.html.

[3] U.S. Dep't of Homeland Sec., *Statement from Acting Secretary Chad F. Wolf on President Trump's State of the Union* (Feb. 4, 2020), https://www.dhs.gov/news/2020/02/04/statement-acting-secretary-chad-f-wolf-president-trump-s-state-union.

terminating enrollment and re-enrollment for all New York residents in Trusted Traveler programs administered by CBP (the "Trusted Traveler Ban").

11.     The Trusted Traveler Ban is a punitive measure intended to coerce New York into changing its policies.

12.     Singling out one state for coercion and retribution as a means to compel conformity with preferred federal policies is unconstitutional.  Defendants' ban on New Yorkers' participation in the Trusted Traveler programs not only violates the law, but also injures New York by undermining public safety and causing extensive economic harm.

13.     The State of New York now brings this suit to vacate and enjoin Defendants' unlawful decision, which violates the Tenth Amendment's guarantee of equal sovereignty among the states; the Tenth Amendment's prohibition on coercive federal action; the Fifth Amendment's equal protection guarantee; and the Administrative Procedure Act.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).  Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

15.     Declaratory and injunctive relief is sought consistent with 5 U.S.C. § 706 and as authorized in 28 U.S.C. §§ 2201 and 2202.

16.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.  Plaintiff the State of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Southern District of New York.

**PARTIES**

17.     Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

18.     New York is aggrieved by Defendants' actions and has standing to bring this action because the Trusted Traveler Ban harms New York's sovereign, quasi-sovereign, economic, and proprietary interests and will continue to cause injury unless and until the Ban is vacated and Defendants' practices are permanently enjoined.

19.     Defendant Chad F. Wolf is the Acting Secretary of Homeland Security.  He is sued in his official capacity.

20.     Defendant the U.S. Department of Homeland Security is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f).

21.     Defendant Mark A. Morgan is the Acting Commissioner of U.S. Customs and Border Protection.  He is sued in his official capacity.

22.     Defendant U.S. Customs and Border Protection is a sub-agency of DHS.  CBP is responsible for, among other functions, facilitating and expediting lawful travel and trade.  6 U.S.C. § 211(c)(3).  As part of these functions, CBP administers the Trusted Traveler programs at issue in this litigation.

**ALLEGATIONS**

**I.      The DHS Trusted Traveler programs.**

23.     Following the attacks of September 11, 2001, President George W. Bush and Congress established the National Commission on Terrorist Attacks Upon the United States (the

"9/11 Commission") to investigate how to prevent future attacks.[4]  From 2002 to 2004, the 9/11

Commission interviewed more than 1,200 people in ten countries, reviewed over 2.5 million

pages of documents, and held 19 days of hearings with public testimony from 160 witnesses.[5]

24.     In its final report, the 9/11 Commission recommended that DHS, "properly

supported by the Congress," implement "a single system for speeding qualified travelers."[6]  The

Commission reasoned that "[t]he further away from our borders that screening occurs, the more

security benefits we gain."[7]

25.     In 2004, Congress enacted the Intelligence Reform and Terrorism Prevention Act

of 2004 ("IRTPA") to codify the Commission's recommendations.  8 U.S.C. § 1365b(k)

(describing the statute's provisions as "[c]onsistent with the report of the [9/11 Commission]").

In the IRTPA, Congress found that "[e]xpediting the travel of previously screened and known

travelers across the borders of the United States should be a high priority," and "[t]he process of

expediting known travelers across the borders of the United States can permit inspectors to better

focus on identifying terrorists attempting to enter the United States."  *Id.* § 1365b(k)(1).

26.     To that end, the IRTPA directs the Secretary of Homeland Security to "establish

an international registered traveler program that incorporates available technologies, such as

biometrics and e-passports, and security threat assessments to expedite the screening and

processing of international travelers, including United States Citizens and residents, who enter

---

[4] Intelligence Authorization Act for Fiscal Year 2003, Pub. L. No. 107-306, §§ 601–611, 116 Stat. 2383, 2408–13 (2002).

[5] Nat'l Comm'n on Terrorist Attacks Upon the U.S., *The 9/11 Commission Report: Final Report of the Nat'l Comm'n on Terrorist Attacks Upon the United States* xv (2004), http://www.9-11commission.gov/report/911report.pdf.

[6] *Id.* at 389.

[7] *Id.*

and exit the United States."  8 U.S.C. § 1365b(k)(3)(A).

27.     The IRTPA further mandates that the Secretary "ensure that the international registered traveler program includes as many participants as practicable."  8 U.S.C. § 1365b(k)(3)(E).  Consequently, the IRTPA requires the Secretary to "mak[e] program enrollment convenient and easily accessible" and "provid[e] applicants with clear and consistent eligibility guidelines."  *Id.*

28.     At the time of the IRTPA's enactment, the concept of a registered traveler program was not new to CBP.  Since 1995, CBP had operated Trusted Traveler programs that expedited processing for pre-identified, pre-approved, lower-risk populations traveling internationally.  Today, the agency's Trusted Traveler programs include the Global Entry Program, NEXUS, Secure Electronic Networks for Travelers Rapid Inspection ("SENTRI"), and Free and Secure Trade ("FAST").

