UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br><br>                    Plaintiff,<br><br>       -v-<br><br>CHAD F. WOLF, *in his official capacity as Acting Secretary of Homeland Security,* et al.,<br><br>                    Defendants. | No. 20 Civ. 1127 (JMF) |
| R. L'HEUREUX LEWIS-MCCOY et al., *on behalf of themselves and all similarly situated individuals,*<br><br>                    Plaintiffs,<br><br>       -v-<br><br>CHAD F. WOLF, *in his official capacity as Acting Secretary of Homeland Security*, et al.,<br><br>                    Defendants. | No. 20 Civ. 1142 (JMF) |

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANTS' PARTIAL MOTION TO DISMISS NEW YORK'S COMPLAINT
### AND THE CLASS-ACTION AMENDED COMPLAINT

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2728, 2745, 2761
Fax: (212) 637-2717
E-mail: Zachary.Bannon@usdoj.gov
           Elizabeth.Kim@usdoj.gov
           Christopher.Connolly@usdoj.gov

ZACHARY BANNON
ELIZABETH J. KIM
CHRISTOPHER K. CONNOLLY
Assistant United States Attorneys
– Of Counsel –

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................................I

TABLE OF AUTHORITIES ...................................................................................... II

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ........................................................................................................ 2

    I.    THE INTELLIGENCE REFORM AND TERRORISM PREVENTION ACT OF 2004 AND THE TTPs.. 2

    II.   NEW YORK'S DRIVER'S LICENSE ACCESS AND PRIVACY ACT: THE GREEN LIGHT LAW. .... 4

    III.  THE TTP DECISION ........................................................................ 5

    IV.  THE COMPLAINTS ........................................................................ 6

STANDARD OF REVIEW ........................................................................................ 9

ARGUMENT .......................................................................................................... 10

    I.    THE TTP DECISION DOES NOT DENY NEW YORK "EQUAL SOVEREIGNTY" UNDER THE
TENTH AMENDMENT........................................................................................... 10

        A.    *The TTP Decision Does Not Impinge on Core Aspects of State Sovereignty.* .............. 11

        B.    *The TTP Decision is Sufficiently Related to the Problem It Targets.* ........................... 13

        C.    *The Motives Underlying the TTP Decision Are Not Relevant to an Equal Sovereignty
Claim.*.............................................................................................................. 15

    II.   THE TTP DOES NOT UNLAWFULLY COERCE NEW YORK IN VIOLATION OF THE TENTH
AMENDMENT. ..................................................................................................... 15

        A.    *The Motivations Underlying the TTP Decision Are Not Relevant Under the Coercion
Doctrine.* ......................................................................................................... 16

        B.    *Plaintiffs Have Not Identified Any Financial Inducement on the State of New York.* .. 17

        C.    *The TTP Policy Is Not Unduly Coercive*....................................................... 19

    III.  THE TTP POLICY RATIONALLY TARGETS RESIDENTS OF STATES THAT HAVE HAMPERED
ENFORCEMENT OF THE TTP. ............................................................................... 21

CONCLUSION ...................................................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................. 9
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................. 9
*Cantor Fitzgerald Inc. v. Lutnick*,
  313 F.3d 704 (2d Cir. 2002) .............................................................................. 9, 11
*Chevron Corp. v. Naranjo*,
  667 F.3d 232 (2d Cir. 2012) .................................................................................. 10
*Cty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................................................... 7
*FCC v. Beach Communications, Inc.*,
  508 U.S. 307 (1993) .......................................................................................... 22, 23
*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ................................................................................................ 12
*In re Border Infrastructure Environmental Litigation*,
  284 F. Supp. 3d 1092 (S.D. Cal. 2018) .................................................................. 12
*Japan Line, Ltd. v. Cty. of Los Angeles*,
  441 U.S. 434 (1979) ................................................................................................ 12
*Lehnhausen v. Lake Shore Auto Parts Co.*,
  410 U.S. 356 (1973) ................................................................................................ 22
*Mayhew v. Burwell*,
  772 F.3d 80 (1st Cir. 2014) .................................................................................... 12
*Morgan v. Virginia*,
  328 U.S. 373 (1946) ................................................................................................ 12
*Nat. Collegiate Athletic Ass'n v. Gov. of New Jersey*,
  730 F.3d 208 (3d Cir. 2013) .............................................................................. 12, 13
*New York v. U.S. Dep't of Health and Human Services*,
  414 F. Supp. 3d 475 (S.D.N.Y. 2019) ................................................................... 20
*New York v. U.S. Dep't of Justice*,
  343 F. Supp. 3d 213 (S.D.N.Y. 2018) ..................................................................... 7
*Northwest Austin Municipal Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009) .......................................................................................... 11, 13
*Oklahoma v. Civil Service Comm'n*,
  330 U.S. 127 (1947) ................................................................................................ 15
*Progressive Credit Union v. City of New York*,
  889 F.3d 40 (2d Cir. 2018) ..................................................................................... 21
*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ......................................................................................... *passim*
*Shelby County v. Holder*,
  570 U.S. 529 (2013) ......................................................................................... *passim*
*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) .......................................................................................... 13, 14

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ................................................................................ 16, 17, 19
*State of New York v. Mnuchin*,
   408 F. Supp. 3d 399 (S.D.N.Y. 2019) ................................................................ *passim*
*State v. Dep't of Justice*,
   951 F.3d 84 (2d Cir. 2020) ................................................................................ *passim*
*Steward Machine Co. v. Davis*,
   301 U.S. 548 (1937) ................................................................................................ 16
*United States Railroad Retirement Bd. v. Fritz*,
   449 U.S. 166 (1980) ................................................................................................ 22
*United States v. Cohen*,
   733 F.2d 128 (D.C. Cir. 1984) ................................................................................ 21

## Statutes

5 U.S.C. § 706 ................................................................................................................ 10
5 U.S.C. § 706(2)(B) ...................................................................................................... 10
8 U.S.C. § 1365b(k)(3)(A)…………………………………………………………..2
28 U.S.C. § 2201 ............................................................................................................ 10
*Driver's License Access and Privacy Act*, S1747B ........................................................ 1
*New York Senate Bill* 7508B ........................................................................................ 1

