# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br><br>              Plaintiff,<br><br>    v.<br><br>CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security, et al.,<br><br>              Defendants. | No. 20 Civ. 1127 (JMF) |
| R. L'HEUREUX LEWIS-MCCOY, et al., on behalf of themselves and all similarly situated individuals,<br><br>              Plaintiffs,<br><br>    v.<br><br>CHAD WOLF, in his official capacity as Acting Secretary of Homeland Security, et al.,<br><br>              Defendants. | No. 20 Civ. 1142 (JMF) |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

LETITIA JAMES
*Attorney General of the State of New York*

Matthew Colangelo
Elena Goldstein
Daniela L. Nogueira
28 Liberty Street
Office of the New York Attorney General
New York, New York 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

*Counsel for Plaintiff in 20 Civ. 1127*

Dated: April 29, 2020

NEW YORK CIVIL LIBERTIES FOUNDATION

Antony P.F. Gemmell
Molly K. Biklen
Jessica Perry
Jordan Laris Cohen
Christopher T. Dunn
125 Broad Street, 19th Floor
New York, New York 10004
212-607-3300
agemmell@nyclu.org

*Counsel for Plaintiffs in 20 Civ. 1142*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND....................................................................................................2

ARGUMENT ..........................................................................................................................5

    I.     The Court should deny Defendants' motion to dismiss Plaintiffs' Tenth
          Amendment claims. ...............................................................................................5

          A.     The complaints plausibly allege that the Ban violates the principle of
                equal sovereignty. ...............................................................................5

          B.     The complaints plausibly allege that the Ban is unconstitutionally
                coercive in violation of the Tenth Amendment. .................................12

                1.     Plaintiffs are not required to plead a Spending Clause violation.........13

                2.     Plaintiffs are not required to plead financial inducement. ...................15

                3.     Plaintiffs have stated a claim for coercion in violation of the
                     Tenth Amendment. ...............................................................17

    II.    New York plausibly alleges that the Ban violates the Fifth Amendment...................19

          A. Excluding New York from the Trusted Traveler Programs is not rationally
             related to Defendants' proffered goals.................................................19

           B. Defendants' rationale for the Ban is not a legitimate government end.................21

CONCLUSION.....................................................................................................................24

i

## TABLE OF AUTHORITIES

**Cases**               Page(s)

*Coal. to End Permanent Cong. v. Runyon*, 971 F.2d 765 (D.C. Cir.), *supplemented*, 979
    F.2d 219 (D.C. Cir. 1992) ...............................................................................23

*Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ..................................................21

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ...............................................23

*Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86 (2d Cir. 2019) ...............5, 13, 17

*Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528 (1985) ................................14

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ......................................................................14

*In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092 (S.D. Cal. 2018) .......10

*Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32 (1928) .........................................22

*Mackey v. Montrym*, 443 U.S. 1 (1979) ............................................................................8

*Mayhew v. Burwell*, 772 F.3d 80 (1st Cir. 2014) .............................................................9

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985) .................................8

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) ......................................23

*Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013),
    *abrogated on other grounds*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct.
    1461 (2018) ..............................................................................9, 13, 15, 18

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) .................................. *passim*

*New York v. United States*, 505 U.S. 144 (1992); .....................................14, 15, 16, 18

*Northwest Austin Municipal Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009) .........6

*Petersburg Cellular P'ship v. Bd. of Supervisors of Nottoway Cty.*, 205 F.3d 688 (4th Cir.
    2000) ...............................................................................................17–18

*Printz v. United States*, 521 U.S. 898 (1997) .......................................................... *passim*

*Romer v. Evans*, 517 U.S. 620 (1996) ...........................................................19, 21, 22, 23

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) .................................................22

*Shelby County, Ala. v. Holder*, 570 U.S. 529 (2013) ............................................. *passim*

ii

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966)..............................................................9, 10, 11

*State of New York v. Mnuchin*, 408 F. Supp. 3d 399 (S.D.N.Y. 2019).................................10, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...............................................2

*United States v. Lopez,* 514 U.S. 549 (1995) ..............................................................................13

*United States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977)...........................................................23

*United States v. Windsor*, 570 U.S. 744 (2013) ..........................................................................22

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) .....................................................20, 22, 23

*Winston v. City of Syracuse*, 887 F.3d 553 (2d Cir. 2018) .....................................................19, 24

## Statutes, Rules, and Regulations

Fed. R. Civ. P. 8(a)(2) ...................................................................................................................5

Fed. R. Civ. P. 12(b)(6)..................................................................................................................2

Fed. R. Evid. 201(b)(2) ..................................................................................................................2

S7508-B, Part YYY (Reg. Leg. Sess. 2020, Ch. 58) (amending N.Y. Vehicle & Traffic
     Law § 201(12)(a))....................................................................................................................20

## Other Authorities

New York S. B. 7508-B, Part YYY (Reg. Leg. Sess. 2020, Ch. 58)................................................2

## INTRODUCTION

In an unprecedented targeting of a single state, Acting Secretary of Homeland Security Chad Wolf abruptly imposed a blanket ban on New York residents' eligibility for the federal Trusted Traveler Programs. That ban (the "Ban") directly targets residents of New York — and only New York — for disfavored treatment because their state legislature enacted the Green Light Law, which addresses issues of central importance to the state. Defendants' actions represent a gross intrusion into New York's power to legislate in areas traditionally within its concern, and violate New York's equal sovereignty among the States. And the message the Acting Secretary has sent to the States is loud and unmistakably clear: renounce state policies with which the federal government disagrees or be punished.

In two separate lawsuits, the State of New York and a class of New York residents challenge this discriminatory and irrational derogation of New York's sovereignty. Plaintiffs in both suits claim the Ban runs afoul of the Tenth Amendment: First, by singling out New York for disparate treatment in a manner wholly disproportionate to the problem the Defendants purport to target in violation of the principle of equal sovereignty; and second, by coercing New York to repeal or amend the Green Light Law in violation of the anti-commandeering doctrine. The State of New York also claims the Ban violates equal protection under the Fifth Amendment by discriminating against New York with no rational basis.