29.     According to CBP, the Trusted Traveler programs "provide modified screening for pre-approved members, improve security by increasing efficiencies in allocating screening resources, and facilitate legitimate trade and travel."[8]

30.     In June 2008, CBP launched the first phase of the Global Entry Program. *Establishment of Global Entry Program*, 77 Fed. Reg. 5681, 5681 (Feb. 6, 2012).  As of June 2018, Global Entry had more than 5 million participants approved to enter the United States via automated kiosks at over 70 selected U.S. airports and preclearance locations abroad.[9]  There are

---

[8] U.S. Customs & Border Prot., *Trusted Traveler Programs Fact Sheet* (Jan. 2018), https://www.cbp.gov/sites/default/files/assets/documents/2018-Jan/fieldops-trusted-traveler-fact-sheet-201510.pdf.

[9] U.S. Customs & Border Prot., *Airports with Global Entry Kiosks* (Sept. 7, 2018),

also five enrollment centers in New York, including in Buffalo, Champlain, Niagara Falls, and two in New York City.[10]  Participants include U.S. citizens, U.S. lawful permanent residents, and citizens of over ten partner countries.[11]

31.     To be eligible, applicants to the Global Entry Program must (1) hold valid, machine-readable passports, lawful permanent resident cards, "or other appropriate travel document[s]"; (2) be U.S. citizens, nationals, lawful permanent residents, or citizens of a partner country; and (3) have parental or guardian consent, if they are minors.  8 C.F.R. § 235.12(b)(1).  Eligibility does not hinge on an applicant possessing a state driver's license.

32.     Applicants complete an application disclosing personal information, such as their email address, gender, eye color, height, and language preference; employment, travel, and address history over the past five years; and whether they have been convicted of a crime or have violated customs or immigration laws.  Along with their applications, Global Entry applicants submit a nonrefundable fee.

33.     Once they have submitted their applications, applicants undergo additional screening to be accepted into Global Entry.  First, CBP routes applications to a vetting center where biographic information contained in the applications is queried against 21 different data systems, including:

      a.  UPAX, a consolidated database that includes information to help identify "potential terrorists, transnational criminals, and other persons who pose a

---

https://www.cbp.gov/travel/trusted-traveler-programs/global-entry/locations.

[10] U.S. Customs & Border Prot., *Global Entry Enrollment Centers—New York* (Jan. 2, 2018), https://www.cbp.gov/travel/trusted-traveler-programs/global-entry/enrollment-centers/new-york.

[11] U.S. Customs & Border Prot., *Eligibility for Global Entry* (Dec. 4, 2017), https://www.cbp.gov/travel/trusted-traveler-programs/global-entry/eligibility.

higher risk of violating U.S. law";

    b.   TECS, a data repository that supports "law enforcement 'lookouts,' border screening, and reporting for CBP's primary and secondary inspection processes";

    c.   IDENT, which stores and processes biometric data "to establish and verify identities," including biometric information from INTERPOL;

    d.   The Federal Bureau of Investigation's ("FBI") National Crime Information Center's Interstate Identification Index, an automated database that integrates criminal history records from federal, state, local, tribal, and certain foreign criminal justice agencies; and

    e.   TSDB, a consolidated database maintained by the FBI's Terrorist Screening Center that "provides information about those known or reasonably suspected of being involved in terrorist activity."[12]

34.    If conditionally approved, applicants must bring proof of residency, their passport, and an additional form of identification (which is not required to be a state driver's license) to an in-person interview with CBP.  8 C.F.R. § 235.12(e).  CBP is authorized to "provide alternative enrollment procedures, as necessary, to facilitate enrollment and ensure an applicant's eligibility for the program," *id*. § 235(12)(e)(3), consistent with the IRTPA's dictate that enrollment be easily accessible, *see* 8 U.S.C. § 1365b(k)(3)(E).

35.    At the interview, CBP confirms the applicant's identity, validates travel documents, and collects biometric information, such as fingerprints and photographs, and

---

[12] U.S. Dep't of Homeland Sec., Office of Inspector Gen., *CBP's Global Entry Program is Vulnerable to Exploitation* 27, https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-49-Jun19.pdf.

conducts a personal interview.  *Id.*  CBP also addresses any additional eligibility questions that may have been raised by the database query.

36.     The fingerprints collected by CBP during a Global Entry interview are ten-finger prints that are "vetted against Federal Bureau of Investigation criminal records, which provide a response within minutes."[13]

37.     Global Entry Program participants may be suspended or removed from the program if CBP determines they have engaged in disqualifying activities; failed to follow the terms, conditions, and requirements of the program; been arrested or convicted of a crime; or if "CBP, at its sole discretion, determines that such action is otherwise necessary."  8 C.F.R. § 235.12(j).