## Regulations

8 C.F.R. § 235.1(b)(4) ...................................................................................................... 4
8 C.F.R. § 235.12 .............................................................................................................. 2
8 C.F.R. § 235.12(b)(1) .................................................................................................... 3
8 C.F.R. § 235.12(b)(2)(i) .............................................................................................. 22

## Other Authorities

*The Racial Evolution of Justice Kennedy and Its Implications for Law, Theory, and the End of the Second Reconstruction*,
   2015 Mich. St. L. Rev. 1473 (2015) ...................................................................... 11
*Unteachable: Shelby County, Canonical Apostasies, and a Way Forward for the Voting Rights Act*,
   67 SMU L. Rev. 3 (2014) ...................................................................................... 11

## PRELIMINARY STATEMENT

U.S. Customs and Border Protection ("CBP"), a component of the U.S. Department of Homeland Security ("DHS"), relies on information maintained by New York's Department of Motor Vehicles ("DMV") to facilitate vetting for the Trusted Traveler Programs ("TTPs"), which provide pre-approved, low-risk travelers expedited processing into the United States through dedicated lanes and kiosks.  But on December 14, 2019, New York restricted its DMV from sharing its records with CBP or any other "agency that primarily enforces immigration law." *Driver's License Access and Privacy Act*, S1747B, § 12(a), (c) (also known as the "Green Light Law").[1]  Faced with loss of access to New York DMV records, which limited CBP's ability to determine whether an applicant meets eligibility requirements for the TTPs, Acting Secretary of Homeland Security Chad Wolf advised the DMV that CBP would no longer permit New York residents to enroll or re-enroll in the TTPs (the "TTP Decision").  *New York v. Wolf, et al.*, No. 20 Civ. 1127 (JMF), Dkt. No. 1-1 ("TTP Decision") at 4.

Plaintiffs in *New York v. Wolf, et al.*, 20 Civ. 1227 (JMF) (S.D.N.Y.) ("New York") and *Lewis-McCoy, et al. v. Wolf, et al.*, 20 Civ. 1142 (JMF) (S.D.N.Y.) (the "Class-Action Plaintiffs" and, together with New York, "Plaintiffs"), challenge the TTP Decision under the Fifth and Tenth Amendments and the Administrative Procedure Act ("APA").  Plaintiffs allege that DHS issued

---

[1] New York's recently-enacted budget amended the Green Light Law to authorize disclosure of DMV information "as necessary for individuals seeking acceptance into a trusted traveler program, or to facilitate vehicle imports and/or exports."  *2019 New York Senate Bill*, 7508B (enacted April 3, 2020).  To date, the New York DMV had not restored CBP's access to its records.  As such, this motion responds to the currently operative complaints—*New York v. Wolf, et al.*, No. 20 Civ. 1127 (JMF), Dkt. No. 1 ("NY Compl.")  (S.D.N.Y. Feb. 10, 2020), and *Lewis-McCoy, et al. v. Wolf, et al.*, 20 Civ. 1142 (JMF), Dkt. No. 24 ("Class-Action Compl.") (S.D.N.Y. Apr. 1, 2020)—rather than speculating on when and how New York may change its data-sharing practices.

the TTP Decision in retaliation for New York's sanctuary city policies.  Even accepting Plaintiffs' allegations as true, their constitutional claims are not actionable.  Accordingly, Plaintiffs' Fifth and Tenth Amendment claims should be dismissed for failure to state a claim.

## BACKGROUND

### I.   The Intelligence Reform and Terrorism Prevention Act of 2004 and the TTPs.

The TTPs find their statutory basis in the Intelligence Reform and Terrorism Prevention Act of 2004 (the "IRTPA" or the "Act").  The IRTPA provides that "[t]he Secretary of Homeland Security shall establish an international registered traveler program . . . to expedite the screening and processing of international travelers . . . who enter and exit the United States."  8 U.S.C. § 1365b(k)(3)(A).  The Act directs the Secretary of Homeland Security to initiate rulemaking "to establish the program, criteria for participation, and the fee for the program."  *Id.* § 1365b(k)(3)(C). Congress provided the Secretary with three pieces of guidance in designing the program: (1) it should have "a reasonable cost of enrollment," *id.* § 1365b(k)(3)(E)(i); (2) "program enrollment" should be "convenient and easily accessible," *id.* § 1365b(k)(3)(E)(ii); and (3) applicants should be provided "clear and consistent eligibility guidelines," *id.* § 1365b(k)(3)(E)(iii).

Pursuant to the IRTPA's mandate, the Secretary of Homeland Security created a number of Trusted Traveler Programs, including Global Entry, NEXUS, Secure Electronic Network for Travelers Rapid Inspection ("SENTRI"), and the Free and Secure Trade ("FAST") program for commercial truck drivers.  Each program implements the IRTPA's goal of expedited screening of international travelers that CBP has determined to be low risk.

The Global Entry Program, 8 C.F.R. § 235.12, "is a voluntary international trusted traveler program consisting of an integrated passenger processing system that expedites the movement of low-risk air travelers into the United States by providing an alternate inspection process for pre-approved, pre-screened travelers."  *Id.* § 235.12(a).  "U.S. citizens, U.S. nationals, [] U.S. lawful

permanent residents," and "certain nonimmigrant aliens from countries that have entered into arrangements with CBP" "may apply to participate in Global Entry" so long as they hold proper documentation as specified in 8 C.F.R. § 235.12(b)(1) and do not meet certain "disqualifying factors." *Id.* § 235.12(b)(1)(i)–(ii). "Disqualifying factors" include an applicant giving "false or incomplete information on the application," having been "arrested for, or convicted of, any criminal offense or [having] pending criminal charges or outstanding warrants in any country," or being "the subject of an investigation by any federal, state, or local law enforcement agency in any country." *Id.* § 235.12(b)(2)(i), (ii), (iv). Based on these "disqualifying factors," an individual can be ineligible to participate in Global Entry "if CBP, at its sole discretion, determines that the individual," among other things, "presents a potential risk for terrorism, criminality (such as smuggling), or is otherwise not a low-risk traveler." *Id.* § 235.12(b)(2).