Largely ignoring the detailed allegations in the pleadings, Defendants instead ask the Court to accept their own version of the facts and sweeping misstatements of constitutional law. But the Court should reject that invitation and, at the pleadings stage, credit what Plaintiffs plausibly have alleged: that the Ban reflects a discriminatory and irrational act of political retaliation. This Court should deny the motion to dismiss.

1

## FACTUAL BACKGROUND

In June 2019, New York State enacted the Driver's License Privacy and Protection Act,
commonly referred to as the "Green Light Law." Lewis-McCoy FAC ¶ 22; New York Compl.
¶¶ 5, 44. That law, which went into effect on December 14, 2019, authorizes New York State's
Department of Motor Vehicles ("DMV") to issue driver's licenses regardless of citizenship or
immigration status, and bars CBP and ICE from accessing DMV records without a court order or
judicial warrant. Lewis-McCoy FAC ¶¶ 22–23; New York Compl. ¶¶ 5–7, 45–50.[1] The Green
Light Law increases the number of licensed and insured drivers in New York, promoting public
safety. New York Compl. ¶ 6; *see also* Lewis-McCoy FAC ¶ 21.

On February 5, 2020, one day after President Trump again castigated New York during
his State of the Union for protecting immigrants, Acting Secretary Wolf abruptly announced an
immediate suspension on enrollment and re-enrollment by New York residents in CBP's Trusted
Traveler Programs ("the Ban"). *See* Lewis-McCoy FAC ¶ 46; New York Compl. ¶ 51. Those
programs, of which Global Entry is the most popular and well known, enable pre-approved, low-
risk travelers to expedite the border-crossing process. Lewis-McCoy FAC ¶ 24; New York
Compl. ¶ 28. Neither DHS nor CBP has ever before singled out residents of one state to ban
them from Global Entry or any other Trusted Traveler Program ("TTP"). Lewis-McCoy FAC ¶

---

[1] After its enactment, the New York State legislature amended the Green Light Law on April 3,
2020, to allow disclosure of DMV records "as necessary for an individual seeking acceptance
into a trusted traveler program, or to facilitate vehicle imports and/or exports." *See* Part YYY,
New York Senate Bill No. 7508. Neither the New York Complaint nor the Lewis-McCoy FAC
allege facts concerning the amendment to the Green Light Law, which was enacted after the
complaints were filed. Nonetheless, Plaintiffs respectfully request that the Court take judicial
notice of the Green Light Law as amended. *See* Fed. R. Evid. 201(b)(2); *Tellabs, Inc. v. Makor
Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007) (recognizing courts must consider facts of which
they may take judicial notice in deciding motions to dismiss under Rule 12(b)(6)). To date,
Defendants have made no change to the Ban in response to the Green Light Law's amendment.

63. Defendant Wolf's unprecedented announcement, which applies to all of New York's nearly 20 million residents, immediately impacted over 80,000 New Yorkers whose TTP applications were pending when the Ban took effect. Lewis-McCoy FAC ¶¶ 47–49, 67–70, 75–87, 93–96; New York Compl. ¶¶ 83–88.  And by year's end, approximately 175,000 additional New Yorkers whose memberships are due to expire in 2020 will be removed from TTPs because they are now barred from re-enrolling.  Lewis-McCoy FAC ¶ 55; New York Compl. ¶ 84.  Beyond those whose current enrollment or pending applications are immediately affected, the Ban bars millions of other New York residents who might want to apply for the first time from doing so. Lewis-McCoy FAC ¶ 55; New York Compl. ¶ 87.

In explaining the sweeping Ban, Defendant Wolf's February 5 letter to New York officials spends little time addressing any actual impact on Global Entry or the other TTPs, and instead focuses on another grievance: the Acting Secretary's claim that losing access to DMV records has impaired law enforcement activities by ICE.  Lewis-McCoy FAC ¶ 50; New York Compl. ¶¶ 72, 77–79.

What little space the letter does devote to addressing the impact of the Green Light Law on TTPs purports to rely on a single rationale: the Green Light Law's protection against warrantless access to DMV records by CBP.  *See* Lewis-McCoy FAC ¶ 48; New York Compl. ¶ 77.  But Plaintiffs allege that those protections do not impair the agency's ability to assess applicants for Global Entry or the other TTPs.  Lewis-McCoy FAC ¶ 56; New York Compl. ¶ 76.  For Global Entry, applicants are not even required to submit a state driver's license. Lewis-McCoy FAC ¶ 33; New York Compl. ¶ 67.  And the DMV possesses no records for millions of New York residents eligible for Global Entry and other TTPs, because many New

York residents do not drive and have never applied for driver's licenses. Lewis-McCoy FAC ¶¶ 57, 75, 77.

For the assessment of New York residents about whom the DMV *may* possess records, the Green Light Law is no impediment. Lewis-McCoy FAC ¶ 58; New York Compl. ¶¶ 33, 76. Although CBP claims that it previously accessed criminal history information from New York's DMV records as part of the Global Entry vetting process, CBP has automatic access to that information from other sources. Lewis-McCoy FAC ¶¶ 37, 58–59; New York Compl. ¶¶ 33, 75. As the *New York* Plaintiff alleges, "[a]ny criminal history information contained in New York DMV records is duplicated in records disseminated to the New York State Division of Criminal Justice Services, which in turn shares such information with the FBI." New York Compl. ¶ 75. And Plaintiffs are unaware of any reports or evidence establishing that CBP has ever relied on DMV records as part of its Global Entry vetting process. Lewis-McCoy FAC ¶ 60.