38.     CBP regulations require that CBP notify Global Entry Program applicants if they have been denied, suspended, or removed from participation in the program.  8 C.F.R. § 235.12(j).  Notification of denial must state the reasons for denial, and offer a way for applicants to seek additional information as to the reason for denial.  *Id.*  Suspension and removal notifications must be made in writing.  *Id.*

39.     The remaining CBP Trusted Traveler programs—NEXUS, SENTRI, and FAST—

---

[13] U.S. Gov't Accountability Office, *Trusted Travelers: Programs Provide Benefits, but Enrollment Processes Could Be Strengthened* 10 (May 2014), https://www.gao.gov/assets/670/663724.pdf.  The FBI maintains criminal history information, including a database of fingerprints called the Integrated Automated Fingerprint Identification System ("IAFIS") that may be searched in an automated fashion and that includes "[m]ore than 59 million criminal history records" and "[m]ore than 210 million criminal arrest cycles."  *See, e.g.*, Fed. Bureau of Investigation, *Integrated Automated Fingerprint Identification System Flyer*, https://www.fbi.gov/file-repository/about-us-cjis-fingerprints_biometrics-biometric-center-of-excellences-iafis_0808_one-pager825/view.

are similarly designed to expedite cross-border travel.

40.     The NEXUS program grants pre-screened travelers expedited processing when traveling between the United States and Canada by air, land, or sea.  Members use dedicated processing lanes at designated northern border ports of entry.[14]

41.     There are currently 19 NEXUS land border crossing locations in the United States, including five in New York at Alexandria Bay, Buffalo, Champlain, and two locations in Niagara Falls.  There are also two NEXUS enrollment centers in New York, at Champlain and Niagara Falls.

42.     Beginning with a pilot location in 1995, SENTRI has allowed expedited clearance for pre-approved, low-risk travelers crossing on land along the southern border of the United States.

43.     In 2002, CBP launched the FAST program along the northern border before expanding to the southern border in 2004.  FAST expedites processing for known low-risk shipments entering the United States from Canada and Mexico.[15]  For shippers to participate in FAST, "every link in the supply chain, from manufacturer to carrier to driver to importer," must be certified under the Customs-Trade Partnership Against Terrorism program.[16]

## II.     New York's "Green Light Law."

44.     New York's Green Light Law was enacted in 2019 and governs the issuance of

---

[14] U.S. Customs & Border Prot., *Trusted Traveler Programs—NEXUS* (Aug. 21, 2019), https://www.cbp.gov/travel/trusted-traveler-programs/nexus.

[15] U.S. Customs & Border Prot., *Trusted Traveler Programs—FAST: Free & Secure Trade for Commercial Vehicles* (June 13, 2019), https://www.cbp.gov/travel/trusted-traveler-programs/fast.

[16] *Id.*

driver's licenses that do not comply with the REAL ID Act,[17] the federal law setting forth

minimum federal requirements for state-issued driver's licenses and identification cards that can

be used to gain entry to federal facilities and board airplanes.  The REAL ID Act permits States

to continue issuing non-REAL ID-compliant driver's licenses, which in New York are known as

"standard licenses."

45.     The Green Light Law directs New York DMV to issue standard driver's licenses

to all eligible state residents without regard to citizenship or immigration status.  The Law

expressly states that proof of lawful presence in the U.S. is not required in order to obtain a

standard license, *see* N.Y. Vehicle & Traffic Law § 502(8)(b), and prohibits DMV from

inquiring about an applicant's citizenship or immigration status, *see id*. § 502(8)(c)(i)-(iii),

(e)(ii).

46.     The Green Light Law accomplishes the goal of licensing residents without regard

to citizenship or immigration status by expanding the types of proof of identity and age that New

York DMV must accept from standard license applicants.  These proofs include various foreign

documents, including foreign passports, foreign consular documents, and foreign driver's

licenses.  *See id.* § 502(1).  The Law also provides that, in lieu of a social security number,

applicants for a standard license may submit an affidavit attesting that they have "not been issued

a social security number."  *See id.*

47.     The Green Light Law also protects applicants and license-holders' personal

information in several ways, including by prohibiting New York DMV or its agents from

disclosing or making accessible "in any manner records or information" that DMV "maintains"

---

[17] Pub. L. No. 109-13, §§ 201–202, 119 Stat. 231, 311–15 (2005) (codified at 49 U.S.C. § 30301 note).

for standard license applicants and holders to federal immigration authorities (including U.S.

Immigration and Customs Enforcement and CBP), absent a court order or judicial warrant.  *See*

*id.* § 201(12)(a), (b), (c).

48.     New York DMV makes the records and information maintained in its databases

about the State's drivers available to various government agencies for use in carrying out those

agencies' functions.  Each government official seeking to access New York DMV's information

must execute a memorandum of understanding with DMV describing the intended use of any

information obtained through searches of DMV's records.

49.     Pursuant to such memoranda of understanding, before the effective date of the

Green Light Law, DHS was granted access to DMV's records.