"If an applicant is denied participation in Global Entry, CBP will notify the applicant of the denial, and the reasons for the denial." *Id.* § 235.12(j)(1). "An individual whose application is denied or whose participation is suspended or terminated has three possible methods for redress," *id.* § 235.12(k): (1) They may contest their denial at the enrollment center where their interview was conducted, *id.* § 235.12(k)(1); (2) they may initiate a redress process through DHS's Traveler Redress Inquiry Program, *id.* § 235.12(k)(2); or (3) they may contest their denial by writing to the CBP Trusted Traveler Ombudsman, *id.* § 235.12(k)(3). The Global Entry regulations provide that "[t]hese processes do not create or confer any legal right, privilege or

benefit on the applicant or participant, and are wholly discretionary on the part of CBP."  *Id.*

§ 235.12(k).[2]

## II. New York's Driver's License Access and Privacy Act: the Green Light Law.

Because eligibility for CBP's Trusted Traveler Programs is determined by reference to

state and local criminal histories, arrest records, and investigations, CBP relies on partnerships

with state and local agencies to determine eligibility for TTPs.  "New York DMV makes the

records and information maintained in its databases about the State's drivers available to various

government agencies for use in carrying out those agencies' functions" provided that the agencies

"execute a memorandum of understanding with DMV describing the intended use of any

information obtained through searches of DMV's records."  NY Compl. ¶ 48.  "Pursuant to such

memoranda of understanding, before the date of the Green Light Law, DHS was granted access to

DMV's records."  *Id.* ¶ 49.  But "[o]n December 14, 2019, as required by the Green Light Law,

New York DMV restricted DHS's access to DMV's records."  *Id.* ¶ 50.

New York's Driver's License Access and Privacy Act, also known as the Green Light Law,

was signed into law by Governor Andrew Cuomo on June 17, 2019.  The Green Light Law

eliminates information sharing between the DMV and "any agency that primarily enforces

immigration law," which specifically includes U.S. Immigration and Customs Enforcement

("ICE") and CBP.  S1747B § 12.  In addition, the law expands access to New York State driver's

licenses to undocumented immigrants by allowing a foreign passport, consular identification

document, or foreign driver's license to be offered as "proof of identity, age, and fitness," and by

---

[2] NEXUS, SENTRI, and FAST apply to travel across the United States' borders with Mexico
and/or Canada (land and/or sea), and operate under a similar set of eligibility requirements to
Global Entry.  *See* 8 C.F.R. § 235.1(b)(4).  For ease of reference, the government will use the
Global Entry program as a representative example for all of the relevant TTPs.

allowing an "affidavit signed by [an] applicant that they have not been issued a social security number" in lieu of requiring a social security number. *Id.* § 3.

The Green Light Law eliminated information sharing by the DMV by adding two new sections to New York's Vehicle Code.  Section 12(a) of the Green Light Law provides that "the Commissioner [of Motor Vehicles] . . . shall not disclose or make accessible in any manner records or information that he or she maintains to any agency that primarily enforces immigration law or to any employee or agent of such agency, unless the Commissioner is presented with a lawful court order or judicial warrant signed by a judge appointed pursuant to Article III of the United States Constitution."   That section continues: "[u]pon receiving a request for such records . . . the Commissioner shall, no later than three days after such request, notify the individual about whom such information was requested, informing such individual of the request and the identity of the agency that made such request."  *Id.* § 12(a).  Section 12(b) expands this information restriction beyond agencies "that primarily enforce[] immigration law."  It provides that "the Commissioner shall require any person or entity that receives or has access to records or information from the Department to certify to the Commissioner, before such receipt or access, that such person or entity shall not . . . disclose  such  records  or  information  to  any  agency  that  primarily  enforces immigration law."   In other words, any federal agency seeking DMV records to implement a federal program must attest that it will abide by New York's policy restricting the flow of information to agencies that primarily enforce immigration law.

### III.   The TTP Decision

On February 5, 2020, Acting Secretary Wolf sent a letter to Acting Commissioner of the New York State DMV Mark J.F. Schroeder and Executive Deputy Commissioner Theresa L. Egan informing them that "New York residents w[ould] no longer be eligible to enroll or re-enroll in

CBP's Trusted Traveler Programs" and that "the exporting of used vehicles titled and registered in New York w[ould] be significantly delayed and could also be costlier."  TTP Decision at 4.

The letter explains that the Green Light Law "precludes [CBP] and [ICE] from accessing and validating pertinent information contained in New York DMV records that is operationally critical in DHS's efforts to keep our nation secure."  *Id.* at 2.  In addition, the law blocks "other state law enforcement agencies and departments" from assisting CBP and ICE.  *Id.*  "Having access to New York DMV information has enabled CBP to validate that an individual applying for [TTP] membership qualifies for low-risk status" because, among other things, those individuals' "criminal history affects their eligibility."  *Id.*   Acting Secretary Wolf also explained that the Green Light Law's data-sharing restriction "delays a used vehicle owner's ability to obtain CBP authorization for exporting their vehicle."  *Id.* at 3.  The TTP Decision discusses only the Green Light Law's restriction of information sharing with CBP and ICE.  It makes no reference to the Green Light Law's separate provision entitling undocumented immigrants to state driver's licenses.

### IV.   The Complaints

New York alleges that "[t]he decision to terminate enrollment in the Trusted Traveler programs solely for New York residents is an intentional effort by Defendants to cause disproportionate injury to New York and New Yorkers."  NY Compl. ¶ 55.  New York attempts to substantiate this allegation by pointing to President Donald J. Trump's criticism of "New York's sanctuary policies" in his State of the Union Address, *id.* ¶ 56, and Acting Secretary Wolf's statement the day after that "DHS will soon announce measures to counter dangerous state and local laws that prohibit coordination with DHS law enforcement officers," *id.* ¶ 57.  New York

also points to other circumstances in which the federal government "unlawfully"[3] sought "to compel state adherence to the federal government's immigration policy agenda." *Id.* ¶ 58. New York concludes that the "purpose of the Trusted Traveler Ban is to compel New York to change its policies or to punish the state for refusing to do so." *Id.* ¶ 59.