Not only does the Ban bar millions of New York residents from applying who do not have DMV records or whose DMV records contain no relevant information, it leaves the program open to former New York residents, regardless of what records the New York DMV may have. Lewis-McCoy FAC ¶ 61. Specifically, any person who moves out of New York — for instance to adjoining New Jersey, Connecticut, or Pennsylvania — becomes immediately eligible to apply for the TTPs whether or not they change their license. Lewis-McCoy FAC ¶ 61. Remarkably, under the Ban, a U.S. citizen currently residing in New York could become eligible to apply by simply moving abroad and establishing residence in *any* foreign in country in the world, regardless of CBP's ability to obtain intelligence regarding persons residing in the country. Lewis-McCoy FAC ¶ 62. Similarly, citizens of Argentina or Germany or India are eligible to apply for Global Entry if they reside in their home country, but would lose that

4

eligibility if they moved to New York even if they never sought a state license.  Lewis-McCoy

FAC ¶¶ 26, 62.

## ARGUMENT

The Court should deny Defendants' motion to dismiss because Plaintiffs have alleged

facts that, taken as true with all reasonable inferences drawn in Plaintiffs' favor, plausibly

support their respective constitutional claims.  Under the Federal Rules of Civil Procedure, a

complaint must contain "a short and plain statement of the claim showing that the pleader is

entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face."  *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 93 (2d Cir. 2019) (internal

quotation marks and citation omitted).  "In assessing . . . motions to dismiss complaints for

failure to state a claim, it is a court's obligation to view the evidence and interpret the allegations

in the light most favorable to Plaintiffs, drawing reasonable inferences in their favor."  *Id.*

**I.      The Court should deny Defendants' motion to dismiss Plaintiffs' Tenth Amendment claims.**

**A.      The complaints plausibly allege that the Ban violates the principle of equal sovereignty.**

The complaints plausibly allege that Defendants have violated the "principle of equal

sovereignty" guaranteed by the Tenth Amendment, because the Ban singles out New York

residents for differential treatment in a manner that does not sufficiently relate to the problem

Defendants purport to target.  *See Shelby County, Ala. v. Holder*, 570 U.S. 529 (2013).

As the Supreme Court recognized in *Shelby County*, this "fundamental principle," which

reflects "the constitutional equality of the States," requires that when the federal government

engages in "differential treatment" of the States, any "disparate geographic coverage is

sufficiently related to the problem that it targets."  *Shelby County, Ala. v. Holder*, 570 U.S. 529,

542, 544 (2013) (quoting *Northwest Austin Municipal Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)).  In *Shelby County*, the Supreme Court applied the equal sovereignty principle to invalidate the coverage formula in Section 4 of the Voting Rights Act ("VRA"), which subjected certain States and other covered jurisdictions to heightened requirements before implementing any change with respect to voting.  570 U.S. at 542–57.  In so doing, the Court conducted a searching review of Congress's rationale in reauthorizing the VRA and that rationale's fit with the coverage formula, holding that there was insufficient evidence that racial discrimination continued to be disproportionately concentrated in covered jurisdictions.  *Id.* at 547–57.  The Court concluded that because the coverage formula was not "sufficiently related to the problem that it targets," its "disparate treatment of the States" could no longer survive Tenth Amendment scrutiny.[2]  *See id.* at 536, 556–57.

Here, Plaintiffs have plausibly alleged that, like in *Shelby County*, Defendants have violated the Constitution's guarantee of equal sovereignty.  The complaints each allege that the Ban singles out residents of New York for differential treatment in violation of the Tenth Amendment.  *See, e.g.*, Lewis-McCoy FAC ¶¶ 49, 56–62; New York Compl. ¶¶ 12, 55.  The complaints also allege numerous ways in which the Ban, and the disparate treatment it creates, is not "sufficiently related" to the purported problem of vetting TTP applicants for whom the government, due to its inability to access DMV data, cannot verify "low-risk" status.

First, the Ban is both over- and under-inclusive.  Defendants' purported rationale for enacting it — that access to the New York DMV database is necessary to vet New York applicants for TTPs — "does not apply to over 3.5 million New York residents for whom DMV

---

[2] Defendants cite two law review articles for the proposition that the *Shelby County* holding "may be *sui generis*." Defs.' Br. at 11 & n.7. Plaintiffs are not aware of any court decision supporting that interpretation.

maintains no records but who may otherwise be eligible to apply for Global Entry." Lewis-McCoy FAC ¶ 49; *see also id.* ¶ 57 ("DMV possesses no records regarding millions of New York residents eligible to apply for Global Entry. Many New York residents do not drive and have never applied for a driver's license."). The Ban is also under-inclusive because it "leaves the program open to persons about whom [DMV] records may contain considerable relevant information," including former New York residents who move to other states, *id.* ¶ 61, as well as U.S. citizens (including former New York residents) residing "in *any* foreign [] country in the world, regardless of CBP's ability to obtain intelligence regarding persons residing in the country," *id.* ¶ 62. These allegations reflect over- and under-inclusion of exactly the sort the Court found impermissible in *Shelby County. See* 570 U.S. at 541–42 (noting that "covered jurisdictions have *far more* black officeholders as a proportion of the black population than do uncovered ones," and "the five worst uncovered jurisdictions . . . have worse records than eight of the covered jurisdictions"); *id.* at 548 (noting that in 2004 "African-American voter turnout exceeded white voter turnout in five of the six States originally covered").

Second, the complaints allege that access to the DMV database is unnecessary for CBP to conduct TTP vetting.[3] They allege the DMV database contains little or no information relevant to TTP vetting, and none that is not obtainable elsewhere. Lewis-McCoy FAC ¶¶ 56, 58–59; New York Compl. ¶¶ 75–76. They also allege that CBP has not historically used information from the DMV database to vet TTP applicants. *See* Lewis-McCoy FAC ¶ 60; New York Compl. ¶ 76 ("According to John Sandweg, former Acting Director of ICE, the Ban is 'irrational in the

---

[3] This is now indisputably true because the New York State legislature has amended the Green Light Law to allow disclosure of DMV records "as necessary for an individual seeking acceptance into a trusted traveler program, or to facilitate vehicle imports and/or exports." *See supra* n. 1.

sense that sanctuary policies in no way shape or form affect DHS' ability to vet people for global entry and other trusted traveler programs.'"). These allegations, taken as true, fatally undermine Defendants' purported justification for the Ban, and show that their differential treatment of New York cannot be justified under the Tenth Amendment.