50.      On December 14, 2019, as required by the Green Light Law, New York DMV

restricted DHS's access to DMV's records pursuant to memoranda of understanding that had

been in place.  *See id.*

**III.    Defendants' abrupt decision to terminate enrollment in the Trusted Traveler programs by all New York residents.**

51.     By letter dated February 5, 2020, Acting Secretary Wolf notified New York DMV

that, effective immediately, Defendants would prohibit all New York residents from enrolling or

re-enrolling in CBP's Trusted Traveler programs.  Ex. 1 (the "February 5 Letter").  Acting

Secretary Wolf further explained that DHS intended to make vehicle exports slower and more

expensive for used vehicles titled and registered in New York.  *See id.*

52.     On February 6, 2020, Defendants cancelled all pending Trusted Traveler program

applications submitted by New York residents, including residents who had already received

preliminary approval for program participation.[18]

53.     The February 5 Letter identifies a single justification for Defendants' decision to immediately terminate New Yorkers' eligibility to enroll or re-enroll in the Trusted Traveler programs: New York's enactment of the Green Light Law, a statute that was enacted nearly eight months earlier.

**A.     Defendants' decision is an intentional effort to target New York for enacting policies that the current federal administration disfavors, and to coerce the State into changing those policies.**

54.     More than a dozen states allow undocumented immigrants to obtain driver's licenses, and dozens of other state and local jurisdictions have enacted legislation or adopted policies limiting information-sharing with the federal government's immigration enforcement efforts.

55.     The decision to terminate enrollment in the Trusted Traveler programs solely for New York residents is an intentional effort by Defendants to cause disproportionate injury to New York and New Yorkers.

56.     Just one day before Defendants adopted the challenged policy, President Trump singled out "New York's sanctuary policies" in his State of the Union address.[19]

57.     Acting Secretary Wolf followed the State of the Union with a statement that likewise criticized state policy choices like the one reflected in New York's Green Light Law,

---

[18] U.S. Customs & Border Prot., *New York Residents No Longer Eligible to Apply for or Renew Trusted Traveler Programs* (Feb. 6, 2020), https://www.cbp.gov/newsroom/national-media-release/new-york-residents-no-longer-eligible-apply-or-renew-trusted.

[19] President Donald J. Trump, State of the Union Address (Feb. 4, 2020), https://www.nytimes.com/2020/02/05/us/politics/state-of-union-transcript.html.

and made clear that the President's State of the Union was intended as a retributive threat to New York: "President Trump sent a strong message to these leaders who play politics with public safety: If you will not protect your people, we will. DHS will soon announce measures to counter dangerous state and local laws that prohibit coordination with DHS law enforcement officers."[20]

58.     The Trusted Traveler Ban is the most recent of numerous efforts by the current federal administration to compel state adherence to the federal government's immigration policy agenda, and to direct punitive measures at state and local governments that decline to do so.  In January 2017, the President issued Executive Order 13,768, *Enhancing Public Safety in the Interior of the United States*, which unlawfully threatened enforcement action against states and cities and the withholding of federal funds to those jurisdictions.  *See Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017) (enjoining Exec. Order 13,768).  And for a period of several years, the United States Department of Justice has unlawfully sought to condition states' participation in federal law enforcement grant programs on compliance with immigration-related grant conditions.  *See New York v. U.S. Dep't of Justice*, 343 F. Supp. 3d 213 (S.D.N.Y. 2018) (vacating the imposition of immigration-related grant conditions on federal funds).

59.     Defendants have indicated through public statements that the purpose of the Trusted Traveler Ban is to compel New York to change its policies or to punish the state for refusing to do so.

60.     President Trump has on multiple previous occasions targeted New York and New

---

[20] U.S. Dep't of Homeland Sec., *Statement from Acting Secretary Chad F. Wolf on President Trump's State of the Union* (Feb. 4, 2020), https://www.dhs.gov/news/2020/02/04/statement-acting-secretary-chad-f-wolf-president-trump-s-state-union.

York's elected officials with unusual invective.[21]

**B.** **Defendants' decision is inconsistent with the statutes and regulations that govern the administration of the Trusted Traveler programs.**

61.     The IRTPA mandates that the Secretary of Homeland Security "shall ensure that the international registered travel program includes as many participants as possible."  8 U.S.C. § 1365b(k)(3)(E).  To meet this mandate, the Secretary must "mak[e] program enrollment convenient and easily accessible" and "provid[e] applicants with clear and consistent eligibility guidelines."  *Id.*

62.     The IRTPA does not include any provision authorizing DHS to impose data-sharing obligations on states as a condition of the participation of that state's residents in the Trusted Traveler programs.

63.     In 2009, CBP's proposal to establish the Global Entry Program as a permanent program reiterated that "[u]nder the IRTPA, the Secretary shall ensure that the international trusted traveler program includes as many participants as practicable by . . . making program enrollment convenient and easily accessible, and providing applicants with clear and consistent eligibility guidelines."  *Establishment of Global Entry Program*, 74 Fed. Reg. 59,932, 59,932 (Nov. 19, 2009) (proposed rule).

64.     The Trusted Traveler Ban violates the IRTPA's requirements.  First, the Ban categorically excludes millions of New York residents from enrolling in the Global Entry Program.  The Ban will also prohibit some 175,000 more from re-enrolling in Global Entry by

---

[21] *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (Feb. 8, 2020, 2:40 PM), https://twitter.com/realDonaldTrump/status/1226229268830662656; Donald J. Trump (@realDonaldTrump), Twitter (Dec. 28, 2019, 4:14 PM), https://twitter.com/realdonaldtrump/status/1211032731012018182; Donald J. Trump (@realDonaldTrump), Twitter (Nov. 7, 2019, 7:08 PM), https://twitter.com/realDonaldTrump/status/1192594646691729408.

the end of 2020.  This blanket ban countermands IRTPA's dictate that enrollment be "convenient and easily accessible."  Indeed, the ban does far more than make enrollment "inconvenient"—for New York residents, enrollment and re-enrollment is now impossible and entirely inaccessible.