New York's Complaint also alleges that the TTP Decision "is not supported by any rational justification." NY Compl. ¶¶ 71-80. It alleges that the TTP Decision's statement that the Green Light Law "compromises CBP's ability to confirm whether an individual applying for Trusted Traveler program membership meets program eligibility requirements," *id.* ¶ 73, lacks any rational basis because (1) "[t]he letter does not specify the criminal history information that is purportedly available to DHS solely through New York DMV," *id.* ¶ 74; (2) the letter "does not explain how DHS was previously able to verify program eligibility for New York residents whose personal information was not included within New York DMV records," *id.*; and (3) any criminal history information contained in DMV records are available elsewhere, *id.* ¶ 75; *but see* Class-Action Compl. ¶ 38 ("the only information that is potentially uniquely in DMV records relates to an individual's New York driving record . . . including non-felony arrests for driving while under the influence of drugs or alcohol"). New York criticizes the TTP Decision for referring to operational effects on ICE, another DHS component. NY Compl. ¶¶ 77-78. And New York further alleges that the TTP Decision: (1) did not provide notice or opportunity for public comment, (2) did not discuss with state officials other sources for the data sought, and (3) "failed to consider important aspects of the problem." *Id.* ¶¶ 79-80.

---

[3] New York cites two examples of purportedly "unlawful" federal actions: *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017), and *New York v. U.S. Dep't of Justice*, 343 F. Supp. 3d 213 (S.D.N.Y. 2018). *New York v. U.S. Dep't of Justice* has since been vacated by the Second Circuit, which concluded that the federal initiative at issue was both statutorily authorized and neither arbitrary nor capricious. *See State v. Dep't of Justice*, 951 F.3d 84, 123-24 (2d Cir. 2020).

New York also makes several allegations concerning the impact the TTP Decision will have on New York and New York residents.  New York asserts that about 175,000 New York residents will be ineligible to reapply for a TTP when their memberships expire this year.  NY Compl. ¶ 84.  It further contends that another 80,000 were cut off from the programs while applying.  *Id.* ¶ 85.  New York also claims that 30,000 FAST drivers will lose access to automated systems.  *Id.* ¶ 86.

New York alleges these effects on New York residents will impact public safety and its economy.  It alleges that CBP has already strained resources and that the TTP Decision "will undermine CBP officers' ability to focus their efforts on higher risk travelers," *id.* ¶ 95, leaving New York residents with "longer lines, strained security resources, and heightened security risks," *id.* ¶ 96.  It further alleges that the TTP Decision "adds hurdles to international business travel," which will disadvantage New York businesses.  *Id.* ¶ 99.  "[A]dded wait time" at the airports resulting from the TTP Decision could "cause direct economic harm."  *Id.* ¶ 100.  Specifically, New York alleges that "[r]esearchers estimate that reducing wait time at the John F. Kennedy Airport alone could save millions of dollars in lost time," although New York does not quantify the TTP Decision's effect on those wait times.  *Id.*  Finally, New York alleges that wait times at the border "cost American businesses billions of dollars each year," although it again fails to quantify with any specificity the effect the TTP Decision will have on those costs.  *Id.* ¶ 102.

The Class-Action Plaintiffs' Complaint is largely similar to New York's Complaint.  The Class-Action Plaintiffs allege that the TTP Decision "is little more than an attempt to coerce New York into participating in federal immigration enforcement by forcing State officials into disclosing sensitive data about driver's license applicants," Class-Action Compl. ¶ 4, in retaliation for its sanctuary city policies, *id.* ¶¶ 15-20.  It further contends that the TTP Decision lacks

reasoned basis because DMV records contain limited unique information about New York residents, *id.* ¶ 59, and because the decision does not exclude individuals who move from New York or who reside in foreign countries, *id.* ¶¶ 61-62.

The principal difference between the Class-Action and New York Complaints is that the Class-Action Plaintiffs assert that, "[t]his case is brought as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of all New York State residents whose applications to enroll or re-enroll in Global Entry were pending at the time of the [TTP Decision] or who otherwise intend to enroll or re-enroll in Global Entry." *Id.* ¶ 103. Further, while the New York Complaint asserts Fifth and Tenth Amendment claims under two separate theories, NY Compl. ¶¶ 104-13, 135-40, the Class-Action Complaint does not assert Fifth Amendment claims, and its Tenth Amendment claim is limited to a single sentence: "The defendants' actions as alleged in the Complaint violate the Tenth Amendment to the United States Constitution," Class-Action Compl. ¶ 116.

## STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept as true the well-pleaded factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555); *see also Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 709 (2d Cir. 2002) (stating that a court need not give "credence to [a] plaintiff's conclusory allegations").

**ARGUMENT**

Together, Plaintiffs' Complaints challenge the decision to exclude New York residents from the TTPs on six grounds, three constitutional and three under the APA.[4]  With respect to its constitutional claims, New York argues that the TTP Decision (1) denies New York equal sovereignty under the Tenth Amendment, NY Compl. ¶¶ 104-08; (2) is a coercive measure in violation of the Tenth Amendment, *id.* ¶¶ 109-13; and (3) irrationally discriminates against New York residents in violation of the Fifth Amendment, *id.* ¶¶ 135-40.  Similarly, the Class-Action Plaintiffs allege that the TTP Decision violates the Tenth Amendment, although they do not specify under what theory.  Class-Action Compl. ¶ 116.  For the reasons that follow, the Complaints do not state a claim under the Constitution.[5]

## I.   The TTP Decision Does Not Deny New York "Equal Sovereignty" Under the Tenth Amendment.

New York's first claim alleges that the TTP Decision is an unconstitutional impingement on New York's "equal sovereignty" under the principles announced in *Shelby County v. Holder*, 570 U.S. 529 (2013).  NY Compl. ¶¶ 104-08.[6]  *Shelby County* involved a challenge to the Voting Rights Act of 1965, a statute which employed "extraordinary measures to address an extraordinary problem."  *Id.* at 534.  "Section 5 of the Act required States to obtain federal permission before

---

[4] Technically, all six claims are brought under the APA.  The Class-Action Complaint states that "[t]he declaratory and injunctive relief the plaintiffs seek is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 [the Declaratory Judgment Act]."  Class-Action Compl. ¶ 111.  New York's Complaint identifies 5 U.S.C. § 706 (the APA) and the Declaratory Judgment Act as its basis for relief.  NY Compl. ¶ 15.  While 5 U.S.C. § 706(2)(B) allows a Plaintiff to assert constitutional claims challenging an agency action, the Declaratory Judgment Act does not confer a right of action.  *See Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012).