Defendants claim the equal sovereignty principle is wholly "inapplicable" because the Ban "involves the power to regulate international travel, an area traditionally committed to the federal government," and therefore "does not intrude into sensitive areas of state and local policymaking." Defs.' Br. at 11–13. But the complaints each allege Defendants enacted the Ban to retaliate against New York for enacting the Green Light Law and discourage other States from adopting similar laws. *See* Lewis-McCoy FAC ¶¶ 4–5, 65; New York Compl. ¶¶ 11, 55–59. Accordingly, the Ban strikes at the *heart* of sensitive areas of state policymaking, especially public safety. *See, e.g.*, New York Compl. ¶ 6 ("[T]he Green Light Law increases the number of licensed and insured drivers on the State's roads, furthering the State's interest in public safety and economic growth."); Lewis-McCoy FAC ¶ 21 (the Green Light Law was passed to "promote public safety"); *see also Mackey v. Montrym*, 443 U.S. 1, 17 (1979) (State has a "paramount interest" in "preserving the safety of its public highways" by regulating those able to drive on its roads); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("States traditionally have had great latitude under their police powers to legislate as the protections of the lives, limbs, health, comfort, and quiet of all persons") (quotation marks omitted)).

More fundamentally, Defendants are incorrect that the equal sovereignty principle applies only in limited policy areas. Defs.' Br. 11. Rather, this "fundamental principle" applies to protect individual States against unjustified disparate treatment by the federal government without regard to the particular policy matter at issue. *See Shelby County*, 570 U.S. at 544.

8

Indeed, the equal sovereignty principle traditionally applied to the terms upon which new States were admitted to the Union — a function that is exclusively, indeed quintessentially, within the federal power. *See id.* at 587 (Ginsburg, J., dissenting) (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 328–29 (1966)). Defendants' argument to the contrary would defeat the "fundamental principle" of equal sovereignty in any instance where the federal government can identify some federal goal or authority underlying its actions, regardless of the State interests at stake. Nothing in the *Shelby County* decision constrains the equal sovereignty principle to that context — to the contrary, the Court specifically rejected the argument that equal sovereignty applies only in the context of certain claims. *See Shelby County*, 570 U.S. at 544 ("[T]he fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States.").[4]

Defendants' attempt to bolster their cramped interpretation of the equal sovereignty principle with recent Tenth Amendment case law is likewise misguided. *See* Defs.' Br. at 12–13. Those cases are plainly distinguishable: They involved laws of general applicability — unlike the Ban — that were alleged to have a discriminatory effect on certain states. *See Mayhew v. Burwell*, 772 F.3d 80, 94 (1st Cir. 2014) (no disparate treatment because "[o]n its face, the MOE provision applies the same rule to each state: freeze eligibility standards in existence as of March 23, 2010 until October 1, 2019, or risk losing Medicaid funding"); *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208, 239 (3d Cir. 2013) ("*NCAA*") (federal law against sports gambling does not "singl[e] out a handful of states for disfavored treatment"),

---

[4] Moreover, *Shelby County* did not even involve "an area that has traditionally been the *exclusive* province of the states." *See* Defs.' Br. at 17 (emphasis added). Rather, as the Court there noted, the federal government plays a significant role in federal elections. *Shelby County*, 570 U.S. at 543.

*abrogated on other grounds*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018);

*State of New York v. Mnuchin*, 408 F. Supp. 3d 399 (S.D.N.Y. 2019) (appeal filed Nov. 26,

2019) (coverage formula at issue in *Shelby County* "bears no resemblance to the SALT cap,

which applies to every state's taxpayers"); *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp.

3d 1092, 1145 (S.D. Cal. 2018) ("[A]s to the [principle] of equal sovereignty, section 102 applies

with equal force to any state that borders the United States.").

The courts in those cases rejected Plaintiffs' attempts to bring an equal sovereignty claim,

which, as *Shelby County* makes clear, must be based on "disparate treatment."  *See Shelby

County*, 570 U.S. at 536, 544, 555.  To the extent that these courts commented on the potential

scope of an equal sovereignty claim, the portions of these cases quoted by Defendants do not

support their extreme position that the equal sovereignty principle is wholly "inapplicable" to

certain areas of policy, much less that the relevant policy area is determined wholly by the

perspective of the federal government.

Defendants cite *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), to support the

position that the federal government may in some instances target remedial efforts at discrete

geographic areas.  *Katzenbach,* which upheld against constitutional challenge sections 4 and 5 of

the VRA as originally enacted, could not be further from the current case.  The Supreme Court

there held that the VRA's coverage formula and preclearance requirement were a permissible

exercise of Congress's enforcement authority under section 2 of the Fifteenth Amendment, and

did not violate the constitutional principle of equality of the states, for two reasons.  First,

Congress was "confronted by an insidious and pervasive evil which had been perpetuated in

certain parts of our country through unremitting and ingenious defiance of the Constitution."

*Katzenbach*, 383 U.S. at 309.  There is no argument here that the Ban is necessary to forestall

New York's "unremitting and ingenious defiance of the Constitution," or to confront "an insidious and pervasive evil" akin to entrenched racial discrimination in voting.  New York Compl. ¶¶ 72–73, 77–78 (identifying stated purposes for the Ban); Lewis-McCoy FAC ¶¶ 48, 50 (same).  Second, Congress's extensive earlier efforts to remedy this entrenched racial discrimination had failed, such that "the unsuccessful remedies which [Congress] had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment."  *Katzenbach*, 383 U.S. at 309. Here, Defendants did not attempt less invasive remedies before resorting to "sterner and more elaborate measures."  New York Compl. ¶ 79 (the Ban was implemented with no notice or opportunity for public comment, and without any discussion with state officials); Lewis-McCoy FAC ¶ 64 (New York officials had no opportunity to engage with DHS over its alleged concerns).  Defendants' basis for targeting New York through the Ban is not remotely similar to the problems Congress sought to remedy when enacting the VRA in 1965.