65.     Second, the Ban has introduced inconsistency into the application process.  New York residents are subject to different eligibility requirements than residents from any other state.  Not only does this violate IRTPA's mandate, but also creates confusion for former and future New York residents who may not be able to determine how the Ban impacts their eligibility as they move to or from New York.

66.     The Trusted Traveler Ban is inconsistent with the regulations Defendants have promulgated to implement the IRTPA as well.

67.     Under Defendants' regulations, Global Entry Program applicants are not required to submit a U.S. state driver's license to be accepted into the program.  Rather, any U.S. citizen, U.S. lawful permanent resident, or citizen from a partner country with a valid, machine-readable passport is eligible for the Global Entry Program so long as they do not fall into the disqualifying categories listed at 8 C.F.R. § 235.12(b)(2).

68.     Pursuant to Section 235.12(b)(2), CBP is only empowered to disqualify "[a]n individual" as ineligible upon a "risk determination" that "the *individual* presents a potential risk for terrorism, criminality (such as smuggling), or is otherwise not a low-risk traveler." 8 C.F.R. § 235.12(b)(2) (emphasis added).

69.     CBP's regulations governing suspension and revocation of Global Entry Program participation carry the same limitations.  Section 235.12(j) states that a Global Entry Program "*participant* may be suspended or removed" upon a determination that "the participant" is disqualified under Section 235.12(b)(2); "the participant" has provided false information during

17

the application; "the participant" has failed to follow the program's terms, conditions, and requirements; or "such action is otherwise necessary."  8 C.F.R. § 235.12(j) (emphasis added).

70.     The plain meaning of these regulations predicates eligibility, suspension, and revocation upon individualized consideration of each applicant.  Here, Defendants have not made any individualized determinations that any single New York resident seeking to enroll or re-enroll in the Global Entry Program presents a security risk or has otherwise failed to qualify for Global Entry under CBP's regulations.

**C.     The Trusted Traveler Ban is not supported by any rational justification.**

71.     Defendants' explanation for the Trusted Traveler Ban is irrational and unsupported by the evidence.

72.     The February 5 Letter announcing the Trusted Traveler Ban cites New York's enactment of the Green Light Law in 2019 as the sole basis for Defendants' decision.

73.     The February 5 Letter contends that the Green Light Law "prevents DHS from accessing relevant information that only New York DMV maintains, including some aspects of an individual's criminal history," and therefore "compromises CBP's ability to confirm whether an individual applying for [Trusted Traveler program] membership meets program eligibility requirements."  Ex. 1 at 2.

74.     The letter does not specify the criminal history information that is purportedly available to DHS solely through New York DMV, and does not explain how DHS was previously able to verify program eligibility for New York residents whose personal information was not included within New York DMV records.

75.     Any criminal history information contained in New York DMV records is duplicated in records disseminated to the New York State Division of Criminal Justice Services, which in turn shares such information with the FBI.

18

76.     According to John Sandweg, former Acting Director of ICE, the Trusted Traveler

Ban is "irrational in the sense that sanctuary policies in no way shape or form affect DHS' ability

to vet people for global entry and other trusted traveler programs."[22]

77.     The February 5 Letter extensively criticizes the Green Light Law because of its

purported impact on Defendants' operations that have nothing to do with CBP's administration

of the Trusted Traveler programs.  For example, the February 5 Letter expresses extensive

concern that the Green Light Law limits information-sharing related to ICE immigration

enforcement efforts, which are not related to CBP's administration of the Trusted Traveler

programs.

78.     The February 5 Letter does not identify any connection between ICE's interior

immigration enforcement efforts and CBP's administration of the Trusted Traveler programs.

The February 5 Letter nonetheless explains that Defendants have terminated New Yorkers'

ability to enroll and re-enroll in the Trusted Traveler programs because that law purportedly has

a broad "negative impact on Department operations" and an "adverse impact on national security

and law enforcement."

79.     Acting Secretary Wolf wrote in the February 5 Letter that "DHS would prefer to

continue our long-standing cooperative relationship with New York."  But the letter offers no

explanation for why the agency took immediate action to terminate enrollment in the Trusted

Traveler programs, with no notice or opportunity for public comment, and without any

discussion with state officials regarding alternative sources for the data Defendants claim to

---

[22] Caroline Kelly et al., *DHS bans New Yorkers from Global Entry and other programs over state law allowing undocumented immigrants to get driver's licenses*, CNN (Feb. 6, 2020), https://www.cnn.com/2020/02/06/politics/department-homeland-security-new-york-trusted-traveler-programs.

need.

80.     Defendants also failed to consider important aspects of the problem, including the

foreseeable risk that the Trusted Traveler Ban will increase threats to public safety.