[5] This motion does not address Plaintiffs' APA claims.

[6] While New York invokes the "equal sovereignty" doctrine set forth in *Shelby County*, the Class Action Plaintiffs do not.  *See* NY Compl. ¶¶ 104-08; Class-Action Compl. ¶ 116.

enacting any law related to voting—a drastic departure from basic principles of federalism." *Id.* at 534-35. "And § 4 of the Act applied that requirement only to some States—an equally dramatic departure from the principle that all States enjoy equal sovereignty." *Id.* at 535. In *Shelby County*, the Supreme Court held that § 4 of the Voting Rights Act violated the Tenth Amendment. 570 U.S. at 550. It based this conclusion on the fact that § 4 continued to cover the same jurisdictions it did when the Voting Rights Act was first enacted in 1965 without any updated Congressional findings. *Id.* at 751. In so holding, the Supreme Court noted that "a statute's 'current burdens' must be justified by 'current needs,' and any 'disparate geographic coverage' must be 'sufficiently related to the problem that it targets.'" *Id.* at 550-51 (quoting *Northwest Austin Municipal Util. Dist. No. One v. Holder*, 557 U.S. 193, 203, 204 (2009)). The unique circumstances giving rise to *Shelby County* have led several commentators to note that its holding may be *sui generis*.[7] Here, in contrast to the statute under consideration in *Shelby County*, the TTP Decision does not work a burden on our system of federalism and its geographical coverage is sufficiently related to the problem it targets to survive Tenth Amendment review.

**A.**      *The TTP Decision Does Not Impinge on Core Aspects of State Sovereignty.*

New York's reliance on *Shelby County* to support its claim under the Tenth Amendment is misplaced because the TTP Decision does not intrude "into sensitive areas of state and local policymaking." *Shelby County*, 570 U.S. at 545. In *Shelby County*, the Supreme Court placed great significance on the fact that the Voting Rights Act regulated a state's "power to regulate

---

[7] *See, e.g.*, Luis Fuentes-Rohwer, *The Racial Evolution of Justice Kennedy and Its Implications for Law, Theory, and the End of the Second Reconstruction*, 2015 Mich. St. L. Rev. 1473, 1519 (2015) ("*Shelby County*, as with the preclearance regime, may be sui generis."); Kareem Crayton & Terry Smith, *Unteachable: Shelby County, Canonical Apostasies, and a Way Forward for the Voting Rights Act*, 67 SMU L. Rev. 3, 24 (2014) (recognizing the "sui generis tact taken by the majority in *Shelby County*").

elections," an area "the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment." *Id.* at 543 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461-62 (1991). The Supreme Court emphasized that the Voting Rights Act represented an "extraordinary departure from the traditional course of relations between the States and the Federal Government," and "authorize[d] federal intrusion into sensitive areas of state and local policymaking." *Id.* at 545 (internal quotation marks omitted).

By contrast, the TTP Decision involves the power to regulate international travel, an area traditionally committed to the federal government. Art. I, § 8, cl. 3 (Congress shall have the power "[t]o regulate Commerce with foreign Nations"); *see also Japan Line, Ltd. v. Cty. of Los Angeles*, 441 U.S. 434, 448 (1979) ("Foreign commerce is preeminently a matter of national concern. In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power.") (internal quotation marks omitted). "[E]xercises of Commerce Clause authority are aimed at matters of national concerns and finding national solutions will necessarily affect states differently; accordingly, the Commerce Clause, '[u]nlike other powers of [C]ongress[,] . . . does not require geographic uniformity.'" *Nat. Collegiate Athletic Ass'n v. Gov. of New Jersey*, 730 F.3d 208, 239 (3d Cir. 2013), *abrogated on other grounds by* 138 S. Ct. 1461 (2018) (quoting *Morgan v. Virginia*, 328 U.S. 373, 388 (1946) (Frankfurter, J., concurring)).

Courts have consistently held that laws with disparate geographical impacts do not violate equal sovereignty principles where they do not impose on areas traditionally committed to the states. *See, e.g.*, *In re Border Infrastructure Environmental Litigation*, 284 F. Supp. 3d 1092, 1145 (S.D. Cal. 2018) ("Here, unlike the State's power to regulate elections in *Shelby*, the authority vested in the Secretary of DHS concerning immigration and border security is broad."); *Mayhew*

*v. Burwell*, 772 F.3d 80, 95-96 (1st Cir. 2014) ("Federal laws that have differing impacts on different states are an unremarkable feature of, rather than an affront to, our federal system . . . .  A state's ability to set the conditions of eligibility for participation in a federal health insurance program that is funded primarily by the federal government is not a core sovereign state function in the same way as is a state's ability to regulate the conduct of its elections."); *Nat. Collegiate Athletic Ass'n*, 730 F.3d at 239  ("[T]here is nothing in *Shelby County* to indicate that the equal sovereignty principle is meant to apply with the same force outside the context of 'sensitive areas of state and local policymaking.'").  Unlike the law at issue in *Shelby County*, the TTP Decision does not intrude into an area that has traditionally been the exclusive province of the states.  The equal sovereignty doctrine set forth in *Shelby County* is, therefore, inapplicable.

**B.**    ***The TTP Decision is Sufficiently Related to the Problem It Targets.***

Even if the Court applies the standard articulated in *Shelby County* to the TTP Decision, it would easily survive Tenth Amendment review because the decision's "disparate geographical coverage" is "sufficiently related to the problem that it targets."  *Shelby County*, 570 U.S. at 551 (quoting *Northwest Austin Municipal Util. Dist. No. One*, 557 U.S. at 203).