Finally, Defendants' contention that their motive in enacting the Ban is irrelevant to Plaintiffs' equal sovereignty claim fails.  In support, they cite to a single case in which the district court concluded that "nothing in *Shelby County* suggests that the equal sovereignty principle bars [government action] to incentivize state-level policy changes simply because it knows that some states will feel those incentives more forcefully than others."  Defs.' Br. at 15 (quoting *Mnuchin*, 408 F. Supp. 3d at 420).  But that holding turned on the district court's determination that the challenged federal action (the cap on federal income tax deduction for state and local taxes) "applies to *every* state's taxpayers and does not require *any* state to 'beseech the Federal Government for permission' to exercise its sovereign powers."  *Mnuchin*, 408 F. Supp. 3d at 420 (quoting *Shelby County*, 570 U.S. at 544). This case, by contrast, is not a

11

challenge to a generally-applicable federal policy that the federal government merely was aware would bear more heavily on New York; instead, the complaints here plausibly allege that New York was singled out for punitive treatment precisely because the State did not "beseech the Federal Government" for permission to exercise its police powers in the way the State saw fit.

*Shelby County* instructs that, when assessing whether the federal government's differential treatment of certain States is "sufficiently related" to the stated problem, evidence regarding the government's intent (including potential animus) is highly relevant to a court's assessment of the fit between the action and its rationale. Furthermore, the principle of equal sovereignty protects the "equal . . . power, *dignity*, and authority" of the States. *Shelby County*, 570 U.S. at 544 (emphasis added). A decision to target certain states for differential treatment, even if justified by reference to a neutral formula, affronts the dignity of a particular State if in fact it is based on animus or concerns unrelated to the government's stated objective. For these reasons, Defendants' intent in enacting the Ban is relevant to their equal sovereignty claim, and provides an independent basis to deny the motion to dismiss.[5]

---

[5] In addition, even if Defendants' purported rationale would be sufficient to justify the Ban, discovery is appropriate to determine whether Defendants *in fact* relied upon that rationale in deciding to enact it. In *Shelby County*, the Court rejected the argument that the record compiled during the 2006 VRA reauthorization could justify extending the coverage formula, because "Congress did not use the record it compiled" to shape that formula, but "instead reenacted a formula based on 40-year-old facts." 570 U.S. at 554. The Court thus "recogniz[ed] that [the record] played no role in shaping the statutory formula before us today." *Id.* Similarly, if Defendants' purported rationale "played no role in shaping the [Ban]," *see id.*, it should not factor into this Court's assessment of whether the Ban was sufficiently related to the problem it targets.

**B.     The complaints plausibly allege that the Ban is unconstitutionally coercive in violation of the Tenth Amendment.**

Defendants argue that the doctrine of coercion is inapplicable because this case falls outside the Spending Clause context.  Defs.' Br. at 16–19.  Even if applicable, Defendants argue, only allegations of financial inducement can support a coercion claim.  *Id.* at 17–19.  These arguments are not simply wrong on the law—they fundamentally misunderstand it.

Certainly, the Tenth Amendment ensures that Congress's power to tax and spend does not trample on state sovereignty.  *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012) ("*NFIB*").  But its protections extend well beyond this limited context.  The Tenth Amendment protects state sovereignty from impermissible federal encroachment, whether through improper exercise of the spending power or, as here, through more novel ways to coerce state action.  A central tenet of the coercion doctrine is that "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997).  "That is true whether [the federal government] directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own."  *NFIB*, 567 U.S. at 578.

Here, Plaintiffs plausibly plead that the Ban "indirectly coerces" New York to repeal or amend the Green Light Law by conditioning its residents access to the Trusted Traveler Programs on such repeal.  Viewing the allegations in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, *Eastman Kodak Co.*, 936 F.3d at 93, Plaintiffs have stated a claim of improper coercion under the Tenth Amendment.

**1.     Plaintiffs are not required to plead a Spending Clause violation.**

The text and purpose of the Tenth Amendment are not tethered to the Spending Clause, but instead embody broad principles of federalism and balance of powers.  The anti-coercion

doctrine's preservation of state sovereignty "serves as one of the Constitution's structural protections of liberty." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1477 (2018) (internal quotation omitted); *see also, e.g.*, *United States v. Lopez,* 514 U.S. 549, 552 (1995) (division of authority between States and the federal government "was adopted by the Framers to ensure protection of our fundamental liberties" (internal quotations omitted)); *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 568 (1985) (tracing history and purpose of the Tenth Amendment) (Powell, J., dissenting).  Most fundamentally, the Tenth Amendment establishes "a healthy balance of power between the States and the Federal Government," and thereby "reduces the risk of tyranny and abuse from either front."  *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

Central to the Tenth Amendment's effectiveness in "checking government abuses" is maintaining political accountability for government conduct.  *Id.* at 458–59.  Where the federal government effectively directs state action, "the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision.  Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation."  *New York v. United States*, 505 U.S. 144, 168–69 (1992); *see also Printz*, 521 U.S. at 930 ("[E]ven when the States are not forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects.").

Accordingly, the Supreme Court has rejected federal efforts to coerce state action where those efforts impinge on state sovereignty, regardless of whether the Spending Clause is

implicated.[6]   For example, in *New York*, the Court held that the "take title" provision of the

Low-Level Radioactive Waste Policy Act constituted coercion in violation of the Tenth

Amendment.  505 U.S. at 174–83.  The provision directed states to either take ownership of

radioactive waste or regulate "according to the instructions of Congress."  *Id.* at 175.  The Court

explicitly recognized that, "[i]n this provision, Congress *has not* held out the threat of exercising

its spending power or its commerce power."  *Id*. at 176 (emphasis added).  Rather, Congress

gave states a "choice" between two options that, "standing alone," would each violate state

sovereignty.  *Id.*  As "[a] choice between two unconstitutionally coercive regulatory techniques

is no choice at all," *id.*, the Court held that the provision "crossed the line distinguishing

encouragement from coercion," *id.* at 175.