**IV.     The Trusted Traveler Ban harms New York.**

81.     The Trusted Traveler Ban harms New York's sovereign, quasi-sovereign,

economic, and proprietary interests.

82.     Defendants acknowledge that the Trusted Traveler Ban injures New York.

Defendant Mark Morgan, the Acting Commissioner of CBP, stated after the Ban was

implemented: "We recognize that many NY residents and businesses will be negatively affected,

but we cannot compromise the safety & security of our homeland."[23]

**A.     New York and its residents will be directly and immediately impacted by
DHS's arbitrary decision to bar New Yorkers from enrollment in the
Trusted Traveler programs.**

83.     The Trusted Traveler programs have a total of 9.6 million enrollees, with more

than 7 million individuals enrolled in the Global Entry Program.[24]

84.     Approximately 175,000 New Yorkers currently enrolled in the Trusted Traveler

programs have memberships that expire this year.[25]  These New Yorkers will be unable to re-

---

[23] Mark Morgan (@CBPMarkMorgan), Twitter (Feb. 6, 2020, 5:20 PM),
https://twitter.com/CBPMarkMorgan/status/1225544854131875844.

[24] Michelle Hackman, *Homeland Security Steps up Feud as It Blocks New Yorkers from Global
Entry Program*, Wall St. J. (Feb. 6, 2020), https://www.wsj.com/articles/homeland-security-
steps-up-feud-as-it-blocks-new-yorkers-from-global-entry-program-11581023240.

[25] Azi Paybarah, *Freeze on Global Entry Enrollment for New Yorkers: What we Know*, N.Y.
Times (Feb. 6, 2020), https://www.nytimes.com/2020/02/06/nyregion/global-entry-what-to-
know.html.

enroll in the Trusted Traveler programs because of Defendants' actions.

85.     An additional 80,000 New Yorkers whose applications are currently pending will be immediately impacted by Defendants' actions.  DHS has conditionally approved roughly 50,000 New York residents for the Trusted Traveler programs; 30,000 additional residents are currently in the application process.  These New Yorkers will be, in the words of a senior DHS official, immediately "cut off."[26]

86.     An additional 30,000 drivers in the FAST program will lose access to those automated systems.[27]

87.     Millions more New Yorkers who would otherwise be eligible to apply for Global Entry and other Trusted Traveler programs are now categorically ineligible.

88.     As fewer New Yorkers enroll and re-enroll in the Trusted Traveler programs, consequences will ripple throughout the state.  Congested lines at New York's airports and border crossings will strain resources at the border and undermine safety for all travelers.  New York's economy will suffer as wait times at border crossings increases, employers doing global business are placed at a competitive disadvantage, and residents who rely on cross-border travel lose access to these programs.

**B.     Defendants' arbitrary decision to target New York residents will undermine public safety for all travelers using New York's airports.**

89.     New York's airports are incredibly busy transportation hubs.  In 2018, the three

---

[26] Caroline Kelly, *DHS Bans New Yorkers from Global Entry*, CNN (Feb. 6, 2020), https://www.cnn.com/2020/02/06/politics/department-homeland-security-new-york-trusted-traveler-programs/index.html.

[27] *Id.*

major airports that serve the New York City metropolitan region served more than 138 million passengers.[28]

90.     As CBP itself concedes, its resources for screening passengers are strained: "Continued growth in international trade and travel, expanding mission requirements, and new facility demands continue to strain CBP resources and CBP efforts to secure the homeland."[29]

91.     Given CBP's limited resources, the Trusted Traveler programs are among the primary tools that enable the agency to meet security needs.  Global Entry and related programs have "saved over 1.4 million inspectional hours and almost 1,200 [Customs and Border Protection Officer] equivalents through FY 2016."[30]

92.     Indeed, CBP acknowledges that the Trusted Traveler programs "provide the platform from which CBP can achieve operational success in the face of increased border traffic, budget constraints, and demand for new and expanded services."[31]

93.     The Global Entry Program provides expedited clearance for pre-approved, low-risk travelers arriving in the United States.  By effectively excluding frequent travelers who have been vetted and screened from the standard customs lines, Global Entry allows CBP officers to focus their time and resources on passengers whose threat status is unknown.

94.     CBP officers seek to identify the proverbial needle in the haystack—the small

---

[28] Port Auth. of N.Y. & N.J., *2000–2018 Monthly Airport Traffic Report Archives*, https://www.panynj.gov/airports/en/statistics-general-info/Monthly_Airport_Activities.html.

[29] U.S. Customs & Border Prot., *Resource Optimization at the Ports of Entry*, at ii (Sept. 12, 2017), https://www.cbp.gov/sites/default/files/assets/documents/2018-Feb/01%20FINAL%20FY%202017%20CBP%20-%20Resource%20Optimization%20Strategy%20at%20POEs_0.pdf; *see also id.* at 2 ("Staffing challenges . . . continue to increase as CBP takes on additional mission requirements" and "trade and traveler volumes continue to grow").

[30] *Id.* at iii.

[31] *Id.* at 2.

number of passengers who pose a security risk among the far larger number who pose no threat at all.