New York alleges that the TTP Decision must be invalidated under *Shelby County*'s equal sovereignty doctrine because it "impermissibly targets New York for unfavorable treatment because the State exercised its sovereign authority to enact the Green Light Law."  NY Compl. ¶ 105.  Federal action should not be deemed invalid simply because it "limit[s] its attention to the geographic areas where immediate action seem[s] necessary."  *South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966).  In fact, the provision struck down in *Shelby County*—section 4 of the Voting Rights Act—was upheld fifty years earlier because it was "rational in both practice and theory," despite its disparate geographical effects.  *Id.* at 330.  But almost fifty years later, the coverage formula had not changed.  The Supreme Court determined that using the same coverage formula,

"based on decades-old data and eradicated practices," violated principles of equal sovereignty. *Shelby County*, 570 U.S. at 551; *see also id.* at 554 (Congress "reenacted a formula based on 40–year–old facts having no logical relation to the present day."). Federal action with disparate geographical treatment runs afoul of the Tenth Amendment only where it is not "sufficiently related to the problem that it targets." *Shelby County*, 570 U.S. at 542.

Here, the Green Light Law's data restriction justifies the TTP Decision's disparate geographic treatment. New York challenges this point by alleging that "[m]ore than a dozen states allow undocumented immigrants to obtain driver's licenses, and dozens of other state and local jurisdictions have enacted legislation or adopted policies limiting information-sharing with the federal government's immigration enforcement efforts." NY Compl. ¶ 54. However, New York's allegation that other states allow undocumented immigrants to obtain driver's licenses does not address DHS's reason for implementing the TTP Decision: the Green Light Law's data-sharing restriction. And New York's allegation concerning information-sharing is notable for its omission. New York pleads that other states have "adopted policies limiting information-sharing with the federal government's immigration enforcement efforts," but stops short of stating that other states have restricted CBP access to records used to vet TTP applicants or vehicle exporters. "Legislation need not deal with all phases of a problem in the same way, so long as the distinctions drawn have some basis in practical experience." *Katzenbach*, 383 U.S. at 331. Here, no other state has adopted a policy barring CBP's access to records to vet TTP applicants or to verify vehicle registrations for export. That "[t]here are no States or political subdivisions exempted from coverage" under the TTP Decision that have similar data restrictions "confirms the rationality of the formula." *Id.*

14

In short, the TTP Decision's geographic scope is tailored to the data restriction that New York implemented in the Green Light Law.  It is therefore "sufficiently related to the problem that it targets."  *Shelby County*, 570 U.S. at 551.

**C.      *The Motives Underlying the TTP Decision Are Not Relevant to an Equal Sovereignty Claim.***

New York cannot revive its equal sovereignty claim through its allegations that the TTP Decision was motivated by a desire to retaliate against New York for passing the Green Light Law. "Put simply, nothing in *Shelby County* suggests that the equal sovereignty principle bars [government action] to incentivize state-level policy changes simply because it knows that some states will feel those incentives more forcefully than others."  *State of New York v. Mnuchin*, 408 F. Supp. 3d 399, 420 (S.D.N.Y. 2019) (appeal filed Nov. 26, 2019).

* * *

For the foregoing reasons, the TTP Decision does not violate the doctrine of equal sovereignty.  New York's Tenth Amendment equal sovereignty claim should accordingly be dismissed.

**II.   The TTP Does Not Unlawfully Coerce New York in Violation of the Tenth Amendment.**

New York's second constitutional claim argues that the TTP Decision violates the Tenth Amendment because it was "an attempt to coerce New York to change its policies."  NY Compl. ¶ 111.[8]  "The offer of benefits to a state by the United States dependent upon cooperation by the state with federal plans, assumedly for the general welfare, is not unusual."  *Oklahoma v. Civil*

---

[8] While it is not clear whether the Class-Action Plaintiffs assert coercion claims, Class-Action Compl. ¶ 116, their Complaint does not include any allegations concerning the effects the TTP Decision will have on New York.  As such, the remainder of the coercion analysis will focus on New York's pleadings.

*Service Comm'n*, 330 U.S. 127, 144 (1947).  The Supreme Court has recognized that Spending Clause legislation that conditions federal benefits on state action is lawful unless "the financial inducement offered by Congress [is] so coercive as to pass the point at which 'pressure turns into compulsion.'"  *South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)).  However, the doctrine of coercion is inapplicable here.  The Supreme Court has considered coercion challenges only in the context of Spending Clause legislation.  *See Steward Machine Co. v. Davis*, 301 U.S. 548 (1937); *South Dakota v. Dole*, 301 U.S. 548 (1987); *NFIB v. Sebelius*, 567 U.S. 519 (2012).  Here, the federal government has not withheld or threatened to withhold federal funding pursuant to an exercise of its spending power.  But even if the coercion doctrine could be applied in this context, the TTP Decision does not pressure New York to change its policies to a degree that violates the Tenth Amendment.

A.    ***The Motivations Underlying the TTP Decision Are Not Relevant Under the Coercion Doctrine.***

Much like with New York's equal sovereignty claim, the question of whether the TTP Decision was motivated by a desire to influence New York policy does not cast doubt upon its validity under the coercion doctrine.  "Even assuming, favorably to the State[]" that the TTP Decision was made in hopes of prompting New York to change the Green Light Law, "the Supreme Court's opinion in *South Dakota v. Dole*, 483 U.S. 203 (1987), makes clear that an otherwise valid federal law does not offend the Constitution simply because it seeks to affect state policies."  *State of New York v. Mnuchin*, 408 F. Supp. 3d at 419; *see also Steward Machine Co.*, 301 U.S. at 589-90 ("[T]o hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties.").  Where a law is passed explicitly as an "encouragement to state action," as with Spending Clause grant conditions, it is not constitutionally suspect if "the enactment of such [state action] remains the prerogative of the State[] not merely in theory but in

fact." *South Dakota*, 483 U.S. at 211, 212.  As such, "[t]o assess the State[]'s coercion claim . . . , the Court must look to the [decision's] effects rather than to the aims [the agency] might have had in enacting it." *State of New York v. Mnuchin*, 408 F. Supp. 3d at 421.