Defendants' argument that unconstitutional coercion arises "only in the context of

Spending Clause legislation," Defs.' Br. at 16, is wrong.  The Constitution prohibits not only

coercive use of the federal government's spending power, but also federal action that "directs the

functioning of" state governments or officials.[7]  *Printz*, 521 U.S. at 932–33, 935 (striking down

provision requiring state employees to conduct background checks on gun purchasers,

concluding that the "whole *object* of the law [was] to direct the functioning of the state

executive," which offends "the very *principle* of separate state sovereignty"); *see also Murphy*,

138 S. Ct. at 1476 (federal statute prohibiting state authorization of sports gambling violates

---

[6] Defendants describe *NFIB* as "the only case in which the Supreme Court has ever found unconstitutional coercion."  Defs.' Br. at 20.  Plaintiffs surmise that Defendants understand "unconstitutional coercion" to encompass only coercive exercises of the spending power.

[7] Defendants also argue that the motivations underlying the Ban are not relevant to Plaintiffs' coercion claim.  Defs.' Br. at 16–17.  Plaintiffs disagree.  As Plaintiffs' analysis reveals here, a federal law or action's "object" may well be relevant to whether there has been a violation of state sovereignty.  *Printz*, 521 U.S. at 932.

Tenth Amendment).  The Tenth Amendment protects against impermissible federal efforts to control state law or policy, regardless of the source of the federal power used to effectuate that coercion.

### 2.      Plaintiffs are not required to plead financial inducement.

Defendants' argument that Plaintiffs must plead "financial inducement" to state a coercion claim likewise lacks merit.  Financial inducement may be relevant in the Spending Clause context, as Defendants recognize.  *See NFIB*, 567 U.S. at 577 (explaining that the Court has "scrutinize[d] Spending Clause legislation to ensure that Congress is not using financial inducements to exert a 'power akin to undue influence'").  But the Supreme Court has never required proof of financial inducement outside of challenges to Congress's tax and spending power, and, thus, Plaintiffs are not required to plead financial inducement.[8]

Indeed, Defendants' argument appears to get the law backwards.  *New York* establishes that attaching conditions on the receipt of federal funds pursuant to Congress's spending power is one of the three *permissible* methods of influencing state policy.  *New York*, 505 U.S. at 167.[9] The Supreme Court has held that this permissible method may be rendered impermissible if the

---

[8] Moreover, Plaintiffs have pled that Defendants' conduct will impose significant financial harm on New York.  At this stage of the litigation, Plaintiffs have more than adequately alleged such financial injury. *See* New York Compl. ¶¶ 97–103.

[9] Beyond conditions on federal funds, the Supreme Court has recognized only two other permissible methods of encouraging states to adopt particular policies. *New York*, 505 U.S. at 160, 167.  First, the Court has explained that it is not coercion when Congress "subject[s] a State to the same legislation applicable to private parties," as where laws apply equally to private and public employers. *Id.* at 160 (collecting cases that "have concerned the authority of Congress to subject state governments to generally applicable laws").  Second, the federal government may offer states "the choice of regulating . . . according to federal standards or having state law pre-empted by federal regulation." *Id.* at 167.  Neither method is applicable here.

federal government wields its purse like a gun, rather than a prize, as was the case with the Medicaid expansion invalidated in *NFIB*.  *See NFIB*, 567 U.S. at 581.  Questions of financial inducement therefore arise when courts consider whether the federal government has acted beyond the scope of its spending power—but not in every coercion challenge.  Plaintiffs were not required to plead financial inducement.

### 3.    Plaintiffs have stated a claim for coercion in violation of the Tenth Amendment.

The complaints sufficiently allege that Defendants' conduct here amounts to unconstitutional coercion.  Plaintiffs have alleged that the Ban effectively requires New York to renounce extant state legislation allowing immigrants to obtain drivers' licenses and protecting the confidentiality of applicants' personal information.  *See* New York Compl. ¶¶ 51–60; Lewis-McCoy Compl. ¶¶ 46, 48, 64–65; Ch. 37, 2019 N.Y. Laws.  The federal government's Ban conditions access to the Trusted Traveler Programs on New York's agreement to amend or withdraw its law governing the issuance of state driver's licenses to eligible state residents.  In so doing, the federal government effectively seeks to require that New York "provide information that belongs to the State and is available to them only in their official capacity; and to conduct investigation in their official capacity, by examining databases and records that only state officials have access to."  *Printz*, 521 U.S. at 933 n.17.  And Plaintiffs have plausibly alleged that if New York does not cede to Defendants' demand, the federal government will undermine the safety of New York's residents, *see* New York Compl. ¶¶ 89–96, and harm the economic livelihood of the state, *see id.* at ¶¶ 97–103.[10]

---

[10] Defendants dispute that the Ban will undermine public safety.  Defs.' Br. at 18.  That contention must be disregarded at this stage of the litigation, where the Court must accept Plaintiffs' factual allegations as true and must draw all reasonable inferences in Plaintiffs' favor. *Eastman Kodak Co.*, 936 F.3d at 93.