95.     By reducing participation in the Trusted Traveler programs, Defendants' decision to implement the Trusted Traveler Ban for New York residents will undermine CBP officers' ability to focus their efforts on higher risk travelers and will burden already-strained security systems.  In so doing, Defendants' policy will make all travelers less safe.

96.     The impact of the Trusted Traveler Ban will be felt most acutely in New York State.  As New York residents returning home from abroad can no longer avail themselves of the Trusted Traveler programs, the airports to which they return will have longer lines, strained security resources, and heightened security risks.

**C.     Defendants' decision will harm New York's economy.**

97.     New York is a global center for commerce, tourism, and business.  New York City alone is home to 4.5 million jobs and more Fortune 500 companies than any other city in North America.  Over 65 million visitors come to New York City every year.[32]

98.     New York City recruits businesses and industry to New York by, *inter alia*, highlighting the metro area's "largest airport system in the United States," which is "first in the world in terms of total flight operations."[33]

99.     The Trusted Traveler Ban adds hurdles to international business travel for companies doing business and employees residing in New York State.  As such, the Trusted Traveler Ban puts New York at a competitive disadvantage for recruiting and retaining business as compared to all other states whose residents retain unfettered access to the Trusted Traveler

---

[32] N.Y.C. Econ. Dev't Corp., *Why New York City?*, https://edc.nyc/why-nyc.

[33] *Id.*

programs.  By denying New Yorkers access to the Trusted Traveler programs, businesses that

rely on their employees to conduct cross-border travel—including, for example, the cargo and

trucking industries—will be forced to either hire non-New Yorkers for these jobs or suffer a

competitive disadvantage in the marketplace.

100.    Moreover, the added wait time resulting from Defendants' policy will cause direct

economic harm to New York State.  Wait time at border crossings in New York directly impacts

New York's economy.  Economists have estimated that adding one additional CBP Officer to

thirteen border crossings across the country would, by reducing wait time at the border, add

$64.8 million to the gross domestic product, create 1,084 jobs, and save $21.2 million in the

value of time gained.[34]  Researchers estimate that reducing wait time at John F. Kennedy Airport

alone could save millions of dollars in lost time.[35]

101.    Trusted Traveler programs are particularly vital to economic functioning around

New York's northern border, where workers and shoppers routinely use such programs to cross

the U.S.-Canada border expeditiously.

102.    Indeed, the NEXUS program is expressly designed to "facilitate lawful trade" and

"encourage[] cross-border travel, supporting both American and Canadian economies."[36]  More

---

[34] *See* Bryan Roberts et al., *The Impact on the U.S. Economy of Changes in Wait Times at Ports of Entry*, 35 Transp. Policy 162, 165 (Sept. 2014).

[35] *Id.*; *see also, e.g.*, *Port of Entry Infrastructure: How Does the Federal Government Prioritize Investments?: Hearing before the Subcomm. on Border & Maritime Sec. of the H. Comm. on Homeland Sec.*, 113th Cong. 4, 6-7 (2014) (growing wait times at ports of entry cost the economy and consumers "billions").

[36] U.S. Dep't of Homeland Sec., *The United States and Canada Announce Plans to Increase NEXUS Benefits* (May 8, 2012), https://www.dhs.gov/news/2012/05/08/united-states-and-canada-announce-plans-increase-nexus-benefits.

than 2 million commercial trucks and 11 million passenger vehicles traveled between New York and Canada in 2018.[37]  Economists have estimated that border delays on the U.S.-Canada border cost American businesses billions of dollars each year, and result in tens of thousands of jobs lost.[38]

103.    By making such travel more difficult and time-consuming, Defendants' policy will have direct and deleterious impacts on New York's economy and job market.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## (U.S. Constitution amend. X—Equal Sovereignty)

104.    Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

105.    The Tenth Amendment requires the federal government to respect the equal sovereignty of the sovereign states.  *Shelby Cty. v. Holder*, 570 U.S. 529, 544 (2013).

106.    Without adequate justification, the Trusted Traveler Ban impermissibly targets New York for unfavorable treatment because the State exercised its sovereign authority to enact the Green Light Law.

107.    The Trusted Traveler Ban thereby violates the Tenth Amendment and the constitutional guarantee of federalism.

108.    Defendants' violation causes ongoing harm to New York and its residents.

---

[37] The Buffalo & Fort Erie Pub. Bridge Auth., *2018 Traffic Statistics Issued by the Bridge & Tunnel Operators Association* (Jan. 17, 2019), https://www.peacebridge.com/index.php/media-room/press-releases-advisories/381-btoa-2018-stats.

[38] New Int'l Trade Crossing, *Study: Border delays cost U.S. and Canada $30 billion every year* (Apr. 29, 2011), https://mirsnews.com/pdfs/pdfs/Press_Releases/1304089398_Dric2.pdf.

## SECOND CLAIM FOR RELIEF

### (U.S. Constitution amend. X—Coercion)

109.    Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

110.    The Tenth Amendment prohibits the federal government from coercing states to legislate or promote policies that capitulate to federal interests.

111.    The Trusted Traveler Ban punishes New York and New York's residents in an attempt to coerce New York to change its policies.