**B.**     ***Plaintiffs Have Not Identified Any Financial Inducement on the State of New York.***

The State of New York has identified two effects allegedly caused by the TTP Decision. First, it claims that the TTP Decision will undermine public safety.  NY Compl. ¶¶ 89-96.  Second, it claims that the TTP Decision will harm New York residents and New York-based businesses economically.  *Id.* ¶¶ 97-103.  Neither of these effects amounts to the type of financial inducement the Supreme Court considers in adjudicating coercion claims.  Accordingly, New York has not adequately pleaded a coercion claim.

**1.**     **In Asserting that the TTP Decision Undermines Public Safety, New York Has Failed to Plead a Cognizable Claim under the Coercion Doctrine.**

With respect to the claim that the TTP Decision will undermine public safety, case law does not support the theory that the potential for a negative impact on public safety is sufficient to allege coercion.  Indeed, the leading Supreme Court coercion cases did not consider any factors other than financial inducement in deciding whether improper coercion existed.  In *South Dakota v. Dole*, the Supreme Court considered whether a threat to restrain highway funding if states failed to raise their minimum drinking age was unduly coercive.  The Supreme Court noted that "all South Dakota would lose if she adheres to her chosen course as to a suitable minimum drinking age is 5% of the funds otherwise obtainable under specified highway grant programs," and concluded that this threatened loss did not amount to unconstitutional coercion.  483 U.S. at 211. In *NFIB v. Sebelius*, the Supreme Court considered and found undue coercion due to "threatened loss of over 10 percent of a State's overall budget" if states declined to expand their Medicaid programs in the manner requested by the federal government.  567 U.S. at 582.

In both cases, the Supreme Court discussed potential harm to the states only in terms of financial inducement.  While the *Dole* Court could have analyzed whether a higher minimum drinking age was more appropriate than South Dakota's eighteen-year minimum drinking age and the *NFIB* Court could have analyzed the comparative ability of the state and federal governments to build a healthcare system, the Court did not do so.  Expanding the doctrine of coercion to require consideration of the practical effects of federal action would potentially transform every dispute about the efficacy of a program into a constitutional debate under the Tenth Amendment.  Here, Plaintiffs and DHS have a policy disagreement falling within an area of DHS's expertise.  *Compare* Compl. ¶ 95 (TTP Decision "will make all travelers less safe"), *with* TTP Decision at 3 ("[T]his Act and the corresponding lack of security cooperation from the New York DMV requires DHS to take immediate action to ensure DHS's efforts to protect the Homeland are not compromised.").  If New York is concerned about security implications, it can "exercise [its] sovereign powers— howsoever [it] wish[es]—to avert or assuage" those problems.  *New York v. Mnuchin*, 408 F. Supp. 3d at 423.  "If being put to such an open-ended choice is coercion, it will be the rare piece of federal legislation that comports with the Tenth Amendment."  *Id.*

**2.    New York's Claim Regarding the Purported Economic Impact of the TTP Decision on New York and New Yorkers Fails.**

New York also alleges that the TTP Decision "adds hurdles to international business travel," NY Compl. ¶ 99, and will decrease gross domestic product by increasing wait times at airports and border crossings, *id.* ¶ 100.  Although these effects may impact New York's budget downstream, they are still not the sort of direct financial inducement that courts consider in adjudicating coercion challenges.

This distinction was drawn in *State of New York v. Mnuchin*:

[E]ven if the States' *taxpayers* here might in the aggregate face an increased federal tax burden equivalent to the amount of Medicaid funding at risk in *NFIB*, nothing

in the present record indicates that the States *themselves* are facing an economic threat equivalent to the threat the states faced in *NFIB*.

408 F. Supp. 3d at 423 n.16 (emphasis in original).

New York's Complaint contains no allegations about the TTP Decision's financial effect on the State of New York.  Without this information, New York has not adequately pleaded an injury that could form the basis for its Tenth Amendment coercion claim.

**C.      *The TTP Policy Is Not Unduly Coercive.***

Notwithstanding these pleading deficiencies, the New York Complaint provides enough information for this Court to conclude that the TTP Decision is not unduly coercive. The constitutional question presented under the coercion doctrine is whether a federal program is "so coercive as to pass the point at which 'pressure turns into compulsion.'"  *Dole*, 483 U.S. at 211. The Court must consider whether a federal policy constitutes "relatively mild encouragement," *Dole*, 483 U.S. at 211, or an unlawful "gun to the head," *NFIB*, 567 U.S. at 581.  Most alleged economic impacts do not rise to the level of coercion.  *See State of New York v. Dep't of Justice*, 951 F.3d at 115 ("The funding loss associated with most grant conditions, however, does not raise such coercion concerns.").

*South Dakota v. Dole* and *NFIB v. Sebelius* again set the guideposts.  In *Dole*, the Supreme Court held that a condition threatening a five-percent deduction in certain federal highway funds, amounting to half-of-one percent of the state's budget, was "a valid use of the spending power." 483 U.S. at 212.  In *NFIB*, the Supreme Court held that "[t]he threatened loss of over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce." 567 U.S. at 582.

Here, New York alleges that "reducing wait time at John F. Kennedy Airport alone could save millions of dollars in lost time" and that "[e]conomists have estimated that border delays on

the U.S.-Canada border cost American businesses billions of dollars each year." Compl. ¶¶ 100, 102. The article New York relies upon for the latter allegation states that delays at the U.S.-Canada border potentially cost American businesses $15 to 30 billion a year. New York does not attempt to quantify how much the TTP Decision will impact border delays, the proportion of individuals crossing the borders who are New York residents, the extent to which border delays affect economic activity in New York rather than in other states, the extent to which the TTP Decision will impact New York businesses as opposed to businesses in other states, or significantly, how those economic effects impact New York's budget.