The choice between undoing the state's properly-enacted road safety legislation or excluding New Yorkers from a travel safety program "cross[es] the line distinguishing encouragement from coercion" and undermines the accountability of elected state officials, who may no longer "regulate in accordance with the views of the local electorate in matters not preempted." *New York*, 505 U.S. at 169, 175; *see Petersburg Cellular P'ship v. Bd. of Supervisors of Nottoway Cty.*, 205 F.3d 688, 703 (4th Cir. 2000) (recognizing that the Tenth Amendment "preclude[s] the presentation to a state of coercive 'choices'" and holding that the federal government could not demand that a state choose between complying with the Telecommunications Act or ending its role as a land use regulator).  Although the federal government is permitted to use "incentives to the States as a method of influencing a State's policy choices," *New York*, 505 U.S. at 166, the federal conduct challenged here—the singular exclusion of an entire state's residents from a public safety program of general applicability—is all stick, no carrot.  And unlike non-coercive grant conditions, whereby a state might reasonably choose to forego federal funding and instead make up any budget shortfall itself, New York has no ability here to counter the harms imposed by the Ban other than to acquiesce to federal coercion.  New York may not itself establish screening processes for international travel, nor may it create its own program for vetting travelers in or out of its borders.

That the courts may not yet have had an opportunity to review this precise type of federal coercion demonstrates only how far afield the federal government's current conduct has strayed.  As the Supreme Court explained in *Printz*, "[f]ederal commandeering of state governments is such a novel phenomenon that this Court's first experience with it did not occur until the 1970's, when the Environmental Protection Agency promulgated regulations requiring States to prescribe" certain vehicular standards.  521 U.S. at 925.  The federal government has since then

tried new ways to bypass the Tenth Amendment's restrictions.  It has put states to false choices, as in *New York*; attempted to commandeer state officials, rather than states themselves, as in *Printz*; and argued that *prohibiting* states from passing certain laws was permissible, even if *compelling* states to pass laws was not, as in *Murphy.  See Murphy*, 138 S. Ct. at 1478 (rejecting the federal government's argument that "prohibiting a State from enacting new laws" is permissible under the Tenth Amendment).  Now, Plaintiffs allege that Defendants have issued the Ban to find a backdoor to what neither Congress nor the President could do directly: force New York to change the Green Light Law.  At this stage, these allegations are sufficient to state a coercion claim.  *NFIB*, 567 U.S. at 578.

## II.   New York plausibly alleges that the Ban violates the Fifth Amendment.

Defendants next argue that the State of New York's equal protection claim must be dismissed because there are purportedly plausible reasons for the Ban.  Defs.' Br. at 21–23.  But Defendants' argument disregards the irrational reason actually given by Defendants, ignores the illegitimacy of the governmental purpose at issue, and in any event goes to the merits, not to the sufficiency of the pleadings.

The Fifth Amendment's guarantee of equal protection requires government action to "bear[] a rational relation to some legitimate end."  *Romer v. Evans*, 517 U.S. 620, 631 (1996).  This requirement mandates "scrutiny" of governmental action and is "not meant to be toothless."  *Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018) (internal quotation marks omitted).  Rather, courts examine statutes and policies to ensure that the lines drawn by policymakers are rationally related to "an independent and legitimate legislative end," so as to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."  *Romer*, 517 U.S. at 633.  Here, New York has more than plausibly alleged that (1)

Defendants' proffered basis for the Ban is not rationally related to their purported end, and (2) the Ban lacks a legitimate goal.

### A. Excluding New York from the Trusted Traveler Programs is not rationally related to Defendants' proffered goals.

Defendants justified the Ban on the sole ground that the Green Light Law "prevents DHS from accessing relevant information that only New York DMV maintains," specifically, "some aspects of an individual's criminal history," and therefore "compromises" Defendants' ability to adequately vet applicants for the Trusted Traveler Programs.  New York Compl. ¶ 73 (quoting Defendants' Ban).  However, as New York alleges, the stated basis for the Ban is untrue, and, regardless, the wholesale exclusion of New York residents from TTPs is wholly unrelated to the purported vetting issue identified by DHS.  *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973) (holding statutory amendments violated equal protection guarantees because they were "without rational basis" in light of stated purposes).

As an initial matter, while the Ban's stated rationale is that banning New York residents is necessary because CBP can no longer access conviction information that may be uniquely in the possession of the DMV, *see* Defs.' Br. at 22, New York expressly pleads the opposite is true, *see* New York Compl. ¶ 76.[11]  As detailed in New York's complaint, Defendants still have access to all pertinent DMV information through other automated sources, *id.* ¶¶ 33, 75, with no impact on its Trusted Traveler vetting operations.  On this ground alone, the Ban's stated justification is foreclosed by New York's well-pleaded complaint.

---

[11] While Defendants attempt to cast doubt on these allegations by citing purportedly contrary sections of the *Lewis-McCoy* complaint, *see* Defs.' Br. at 22, only New York has alleged a violation of equal protection.  Moreover, Defendants misquote the allegations in the Lewis-McCoy complaint.  *See* Lewis-McCoy Compl. ¶¶ 36, 38.

Recent legislative amendments to the Green Light Law paint an even starker picture of Defendants' irrationality.  On April 3, the State amended the Green Light Law to permit disclosure of DMV records "as necessary" for vetting New York applicants for Trusted Traveler programs.  *See* S7508-B, Part YYY (Reg. Leg. Sess. 2020, Ch. 58) (amending N.Y. Vehicle & Traffic Law § 201(12)(a)).[12]  As a result, the sole policy aim that Defendants purport to rely upon — access to DMV records for vetting applicants — no longer even arguably exists. Yet Defendants continue to demand that New Yorkers be categorically excluded from a generally applicable public safety program.  A blanket ban against a state's residents from public safety programs otherwise available across the country (and outside of it) is not a rational means to provide Defendants with information that they may already access.  *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985) (holding that equal protection requires the government to use "a rational means" to achieve its ends).  Accordingly, New York has more than plausibly pled that Ban is not rationally related to Defendants' stated goal.