112.    The Trusted Traveler Ban thereby violates the Tenth Amendment and its protection against federal coercion of the states.

113.    Defendants' violation causes ongoing harm to New York and its residents.

## THIRD CLAIM FOR RELIEF

### (Administrative Procedure Act—Without Observance of Procedure Required by Law)

114.    Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

115.    The Administrative Procedure Act provides that courts must "hold unlawful and set aside" agency action promulgated "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

116.     The APA requires agencies to publish notice of all proposed rulemakings in a manner that "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ."  5 U.S.C. § 553(c); *see also id.* § 553(b).

117.    The Trusted Traveler Ban is a "rule" as that term is used in the APA.  5 U.S.C. § 551(4).

118.    Defendants provided no opportunity for public comment on the Trusted Traveler

Ban.

119.    The APA further requires that "publication . . . of a substantive rule shall be made not less than 30 days before its effective date," except "for good cause found and published with the rule."  5 U.S.C. § 553(d).

120.    The Trusted Traveler Ban was issued with immediate effect, and Defendants did not find or publish a finding of good cause with the Ban.

121.    The Trusted Traveler Ban is therefore unlawful and must be set aside because it was promulgated without observance of procedure required by law, in violation of the APA.  5 U.S.C. §§ 553(b)–(d); 706(2)(D).

122.    Defendants' violation causes ongoing harm to New York and its residents.

## FOURTH CLAIM FOR RELIEF

### (Administrative Procedure Act—Not in Accordance with Law)

123.    Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

124.    The Administrative Procedure Act provides that the Court "shall" "hold unlawful and set aside" agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

125.    The Trusted Traveler Ban does not comply with the statutory requirement under the Intelligence Reform and Terrorism Prevention Act that Defendants make Trusted Traveler programs as accessible as possible, and include as many participants as practicable.

126.    The Trusted Traveler Ban does not comply with the statutory requirement that the Commissioner of CBP "shall . . . facilitate and expedite the flow of lawful travel and trade."  6 U.S.C. § 211(c)(3).

127.    The Trusted Traveler Ban does not comply with DHS regulations requiring an individualized determination of risk before denying, suspending, or revoking participation in the

Global Entry Program.

128.    The Trusted Traveler Ban is therefore "not in accordance with law" as required by the APA.  5 U.S.C. § 706(2)(A).

129.    Defendants' violation causes ongoing harm to New York and its residents.

## FIFTH CLAIM FOR RELIEF

### (Administrative Procedure Act—Arbitrary and Capricious)

130.    Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

131.    The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

132.    The Trusted Traveler Ban is arbitrary and capricious because Defendants' justification for the decision runs counter to the evidence before the agency, disregards material facts and evidence, relies on factors Congress did not intend the agency to consider, and fails to fully consider the foreseeable harms of the agency's decision.

133.    The Trusted Traveler Ban is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA.  5 U.S.C. § 706(2)(A).

134.    Defendants' violation causes ongoing harm to New York and its residents.

## SIXTH CLAIM FOR RELIEF

### (U.S. Constitution amend. V—Due Process Clause)

135.    Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

136.    The equal protection component of the Due Process Clause of the Fifth Amendment prohibits the federal government from taking action to discriminate against the residents of one state unless that action is rationally related to a legitimate government interest.

28

137.    Defendants' decision to target all New York residents by categorically excluding them from enrollment or re-enrollment in the Trusted Traveler programs is not rationally related to any legitimate government interest.

138.    The Trusted Traveler Ban targets all New York residents for discriminatory treatment with no rational basis.

139.    The Trusted Traveler Ban was motivated, at least in part, by a desire to injure New York and its residents.

140.    Defendants' violation causes ongoing harm to New York and its residents.

### PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

1.    Issue an order holding unlawful, vacating, and setting aside the Trusted Traveler Ban;

2.    Declare that the Trusted Traveler Ban is unconstitutional;

3.    Declare that the Trusted Traveler Ban was implemented without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D);

4.    Declare that the Trusted Traveler Ban is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

5.    Enjoin Defendants and all their officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Trusted Traveler Ban;

6.    Postpone the effective date of the Trusted Traveler Ban pursuant to 5 U.S.C. § 705;

7.    Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees; and

8.      Grant such other and further relief as the Court deems just and proper.


DATED:  February 10, 2020                    Respectfully submitted,

                                             LETITIA JAMES
                                             *Attorney General of the State of New York*

                                             By: */s/ Matthew Colangelo*
Jeffrey W. Lang                              Matthew Colangelo
   *Deputy Solicitor General*                   *Chief Counsel for Federal Initiatives*
Linda Fang                                   Elena Goldstein
   *Assistant Solicitor General*                *Deputy Chief, Civil Rights Bureau*
                                             Daniela Nogueira,* *Assistant Attorney General*
*Of Counsel*                                 Office of the New York State Attorney General
                                             28 Liberty Street
                                             New York, NY 10005
                                             Phone: (212) 416-6057
                                             Matthew.Colangelo@ag.ny.gov

                                             *Attorneys for the State of New York*


*S.D.N.Y. application for admission pending.