The purported economic effects of the TTP Decision certainly fall far short of the "approximately $3.3 trillion" over a decade that was threatened in the single case in *NFIB v. Sebelius*, the only case in which the Supreme Court has ever found unconstitutional coercion. *NFIB*, 567 U.S. at 581; *see also New York v. U.S. Dep't of Health and Human Services*, 414 F. Supp. 3d 475, 570 (S.D.N.Y. 2019) (finding impermissible coercion where rule threatened all federal health care funding, amounting to "nearly $200 billion for [Plaintiff] States alone in fiscal year 2018"). Taking New York's projections as true, the TTP Decision would result in a financial inducement totaling only a fraction of the "billions of dollars each year" attributable to border delays nationally. Courts have found similar and more significant economic effects to be insufficiently coercive to state a Tenth Amendment claim. *State of New York v. Mnuchin*, 408 F. Supp. 3d at 422 (alleged burden of "billions of dollars in additional federal income taxes" to state taxpayers and "decrease[d] . . . value of real estate in the Plaintiff States by billions of dollars" insufficient); *State of New York v. Dep't of Justice*, 951 F.3d at 116 (loss of "2017 Byrne award [was] $8,879,161, a significant amount of money to be sure, but one representing less than 0.1% of the State's annual $152.3 billion budget, a smaller percentage loss even than that in *Dole*").

Simply put, any downstream effects that may be caused on New York's budget from increased wait times at the border are not so significant as to amount to "economic dragooning that leaves the State[] with no real option but to acquiesce" to federal policy.  *NFIB*, 567 U.S. at 582. Accordingly, Plaintiffs' coercion claims should be dismissed.

### III.   The TTP Policy Rationally Targets Residents of States That Have Hampered Enforcement of the TTP.

New York's final constitutional challenge alleges that the TTP Decision "targets all New York residents for discriminatory treatment with no rational basis," in violation of the equal protection guarantee embodied in the Due Process Clause of the Fifth Amendment.  NY Compl. ¶¶ 135-140.   "When a plaintiff alleges an equal protection violation (without also alleging discrimination based upon membership in a protected class), the plaintiff must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment."  *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018); *see also United States v. Cohen*, 733 F.2d 128, 134-36 (D.C. Cir. 1984) (en banc) (residents of District of Columbia are not a protected class).  New York appears to concede that rational-basis review applies to its challenge.  NY Compl. ¶ 136 ("The equal protection component of the Due Process Clause of the Fifth Amendment prohibits the federal government from taking action to discriminate against the residents of one state unless that action is rationally related to a legitimate government interest.").  The TTP Decision easily satisfies the deferential rational basis standard.

"[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).  New York bears the burden "to

negative every conceivable basis which might support" the TTP Decision.  *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (internal quotation marks omitted).  "[I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated" DHS.  *Beach Communications*, 508 U.S. at 315.  A rational basis "may be based on rational speculation unsupported by evidence or empirical data."  *Id.*  Once a court finds "plausible reasons" for an action, its "inquiry is at an end."  *United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980).

As New York pleaded, "before the effective date of the Green Light Law, DHS was granted access to DMV records."  NY Compl. ¶ 49.  "On December 14, 2019, as required by the Green Light Law, New York DMV restricted DHS's access to DMV's records pursuant to memoranda of understanding that had been in place."  *Id.* ¶ 50.  DHS had ample basis to exclude New York residents from TTPs following these events.  For example, CBP may deny Global Entry participation to an individual if it determines that the individual "provide[d] false or incomplete information on [their Global Entry] application."  8 C.F.R. § 235.12(b)(2)(i).  One plausible reason for excluding New York residents from TTP is that CBP was no longer able to verify their application information against DMV records.  Another plausible reason, as the Class-Action Plaintiffs note, is that "convictions for driving under the influence of drugs or alcohol" may be "uniquely in DMV records."  Class-Action Compl. ¶ 38.  Criminal convictions are a basis for disqualification from Global Entry.  8 C.F.R. § 235.12(b)(2)(ii).  And another: DHS may have relied on non-unique DMV records and been left with an operational gap while it determined where else to find the relevant records, potentially at greater administrative burden.  A plausible reason for the delay in vehicle exports is evident from the face of the TTP Decision: the Green Light Law

"hinders DHS from validating documents used to establish vehicle ownership."  TTP Decision at 4.  These possible justifications easily satisfy the minimal burden of rational basis review.

New York's Complaint includes several allegations which New York claims show that the TTP Decision "is not supported by any rational justification."  NY Compl. ¶¶ 71-80.  But each allegation misconceives the limited scope of rational basis review.  For example, New York criticizes DHS for failing to "specify the criminal history information that is purportedly available to DHS solely through New York DMV," *id.* ¶ 74, for failing to explain how DHS previously verified eligibility for individual's whose records were not contained in DMV databases, *id.* ¶ 74, and for failing to explain why the agency took immediate action rather than consulting with New York, *id.* ¶ 79.  These kinds of criticisms could give rise to APA claims.  *See also id.* ¶ 79 (decision made "with no notice or opportunity for public comment"); *id.* ¶ 80 (DHS "failed to consider important aspects of the problem").  But a failure to explain a decision does not provide a basis to set aside an agency action on rational basis review under the Fifth Amendment's equal protection guarantee.  *See Beach Communications*, 508 U.S. at 315 ("[W]e never require a legislature to articulate its reasons for enacting a statute.").  And while New York challenges the sufficiency of the reasons set forth in the TTP Decision, NY Compl. ¶¶ 77-78, its contentions have no bearing on New York's Fifth Amendment claim.  *Beach Communications*, 508 U.S. at 315 ("[I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.").

In short, New York's challenge to the TTP Decision under the Fifth Amendment's rational basis review, a standard of review that is "a paradigm of judicial restraint," fails.

## CONCLUSION

For the foregoing reasons, Plaintiffs' constitutional claims should be dismissed.

23

Dated:  April 15, 2020
          New York, NY

                                        Respectfully,

                                        GEOFFREY S. BERMAN
                                        United States Attorney for the
                                        Southern District of New York

                          By:          /s/ Zachary Bannon
                                        ZACHARY BANNON
                                        ELIZABETH J. KIM
                                        CHRISTOPHER K. CONNOLLY
                                        Assistant United States Attorneys
                                        86 Chambers St. 3rd Floor
                                        New York, New York 10007
                                        Tel.:    212-637-2728, 2745, 2761
                                        Fax:     212-637-2717
                                        E-mail: Zachary.Bannon@usdoj.gov
                                                  Elizabeth.Kim@usdoj.gov
                                                  Christopher.Connolly@usdoj.gov