Moreover, even the "plausible reasons" Defendants have now manufactured to support the Ban are unavailing and contrary to the well-pleaded facts.  Defs.' Br. at 22–23.  Defendants hypothesize that DMV records may be more convenient for CBP to access or vet against than the alternatives, *see* Defs.' Br. at 22, but New York has pled the contrary, *see* New York Compl. ¶¶ 33(d), 75.  Even assuming that using DMV records offers some administrative benefit, the complaint plausibly alleges that it is irrational categorically to exclude millions of New York

---

[12] The Court may properly take judicial notice of this legislative change. *See supra* at 1, n.1.

residents from the Trusted Traveler Programs on this basis and thereby make all travelers less safe.  *See* New York Compl. ¶¶ 94-96.[13]

**B.      Defendants' rationale for the Ban is not a legitimate government end.**

The Fifth Amendment requires not only that the federal government's conduct be rational, but also that it serve a "legitimate end."  *Romer*, 517 U.S. at 631.  Defendants' *post hoc* musings notwithstanding, the Ban fails this requirement as well.

The only plausible rationale for the Ban in light of the facts Plaintiffs have alleged is that it was enacted to punish New York for adopting a disfavored licensing scheme.  *See* New York Compl. ¶¶ 59–60 (describing public statements with "unusual invective" directed at New York); *id.* ¶ 57 (describing how the President sought to send a "strong message" to jurisdictions like New York); *cf. Saget v. Trump*, 375 F. Supp. 3d 280, 369 (E.D.N.Y. 2019) ("Administrative action may violate equal protection if the alleged animus of other senior executive officials, including the President, influenced or manipulated their decisionmaking process." (internal quotation marks omitted)).  Punishing New York due to political disagreement is not a "legitimate governmental purpose" under the equal protection doctrine.  *Romer*, 517 U.S. at 634-35 ("[A] bare desire to harm a politically unpopular group cannot constitute a *legitimate* government interest." (quoting *Moreno*, 413 U.S. at 534 (internal alteration omitted))).

To the extent these facts present an unusual case, that is because — before now — it would have been unthinkable for the federal government to single out a state for targeted retribution to exact punishment for refusing to comply with the federal government's policy

---

[13] Finally, Defendants argue that the fact that the Green Light Law allegedly "hinders DHS from validating documents used to establish vehicle ownership" is "a plausible reason for the delay in vehicle exports."  Defs' Br. at 22–23.  This argument fails to provide a rational basis for the Ban.  Even if true, Defendants' own argument concedes that this reason supports export delays — not banning New Yorkers from applying to the four Trusted Traveler programs.

agenda.  *See* New York Compl. ¶¶ 11, 54–60.  This only bolsters the conclusion that illegitimate

animus against New York is the sole plausible basis for the Ban.  "Discriminations of an unusual

character especially suggest careful consideration to determine whether they are obnoxious to the

constitutional provision" of equal protection.  *See Louisville Gas & Elec. Co. v. Coleman*, 277

U.S. 32, 37–38 (1928); *see also United States v. Windsor*, 570 U.S. 744, 770 (2013) (same).

Where, as here, government action "has the peculiar property of imposing a broad and

undifferentiated disability on a single named group," and where its "breadth is so discontinuous

with the reasons offered for it that the [action] seems inexplicable by anything but animus toward

the class it affects; it lacks a rational relationship to legitimate state interests." *Romer*, 517 U.S.

at 632.

Defendants suggest that the Court — confronted with a facially illegitimate government

end and a thorough rebuttal of the other offered rationales — must nonetheless continue to

conduct its own imaginative search at the pleading stage for some supportable rationale for the

Ban.  *See* Defs.' Br. at 22–23.  Although Plaintiffs agree that policymakers need not articulate a

rationale for their decision, *see F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993), when

an agency *does* offer a reason, this Court need not discard the actual reason and instead invent

different ones.  *Cf. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) ("Our review

is deferential, but we are 'not required to exhibit a naiveté from which ordinary citizens are

free.'") (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).  Instead, where

a policymaker "expressly set[s] forth" the basis for government action, courts generally look to

that stated purpose to ascertain whether the action in question bears a rational relationship to a

legitimate government purpose.  *Moreno*, 413 U.S. at 533 (holding that amendments to the Food

Stamp Act excluding unrelated household members were "without rational basis" in light of

stated purposes and therefore violated equal protection guarantees); *see also Romer*, 517 U.S. at 635 (looking to "primary rationale" and "particular justifications" put forth for the challenged state action and finding no rational relationship to a legitimate state interest); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 461–63 (1981) (examining the "purposes of the Act cited by the legislature" to assess whether there was a rational relationship); *Coal. to End Permanent Cong. v. Runyon*, 971 F.2d 765 (D.C. Cir.), *supplemented*, 979 F.2d 219 (D.C. Cir. 1992) (gauging rationality from statute's stated purpose).

Particularly on a motion to dismiss, the Court should not contort itself to credit a contrived, after-the-fact rationale.  Accepting Defendants' invitation to do so would allow governments to categorically evade equal protection challenges by simply propounding counterfactuals without the benefit of any discovery or evidence.  Drawing "all reasonable inferences" in favor of the New York Plaintiffs, New York "plausibly allege[s] facts that would overcome the policy rationales that" Defendants offer.  *Winston*, 887 F.3d at 560.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss.


Dated:  April 29, 2020
          New York, New York

                                             Respectfully Submitted,


                                             LETITIA JAMES
                                             *Attorney General of the State of New York*

                              By:     /s/ *Matthew Colangelo*
                                             Matthew Colangelo
                                             Elena Goldstein
                                             Daniela L. Nogueira
                                             28 Liberty Street

Office of the New York Attorney General
New York, New York 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

*Counsel for Plaintiff in 20 Civ. 1127*


NEW YORK CIVIL LIBERTIES
 FOUNDATION

By:     */s/ Antony P.F. Gemmell*
        Antony P.F. Gemmell
        Molly K. Biklen
        Jessica Perry
        Jordan Laris Cohen
        Christopher T. Dunn
        125 Broad Street, 19th Floor
        New York, New York 10004
        212-607-3300
        agemmell@nyclu.org

*Counsel for Plaintiffs in 20 Civ. 1142*