UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br><br>       Plaintiff,<br><br>  -v-<br><br>CHAD F. WOLF, *in his official capacity as Acting Secretary of Homeland Security,* et al.,<br><br>       Defendants. | No. 20 Civ. 1127 (JMF) |
| R. L'HEUREUX LEWIS-MCCOY et al., *on behalf of themselves and all similarly situated individuals,*<br><br>       Plaintiffs,<br><br>  -v-<br><br>CHAD WOLF, *in his official capacity as Acting Secretary of Homeland Security,* et al.,<br><br>       Defendants. | No. 20 Civ. 1142 (JMF) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2728/2745/2761
Fax: (212) 637-2717
E-mail: Zachary.Bannon@usdoj.gov
    Elizabeth.Kim@usdoj.gov
    Christopher.Connolly@usdoj.gov

ZACHARY BANNON
ELIZABETH J. KIM
CHRISTOPHER K. CONNOLLY
Assistant United States Attorneys
– Of Counsel –

i

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES...........................................................................................ii

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND............................................................................................................ 2

    I.    The Intelligence Reform and Terrorism Prevention Act of 2004...................... 2

    II.   The Green Light Law. ....................................................................................... 4

    III.  The TTP Decision ............................................................................................ 5

    IV. Amendment of the Green Light Law ................................................................ 7

STANDARD OF REVIEW ............................................................................................ 8

ARGUMENT ................................................................................................................. 9

    I.    Adjudication of TTP Applications Is Committed to DHS's Discretion by Law. .............. 9

    II.   The TTP Decision Is Not Subject to the APA's Notice-and-Comment Rulemaking Provision. .......................................................................................................11

        A.   The TTP Decision is a General Statement of Policy. ...................................11

        B.   The TTP Decision Could Alternatively Be Construed as an Interpretive Rule. ...........13

        C.   If the Court Determines that the TTP Decision Is a Legislative Rule, DHS Seeks Leave to Issue a Statement of Good Cause. ...............................................14

    III.  The TTP Decision Is Consistent with the Statutory and Regulatory Mandates Imposed on CBP. ...............................................................................................15

    IV.  The TTP Decision Is a Reasoned Response to the Information Restriction Imposed by the Green Light Law.....................................................................................18

CONCLUSION………………………………….……………………………………25

# TABLE OF AUTHORITIES

Page(s)

Cases

*American Wrecking Corp. v. Secretary of Labor*,
   351 F.3d 1254 (D.C. Cir. 2003) .......................................................................24

*Ass'n of Proprietary Colls. v. Duncan*,
   107 F. Supp. 3d 332 (S.D.N.Y. 2015) ................................................................ 8

*Badawy v. First Reliance Standard Life Ins. Co.*,
   581 F. Supp. 2d 594 (S.D.N.Y. 2008) ...............................................................18

*Camp v. Pitts*,
   411 U.S. 138 (1973).........................................................................................22

*County of Westchester v. U.S. Dep't of Housing and Urban Development*,
   802 F.3d 413 (2d Cir. 2015) ............................................................................21

*Fresno Mobile Radio, Inc. v. FCC*,
   165 F.3d 965 (D.C. Cir. 1999) ...................................................................16, 17

*Heckler v. Cheney*,
   470 U.S. 821 (1985)........................................................................................... 9

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) .....................................................................................17

*Lincoln v. Vigil*,
   508 U.S. 182 (1993)....................................................................................11, 12

*Lunney v. U.S.*,
   319 F.3d 550 (2d Cir. 2003) .............................................................................. 9

*Mack Trucks, Inc. v. EPA*,
   682 F.3d 87 (D.C. Cir. 2012)............................................................................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................... 18, 19, 21

*Nader v. Sawhill*,
   514 F.2d 1064 (Temp. Emer. Ct. App. 1975) ...................................................14

*Nat. Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) .........................................................................12

*Nat'l Fed'n of Fed. Emps. v. Devine*,
  671 F.2d 607 (D.C. Cir. 1982) ...................................................................................15

*New York Institute of Dietetics, Inc. v. Riley*,
  966 F. Supp. 1300 (S.D.N.Y. 2011) ..........................................................................22

*NRDC v. EPA*,
  808 F.3d 556 (2d Cir. 2015) ......................................................................................15

*NRDC v. EPA*,
  No. 19 Civ. 5174 (DLC), 2020 WL 615072 (S.D.N.Y. Feb. 10, 2020) ...................12

*NRDC v. NHTSA*,
  894 F.3d 95 (2d Cir. 2018) ........................................................................................14

*Olivares v. Transportation Sec. Admin.*,
  819 F.3d 454 (D.C. Cir. 2016) ....................................................................... 19, 21, 22

*PDK Labs. v. DEA*,
  362 F.3d 786 (D.C. Cir. 2004) ...................................................................................15

*R.F.M. v. Nielsen*,
  365 F. Supp. 3d 350 (S.D.N.Y. 2019) ......................................................................... 8

*Riverkeeper, Inc. v. EPA*,
  358 F.3d 174 (2d Cir. 2004) ......................................................................................18

*Roberts v. Napolitano*,
  792 F. Supp. 2d 67 (D.D.C. 2011) .............................................................................10

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943).....................................................................................................23

*Sweet v. Sheahan*,
  235 F.3d 80 (2d Cir. 2000) ........................................................................................13

*Time Warner Cable Inc. v. FCC*,
  729 F.3d 137 (2d Cir. 2013) ......................................................................................11

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)...................................................................................................21

*Webster v. Doe*,
  486 U.S. 592 (1988)..................................................................................................... 9

Statutes

5 U.S.C. § 553 .................................................................................................................11

5 U.S.C. § 553(b)(A) ..................................................................................................11, 13

5 U.S.C. § 553(b)(B) .......................................................................................................14

5 U.S.C. § 701(a)(2) ........................................................................................................10

5 U.S.C. § 702 ...................................................................................................................9

5 U.S.C. § 706 .................................................................................................................15

5 U.S.C. § 706(2)(A) .......................................................................................................18

5 U.S.C. § 706(2)(D) .......................................................................................................11

6 U.S.C. § 122(d)(2) ........................................................................................................25

6 U.S.C. § 211(c)(3) ........................................................................................................16

6 U.S.C. §§ 211(c)(1) ......................................................................................................16

8 U.S.C. § 1365(k)(3) ......................................................................................................10

8 U.S.C. § 1365b(k)(1)(B) .........................................................................................15, 17

8 U.S.C. § 1365b(k)(3)(A) ........................................................................................10, 17

8 U.S.C. § 1365b(k)(3)(C) ................................................................................................3

8 U.S.C. § 1365b(k)(3)(E) ...............................................................................................17

Regulations

8 C.F.R. § 235.12(a) ....................................................................................................7, 18

8 C.F.R. § 235.12(b)(1) .....................................................................................................7

8 C.F.R. § 235.12(b)(2) ..............................................................................................14, 21

19 C.F.R. § 192.2 ............................................................................................................24

Other Authorities

New York Senate Bill No. 1747B..............................................................................5

New York Senate Bill No. 7508B............................................................................11

## PRELIMINARY STATEMENT

On December 16, 2019, New York's *Driver's License Access and Privacy Act*, S1747B (also known as the "Green Light Law") took effect, prohibiting the New York Department of Motor Vehicles ("DMV") from providing its records "to any agency that primarily enforces immigration law." New York Senate Bill No. 1747B § 12(a). On December 30, 2019, Acting Secretary of Homeland Security Chad F. Wolf issued a memorandum directing components of the Department of Homeland Security ("DHS") to assess the impact of the Green Light Law on its security-related mission and to determine how DHS should respond to mitigate any impacts. Over the next month, DHS components, including U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE"), conducted assessments and determined that the Green Light Law impacted their operations in several significant ways. On February 5, 2020, Acting Secretary Wolf wrote a letter (the "TTP Decision") informing the Commissioner of the DMV that New York residents would no longer be eligible to enroll in CBP's Trusted Traveler Programs ("TTPs") and that used vehicle exports from New York might experience delays. This decision stemmed from the Green Light Law's data restrictions, which prevent CBP from fulfilling its mission responsibilities, including, but not limited to, determining the eligibility of applicants for TTPs.

New York and a class of New York residents brought these lawsuits challenging the TTP Decision based on, among other things, the Administrative Procedure Act ("APA"). *See New York v. Wolf*, No. 20 Civ. 1127 (JMF), Dkt. No. 1 ("NY Compl.") (S.D.N.Y.); *Lewis-McCoy v. Wolf*, No. 20 Civ. 1142 (JMF), Dkt. No. 24 ("Class Compl.") (S.D.N.Y.). But administration of the TTPs has been committed to the discretion of CBP by both statute—the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA")—and the regulatory framework established by CBP. Accordingly, the TTP Decision is not subject to judicial review under the APA.

Moreover, were the TTP Decision reviewable, it would easily survive APA review. The TTP Decision is a guidance document that informs the public of how CBP intends to exercise its significant discretion administering TTPs. It is therefore not subject to the APA's notice-and-comment rulemaking provision. In addition, rather than constituting an act of "political retribution," as alleged by Plaintiffs, *see* NY Compl. ¶ 1, the TTP Decision was the culmination of an agency-wide operational assessment that revealed specific operational concerns created by the Green Light Law. In particular, the TTP Decision reflects a reasoned conclusion that as a result of the Green Light Law, CBP no longer had access to information necessary to vet TTP applicants from New York and to facilitate the exportation of New York titled vehicles in an expeditious manner. For the reasons that follow, this Court should grant summary judgment on Plaintiffs' APA claims in favor of Defendants.

## BACKGROUND

### I.   The Intelligence Reform and Terrorism Prevention Act of 2004.

The Global Entry program is a product of the Intelligence Reform and Terrorism Prevention Act of 2004. "Consistent with the report of the National Commission on Terrorist Attacks Upon the United States [(the "9-11 Commission")], Congress" found that: "[e]xpediting the travel of previously screened and known travelers across the borders of the United States should be a high priority;" and "[t]he process of expediting known travelers across the borders of the United States can permit inspectors to better focus on identifying terrorists attempting to enter the United States." 8 U.S.C. § 1365b(k)(1). To accomplish these goals, the IRTPA provides that "[t]he Secretary of Homeland Security shall establish an international registered traveler program . . . to expedite the screening and processing of international travelers . . . who enter and exit the United States." *Id.* § 1365b(k)(3)(A).

Congress provided the Secretary with only limited guidance on how the Secretary was to

establish "criteria for participation," 8 U.S.C. § 1365b(k)(3)(C), in registered traveler programs. For example, the Secretary was required to "incorporate[] available technologies, such as biometrics and e-passports, and security threat assessments." *Id.* The Secretary was also directed to "establish[] a reasonable cost of enrollment," "mak[e] program enrollment convenient and easily accessible," and "provid[e] applicants with clear and consistent eligibility guidelines." *Id.* § 1365b(k)(3)(E)(i)-(iii).

Accordingly, the Secretary created Global Entry to implement IRTPA's goal of expedited screening of low-risk international travelers. In addition, the Secretary created NEXUS, Secure Electronic Network for Travelers Rapid Inspection ("SENTRI"), and Free and Secure Trade ("FAST"), similar programs providing for expedited travel for known travelers at land borders. Global Entry "is a voluntary international trusted traveler program consisting of an integrated passenger processing system that expedites the movement of low-risk air travelers into the United States by providing an alternate inspection process for pre-approved, pre-screened travelers." 8 C.F.R. § 235.12(a). "U.S. citizens, U.S. nationals, [] U.S. lawful permanent residents," and "certain nonimmigrant aliens from countries that have entered into arrangements with CBP" "may apply to participate in Global Entry" so long as they hold proper documentation as specified in 8 C.F.R. § 235.12(b)(1) and are not deemed ineligible based on certain "disqualifying factors." *Id.* § 235.12(b)(1)(i)–(ii). "Disqualifying factors" include an applicant giving "false or incomplete information on the application," having been "arrested for, or convicted of, any criminal offense," and being unable to "satisfy CBP of his or her low-risk status." *Id.* § 235.12(b)(2)(i), (ii), (vii). An individual is not eligible to participate in Global Entry "if CBP, at its sole discretion, determines that the individual," among other things, "presents a potential risk for terrorism, criminality (such as smuggling), or is otherwise not a low-risk traveler." *Id.* § 235.12(b)(2); *see also* Declaration of

Pete Acosta, dated June 19, 2020 ("Acosta Decl.") ¶¶ 9-12, 14-16 (explaining NEXUS, SENTRI, and FAST).

Policies and procedures for the TTPs are set forth in an internal CBP handbook (the "TTP Handbook"). Dkt. No. 65-1[1] ("AR") 48-61. When vetting applicants, CBP applies "strict standards for multiple convictions," AR 62, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, AR 52. "CBP officers at the VC [vetting center] . . . electronically vet each application through the use of automated queries" of certain systems, AR 56, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* "Applicants who fail to meet the eligibility requirements after VC vetting will be denied." AR 60. "*Generally, if low-risk status cannot be determined, the application must be denied.*" AR 52 (emphasis in original).

## II. The Green Light Law.

Because eligibility for CBP's TTPs is determined by reference to state and local criminal histories, arrest records, and investigations, CBP relies on partnerships with state and local agencies. Until recently, CBP was able to access real-time driver license and vehicle data from New York through the International Justice and Public Safety Network ("Nlets"). AR 9; Acosta Decl. ¶ 22. However, when the Green Light Law went into effect on December 16, 2019, the DMV was prohibited from sharing information with "any agency that primarily enforces immigration law"—specifically including ICE and CBP—absent a court order or judicial warrant. New York Senate Bill No 1747B § 12. It further provided that "any person or entity that receives or has access to records or information from the Department [must] certify to the Commissioner,

---

[1] Citations to docket entries refer to the docket of *New York v. Wolf*, No. 20 Civ. 1127 (JMF) (S.D.N.Y.).

before such receipt or access, that such person or entity shall not . . . disclose such records or information to any agency that primarily enforces immigration law." *Id.* § 12(b).  New York is the only state that has restricted CBP's access to driver's license and vehicle data via Nlets.  *See* Acosta Decl. ¶ 22.

### III.   The TTP Decision

Implementation of the Green Light Law raised immediate concerns within DHS.  AR 65. By December 30, 2019, Acting Secretary Wolf "instruct[ed] each operational component [of DHS] to conduct an assessment of the impacts of" the Green Light Law and similar laws in order to complete a "Department-wide assessment of the impacts" and determine "potential solutions to mitigate" them.  AR 4.  Acting Secretary Wolf tasked the DHS Office of Strategy, Policy, and Plans ("Policy") with consolidating those assessments.  AR 5.

DHS components, including CBP, completed operational assessments.  *See* AR 6-30.  CBP explained that due to the Green Light Law, its access to Nlets had been discontinued, and that it had previously used Nlets information "for a variety of reasons beyond immigration enforcement," including "national security, enforcement of agricultural and customs laws as well as other federal laws that CBP enforces and administers at the borders."  AR 9; *see also* Acosta Decl. ¶ 20; Declaration of Robert Perez, dated June 17, 2020 ("Perez Decl.") ¶¶ 8-11.  In its assessment, CBP specifically discussed the potential impacts of CBP's inability to use DMV information for TTPs, the Enhanced Driver's License Program, and vehicle exports.  AR 10-13.

On January 27, 2020, DHS Policy issued a memorandum summarizing the operational assessments of each DHS component and providing recommendations on how to mitigate the detrimental effects of the Green Light Law.  AR 31-41.  Policy's recommendations included "exclud[ing] residents from uncooperative states from participating in DHS Trusted Traveler Programs" and "[d]e-prioritiz[ing] the export of uncooperative state-titled vehicles."  AR 40-41.

These recommendations were responsive to the negative effects of the Green Light Law on CBP programs. CBP's operational assessment explained that "[i]dentity confirmation is a critical element in establishing eligibility" for participation in TTPs, which "expedite the processing of known, low risk, vetted travelers arriving into the United States[.]" AR 10. CBP also explained that "Nlets enables CBP to validate NY driver's license identity during the interview process for issuance of the TTP cards which serve in lieu of a passport at land borders." AR 10-11. CBP's operational assessment also noted that "[w]ithout access to NY DMV Nlets data[,] CBP is required to manually authenticate" each of thousands of "vehicle[s] and supporting data" for New York state titled vehicle exports. AR 12. Further, in correspondence sent to DHS leadership, CBP explained that the Green Light Law "would prevent CBP from receiving information relating to criminal convictions involving motor vehicles (DWIs, misdemeanors or felonies)," and that "[m]embership in a CBP Trusted Traveler Program requires application of strict standards for multiple convictions that can no longer be assessed for applicants residing in the State of NY." AR 62.

On February 5, 2020, Acting Secretary Wolf informed New York that "New York residents w[ould] no longer be eligible to enroll or re-enroll in CBP's Trusted Traveler Programs" and that "the exporting of used vehicles titled and registered in New York w[ould] be significantly delayed and could also be costlier." AR 3. Acting Secretary Wolf explained that the Green Light Law "precludes [CBP] and [ICE] from accessing and validating pertinent information contained in New York DMV records that is operationally critical in DHS's efforts to keep our nation secure." AR 1. Specifically, "[h]aving access to New York DMV information has enabled CBP to validate that an individual applying for [TTP] membership qualifies for low-risk status" because, among other things, those individuals' "criminal history affects their eligibility." *Id*. Acting Secretary Wolf

also explained that the Green Light Law's data-sharing restriction "delays a used vehicle owner's ability to obtain CBP authorization for exporting their vehicle."  AR 2.

### IV.   Amendment of the Green Light Law

On April 3, 2020, during the pendency of this litigation, New York amended the Green Light Law (the "Amendment").  *See* Part YYY, New York Senate Bill No. 7508B.   The Amendment allows for disclosure of New York DMV records by the DMV Commissioner or his agents or employees "as necessary for an individual seeking acceptance to a trusted traveler program, or to facilitate vehicle imports and/or exports." *Id*.  However, it also criminalizes the disclosure of DMV records to any employee or agent of CBP or ICE for purposes not within the law's carve-outs, even if that disclosure is internal to DHS. *Id*.

To date, New York has not restored CBP's access to its DMV data.  Perez Decl. ¶ 6.  Even if access were restored, "[t]he Amendment presents CBP officers with a choice of either following NY law or properly fulfilling their statutory mandates." *Id*. ¶ 8.  In 2002, the 9-11 Commission determined that information sharing across the federal government was of critical importance to guarding against future terrorist attacks.  The 9-11 Commission Report at 416-18, available at https://govinfo.library.unt.edu/911/report/911Report.pdf;  *see also* Declaration of Scott Glabe, dated June 19, 2020 ("Glabe Decl.") ¶ 4; Perez Decl. ¶ 16.  The Homeland Security Act of 2002 accordingly provided that the Secretary of Homeland Security must have access to all information necessary to carry out DHS's mission, and that he should facilitate information sharing both within the federal government and between federal, state, and local governments.  Glabe Decl. ¶ 5.  Moreover, DHS's February 2007 Policy for Internal Information Exchange and Sharing (the "One DHS Policy") provides that no DHS component shall consider another DHS component to be a separate agency for information-sharing purposes, and prohibits DHS components from entering into agreements that are inconsistent with any aspect of the policy. *Id*. ¶ 6.

The Amendment conditions access to DMV records on the imposition of data restrictions antithetical to the 9-11 Commission's recommendations and DHS's statutory and policy objectives. *Id.* ¶ 12. When CBP accesses data from New York's DMV for TTP vetting, that information may be entered across multiple law enforcement databases. Perez Decl. ¶ 10. In order to utilize DMV information, CBP would be required "to silo that information from its databases, preventing law enforcement officers who may be conducting critical investigations, including those related to terrorism, from identifying connections between individuals or relevant information." *Id.* ¶ 15. Compliance with "New York's Green Light Law would require CBP to reverse decades of efforts to achieve the fluid network of information sharing across the government that was deemed critical by the 9-11 Commission to avoid future threats to our nation's security." *Id.* ¶ 16. The Amendment does not make DMV information available to CBP unless it agrees to fundamentally alter its operations, in contravention of policy and statute.

## STANDARD OF REVIEW

"In deciding a motion for summary judgment under Rule 56, courts 'grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 360 (S.D.N.Y. 2019) (quoting Fed. R. Civ. P. 56(a)). "However, where 'a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal, and the entire case on review is a question of law.'" *Id.* (quoting *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015)). "Accordingly, the usual summary judgment standard under Rule 56 does not apply because the Court need only 'address legal questions' to decide 'whether the agency acted arbitrarily, capriciously or in some other way that violates" the APA. *Id.* (quoting *Ass'n of Proprietary Colls.*, 107 F. Supp. 3d at 344).

8

**ARGUMENT**

The TTP Decision provides guidance on how DHS will administer its discretionary programs for residents of New York. Because enforcement of the TTPs is committed to agency discretion by law, the TTP Decision is not reviewable under the APA. Were the TTP Decision reviewable, it would be lawful. The TTP Decision was not subject to the APA's notice-and-comment rulemaking provision because it was not a substantive rule. Further, it was consistent with the statutory and regulatory mandates governing administration of the Trusted Traveler Programs. And finally, it was a reasonable response to the information deficit caused by New York's revocation of DMV data access pursuant to the Green Light Law. For the reasons that follow, this Court should grant summary judgment in favor of Defendants.

**I.    Adjudication of TTP Applications Is Committed to DHS's Discretion by Law.**

At the threshold, Plaintiffs' claims are not cognizable under the APA. While the APA grants a cause of action to those who are "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, it withdraws that cause of action "to the extent that . . . agency action is committed to agency discretion by law." *Id.* § 701(a)(2). "[E]ven where Congress has not affirmatively precluded review" of an action, it is not reviewable under the APA when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Cheney*, 470 U.S. 821, 830 (1985). "[Section] 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based," *Webster v. Doe*, 486 U.S. 592, 600 (1988), and permits review only if a plaintiff can "specify some statute or regulation that would limit the [agency's] discretion" in taking the challenged action, *Lunney v. U.S.*, 319 F.3d 550, 558 (2d Cir. 2003).

Here, Plaintiffs challenge the TTP Decision, which informs how CBP will exercise its discretion when reviewing TTP applications and facilitating vehicle exports. The IRTPA instructs

9

the Secretary of Homeland Security to "establish an international registered traveler program that incorporates available technologies, such as biometrics and e-passports, and security threat assessments to expedite the screening of processing of international travelers." 8 U.S.C. § 1365b(k)(3)(A). That provision does not provide guidance relevant to the TTP Decision; Plaintiffs do not challenge whether the TTPs "incorporat[ed] available technologies" of the sort delineated by the IRTPA. Moreover, the implementing regulations of the Global Entry program repeatedly emphasize the broad discretion afforded to CBP in adjudicating TTP applications. "An individual is ineligible to participate in Global Entry if CBP, *at its sole discretion*, determines that the individual . . . is otherwise not a low-risk traveler." 8 C.F.R. § 235.12(b)(2) (emphasis added); *see also id.* § 235.12(k) ("An individual whose application is denied . . . has three possible methods for redress [that] do not create or confer any legal right, privilege or benefit on the applicant or participant, and are wholly discretionary on the part of CBP."); *id.* § 235.12(j)(2) (listing five reasons for suspension or removal, all committed to "CBP, at its sole discretion"). Significantly, the sole court to address whether there are meaningful standards against which to judge the adjudication of Global Entry applications found that there are not. *See Roberts v. Napolitano*, 792 F. Supp. 2d 67, 73-74 (D.D.C. 2011). The *Roberts* court observed that aside from the general mandates set forth in 8 U.S.C. § 1365(k)(3), the IRTPA "[was] silent as to the criteria the Secretary of Homeland Security should apply in approving applications for entry into the Global Entry program[,]" which "indicate[d] that Congress committed to the [government] the sole discretion to determine eligibility guidelines and evaluate applicants." *See id.* at 73-74.

Because the IRTPA and CBP's implementing regulations do not provide standards through which the TTP Decision can be judged, Plaintiffs' APA claims should be dismissed as unreviewable under 5 U.S.C. § 701(a)(2).

10

## II.   The TTP Decision Is Not Subject to the APA's Notice-and-Comment Rulemaking Provision.

The manner in which DHS promulgated the TTP Decision also does not render it invalid under the APA.   New York and the Class-Action Plaintiffs assert that the TTP Decision was promulgated "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), because DHS did not promulgate the decision under the notice-and-comment rulemaking provision, 5 U.S.C. § 553.   NY Compl. ¶¶ 114-22; Class Compl. ¶ 115.   But "[t]he APA's notice-and-comment requirements apply only to 'substantive,' what are sometimes termed 'legislative,' rules." *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 168 (2d Cir. 2013) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 196 (1993)).   By contrast, § 553 explicitly exempts from its requirements "general statements of policy," "interpretive rules," and rules promulgated "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(A), (B).   Each of these provisions exempts the TTP Decision from § 553.

## A.   The TTP Decision Is a General Statement of Policy.

The TTP Decision explains that the Green Light Law "compromises CBP's ability to confirm whether an individual applying for TTP membership meets program eligibility requirements."   AR 1.   Specifically, the Green Light Law "prevent[s] CBP from receiving information relating to criminal convictions involving motor vehicles."   AR 62.   As the Global Entry regulations state, an "applicant may not qualify for participation" in Global Entry if "[t]he applicant has been arrested for, or convicted of, any criminal offense," or if "[t]he applicant cannot satisfy CBP of his or her low-risk status or meet other program requirements."   8 C.F.R. § 235.12(b)(2)(ii), (vii).   In light of the Green Light Law's data restriction, "[these] standards . . . [could] no longer be assessed for applicants residing in the State of NY."   AR 62.   Rather than *sub*

11

*silentio* denying New York applications on a one-off basis, DHS opted for transparency and issued the TTP Decision to explain that, moving forward, it would no longer be able to satisfy itself of the preconditions for admission of New York residents into TTPs. AR 3.

Where, as here, an "agency action . . . merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule," the agency action is a "general statement of policy." *Nat. Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014); *see also NRDC v. EPA*, No. 19 Civ. 5174 (DLC), 2020 WL 615072, at *10 (S.D.N.Y. Feb. 10, 2020) ("General statements of policy . . . are 'statements issued by an agency to advise the public prospectively on the manner in which the agency proposes to exercise a discretionary power.'" (quoting *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993)).

TTP applications are adjudicated "in the sole discretion" of CBP, by application of several "disqualifying factors," including whether an individual is able to "satisfy CBP of his or her low-risk status or meet other program requirements." *See e.g.*, 8 C.F.R. § 235.12(b)(2)(vii). The Green Light Law "compromise[d] CBP's ability to confirm whether an individual applying for TTP membership meets program eligibility requirements." AR 2. And, "[*g*]*enerally, if low-risk status cannot be determined, the application must be denied.*" AR 52 (emphasis in original). In other words, without DMV information, DHS determined that TTP applicants from New York could not satisfy TTP eligibility requirements. The TTP Decision explains how TTP applications would be reviewed, pursuant to pre-existing standards, moving forward.

Because "[t]he APA's notice-and-comment requirements do not apply to general statements of policy," *NRDC*, 2020 WL 615072, at *10 (quotation marks omitted), DHS was not obligated to promulgate the TTP Decision under the notice-and-comment rulemaking provision.

**B.      The TTP Decision Could Alternatively Be Construed as an Interpretive Rule.**

As with general statements of policy, the APA's notice-and-comment provision excludes from its purview "interpretative rules." 5 U.S.C. § 553(b)(A). In contrast with legislative rules, "[i]nterpretive rules . . . do not create rights, but merely clarify an existing statute or regulation." *Sweet v. Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000) (quotation marks omitted). If identified as a rule rather than a general statement of policy, the TTP Decision is best understood as an interpretive rule rather than a legislative rule.

The TTP Decision does not create (or take away) rights. The standards setting forth eligibility requirements for TTP membership are clearly delineated in those programs' implementing regulations. *See e.g.*, 8 C.F.R. § 235.12(b)(2)(i)-(vii). Those regulations authorized CBP, in its sole discretion, to deny TTP membership to individuals who could not provide the necessary information for CBP to adequately vet their low-risk status. Specifically, the regulations make it a "disqualifying factor," where "[t]he applicant cannot satisfy CBP of his or her low-risk status." *See e.g.*, 8 C.F.R. § 235.12(b)(2)(vii). Rather than creating new rights, the TTP Decision merely explains that a certain category of TTP applicants—New York residents—cannot satisfy CBP of their low-risk status, because CBP has been deprived of potentially relevant information by the Green Light Law. *See* AR 1 (Green Light Law "compromises CBP's ability to confirm whether an individual applying for TTP membership meets program eligibility requirements."); AR 62 ("[S]trict standards…[could no] longer be assessed for applicants residing in the State of NY.").

Because the APA "permits an exception to the usual notice-and-comment rulemaking procedures when a rule is merely 'interpretative,'" *Sweet*, 235 F.3d at 90, the TTP Decision is exempt from the notice-and-comment procedures even if construed as a rule.

**C.    If the Court Determines that the TTP Decision Is a Legislative Rule, DHS Seeks Leave to Issue a Statement of Good Cause.**

In the event that the Court finds that the TTP Decision is a legislative rule, the Court should grant DHS leave to issue a statement of good cause in accordance with 5 U.S.C. § 553(b)(B). [2] That provision provides exemption from the notice-and-comment requirements "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* Here, DHS did not issue such a statement, given its view that it was not promulgating a legislative rule. Nonetheless, this exemption applies to the TTP Decision.

In particular, compliance with the notice-and-comment requirements would have been impractical in light of the exigency created by the Green Light Law. "Impracticality is fact and context specific, but is generally confined to emergency situations in which a rule would respond to an immediate threat to safety, such as to air travel, or when immediate implementation of a rule might directly impact public safety." *NRDC v. NHTSA*, 894 F.3d 95, 114 (2d Cir. 2018); *see also Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) ("[W]e have suggested agency action could be sustained on this basis if, for example, air travel security agencies would be unable to address threats posing a possible imminent hazard to aircrafts, persons, and property within the United States." (quotation marks omitted)). The Green Light Law prevented CBP from conducting comprehensive risk assessments. *See* AR 1, 10. Had CBP continued processing applications, it would not have been able to ensure that TTP applicants from New York were low-risk. 8 C.F.R.

---

[2] Alternatively, this Court can find good cause without requiring reasoning expressed through a statement of good cause. *See, e.g.*, *Nader v. Sawhill*, 514 F.2d 1064, 1068-69 (Temp. Emer. Ct. App. 1975) (finding good cause based on reasoning not found in agency's statement of good cause because the failure to include that reasoning was "but a technical violation of normal procedures, which [the Court did] not think warrants reversal, considering the expeditious nature of the proceedings and that good cause in fact was present.").

§ 235.12(a), (b)(2).  Compromising the thorough background check procedures that undergird the TTPs would have prevented those programs from serving their purpose—allowing inspectors to better focus on identifying security threats.  *See* 8 U.S.C. § 1365b(k)(1)(B); *see also* Acosta Decl. ¶ 17 ("The importance of thoroughly vetting the applicants for TTPs cannot be overstated.").

DHS's "action was required by events and circumstances beyond its control, which were not foreseen in time to comply with notice and comment procedures." *Nat'l Fed'n of Fed. Emps. v. Devine*, 671 F.2d 607, 611 (D.C. Cir. 1982).  It had good cause to forego notice-and-comment rulemaking.

* * *

For the foregoing reasons, the TTP Decision was not subject to the notice-and-comment requirements of the APA.[3]

### III.  The TTP Decision Is Consistent with the Statutory and Regulatory Mandates Imposed on CBP.

Further, contrary to Plaintiffs' suggestion, NY Compl. ¶¶ 123-29, Class Compl. ¶¶ 112-15, the TTP Decision presents no conflict with the statutory or regulatory provisions governing CBP and TTP operations.  Plaintiffs selectively identify statutory provisions regarding CBP's responsibilities to argue that the TTP Decision is illegal because it makes fewer people eligible for TTPs.  But their isolated reading of statutory provisions embodying general principles provides no

---

[3] To the extent the Court disagrees, remand without vacatur is the appropriate remedy.  *See NRDC v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015) (acknowledging the power of courts to remand without vacatur under the APA).  The APA directs that "due account shall be taken of the rule of prejudicial error," 5 U.S.C. § 706, meaning that if an "agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration," *PDK Labs. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004).  Because of the Green Light Law, CBP would have rejected each New York resident's TTP application, with or without the TTP Decision.  Moreover, even with the Amendment, CBP's access to New York DMV data has not been restored.  *See* Perez Decl. ¶ 6.  Remand without vacatur is accordingly appropriate to remedy any procedural error.

reason to find the TTP Decision unlawful.

For example, New York argues that the TTP Decision "does not comply with the statutory requirement that the Commissioner of CBP 'shall . . . facilitate and expedite the flow of [legitimate] travel and trade.'"   NY Compl. ¶ 126 (quoting 6 U.S.C. § 211(c)(3)).   Section 211(c)(3) falls within CBP's organic statute and is one of nineteen objectives imposed on CBP.  It thus cannot be read in isolation.   Other objectives include that the "Commissioner shall":

- "coordinate and integrate the security . . . functions of [CBP], *id.* § 211(c)(1);
- "ensure the interdiction of persons and goods illegally entering or exiting the United States," *id.* § 211(c)(2);
- "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States, in cases in which such persons are entering, or have recently entered, the United States," *id.* § 211(c)(5); and
- "safeguard the borders of the United States to protect against the entry of dangerous goods.," *id.* § 211(c)(6).

Far from unilaterally focusing on maximizing trade and travel within the United States, CBP is tasked with balancing the facilitation of travel with the maintenance of border security.  While the TTP Decision may not expand the number of individuals eligible for TTPs, it serves security objectives in furtherance of CBP's mission.   *See, e.g.*, AR 1 (noting that DMV information "enabled CBP to validate that an individual applying for [TTP] membership qualifies for low-risk status").   These security objectives are delineated in the same statute that Plaintiffs contend Defendants have violated.  *See* 6 U.S.C. §§ 211(c)(1), (2), (5) and (6).  Because the TTP Decision advances multiple objectives of CBP, New York's assertion that it "does not comply" with 6 U.S.C. § 211(c)(3) is unavailing.  *See Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999) ("When an agency must balance a number of potentially conflicting objectives, which these are, judicial review is limited to determining whether the agency's decision reasonably advances at least one of those objectives.").

For the same reason, the TTP Decision does not conflict with the IRTPA's requirement that "[t]he Secretary shall ensure that the international registered traveler program includes as many participants as practicable." 8 U.S.C. § 1365b(k)(3)(E). Rather than mandating open enrollment in TTPs, this provision recognizes DHS's need to balance enrollment against other objectives, as evidenced by the statute's direction to enroll "as many participants *as practicable.*" *Id.* (emphasis added). In other provisions, Congress identified the need for DHS to conduct "security threat assessments," *id.* § 1365b(k)(3)(A), and explained that the purpose of TTPs was to separate low-risk travelers from others, so that DHS could "better focus on identifying terrorists attempting to enter the United States," *id.* § 1365b(k)(1)(B). Again, the TTP Decision reflects CBP's reasonable balance of the TTPs' security and enrollment objectives. The Court should reject the invitation to second-guess this balance under "contrary to law" review.

Finally, Plaintiffs' suggestion that the TTP Decision conflicts with regulations allegedly "requiring an individualized determination of risk," in connection with TTP applications, NY Compl. ¶ 127, is without merit because the TTP Decision simply explains how CBP will apply its risk-determination criteria to a group of similarly situated applicants. Under 8 C.F.R. § 235.12(b)(2), "[a]n individual is ineligible to participate in Global Entry if CBP, at its sole discretion, determines that the individual . . . is otherwise not a low-risk traveler." As discussed above, because of the Green Light Law, New York applicants can no longer assure CBP that they are low-risk and meet other program requirements. *See supra* Section II.A. In other words, an "applicant [from New York] cannot satisfy CBP of his or her low-risk status or meet other program requirements." *Id.* § 235.12(b)(2)(vii). This determination was a reasonable interpretation of the risk-assessment categories delineated by CBP's regulations, and is entitled to deference. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2411-14 (2019). Having made this determination, nothing compelled

CBP to deny New York applicants one by one, rather than issuing the TTP Decision.

* * *

Accordingly, because Plaintiffs' invocation of general statutory objectives imposed on CBP do not establish that the TTP Decision was issued "not in accordance with law," 5 U.S.C. § 706(2)(A), the Court should grant summary judgment in favor of Defendants.

### IV.   The TTP Decision Is a Reasoned Response to the Information Restriction Imposed by the Green Light Law.

Finally, Plaintiffs challenge the TTP Decision as arbitrary and capricious. NY Compl. ¶¶ 130-34; Class Compl. ¶ 112. The TTP Decision reflects the culmination of an operational assessment conducted to determine how the Green Light Law impacted DHS. DHS identified specific concerns created by the loss of access to data on which its components had long relied, determined that specific programs would be affected, and issued a targeted response to counteract those effects. The TTP Decision thus was not arbitrary or capricious.

"The arbitrary and capricious standard of review is considered the least demanding form of judicial review of administrative action." *Badawy v. First Reliance Standard Life Ins. Co.*, 581 F. Supp. 2d 594, 601 (S.D.N.Y. 2008) (quotation marks omitted). Arbitrary and capricious review "is narrow, limited to examining the administrative record to determine whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Riverkeeper, Inc. v. EPA*, 358 F.3d 174, 184 (2d Cir. 2004) (quotation marks omitted). Agency action must be upheld if it is "rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). Moreover, "courts do not second-guess expert agency judgments on potential risks to national security," "[r]ather, [they]

defer to the informed judgment of agency officials whose obligation it is to assess [those] risks."
*Olivares v. Transportation Sec. Admin.*, 819 F.3d 454, 462 (D.C. Cir. 2016).

The TTP Decision easily survives arbitrary and capricious review. When New York restricted DHS's access to DMV records, Acting Secretary Wolf directed a review of the Green Light Law's operational impact on each DHS component "so that [DHS] [would be] prepared to deal with and counter these impacts as [it] protect[s] the homeland." AR 4. Pursuant to that directive, DHS components conducted assessments. *See id.* 6-30.

CBP explained that "[t]he State of NY information is used for national security and enforcement of agricultural and Customs laws as well as other federal laws that CBP enforces and administers at the border." AR 6. CBP identified Trusted Traveler Programs and vehicle exports as affected areas. *Id.* It noted that "[i]dentity confirmation is a critical element in establishing eligibility to participate in any of CBP's TTPs" and that "Nlets helps CBP in confirming identity and making eligibility determinations for issuance of its TTP cards[.]" AR 34. CBP also explained that "[t]he NY Green Light law would prevent CBP from receiving information relating to criminal convictions involving motor vehicles (DWIs, misdemeanors or felonies)" which would prevent CBP from applying its "strict standards for multiple convictions" on "applicants residing in the State of NY." *Id.* 62. As set forth in the TTP Handbook, "[t]he integrity of the TTPs is maintained by a strict screening process that includes: queries of multiple law enforcement databases and biometric validation of identity prior to enrollment; 24-hour checks to continually verify low risk status of enrolled travelers; and a system of randomized referrals to secondary inspection to ensure Trusted Traveler members are in compliance with all policies and regulations of TTP." *Id.* 50. CBP also explained that the Green Light Law impacted its ability to "[d]etermin[e] the authenticity of a vehicle title and/or owner information," which is utilized when CBP performs an "inspection

in accordance with 19 CFR 192.2."[4]  AR 6; *see also* AR 12 ("CBP must determine eligibility of vehicles titled in NY, specifically to verify clear ownership of the vehicle by the exporter.").  New York was the only state that has terminated CBP's access to driver license and vehicle data via Nlets.  *See* Acosta Decl. ¶ 22; *see also* AR 9 ("At this time, CBP continues to receive DMV data from other states who have restricted access to ICE.").

CBP was not the only DHS component that reported impacts.  U.S. Citizenship and Immigration Services advised that the restriction would cause "identity management concerns" with its E-Verify Program.  AR 27 ("Unfortunately, E-Verify participating employers will have to rely on a physical inspection of driver's licenses from these states and make a subjective decision as to the validity of the document . . . [which] is less secure than validating data with the source Department of Motor Vehicle (DMV) database.").  ICE reported that the Green Light Law would cause significant deleterious effects to international law enforcement efforts.  *See, e.g.*, *id.* 23 ("Long-term loss of DMV information would severely impede ICE HIS's ability to identify, locate, and arrest individuals violating federal law and severely hinder ICE HIS's ability to investigate disrupt, and dismantle transnational criminal organizations in every case category ICE HIS investigates.").  DHS's Policy office summarized the reports from each component and, on January 27, 2020, recommended, among other things, "[e]xclud[ing] residents of uncooperative states from participating in DHS Trusted Traveler Programs" and "[d]e-prioritiz[ing] the export of uncooperative state-titled vehicles."  AR 40, 41.

---

[4] Entitled "Requirements for exportation," 19 C.F.R. § 192.2 provides, in relevant part, that: "[a] person attempting to export a used self-propelled vehicle shall present to Customs, at the port of exportation, both the vehicle and the required documentation describing the vehicle, which includes the Vehicle Identification Number or, if the vehicle does not have a Vehicle Identification Number, the product identification number.  Exportation of a vehicle will be permitted only upon compliance with these requirements...."

The TTP Decision followed about a week later.  It explains in detail how the Green Light Law impacts CBP and ICE operations.  AR 1-2.  It explains that "New York DMV information has enabled CBP to validate that an individual applying for [TTP] membership qualifies for low-risk status or meets other program requirements."  AR 1; *see also id.* 10 ("[i]dentity confirmation is a critical element in establishing eligibility to participate in any of CBP's TTPs"); *id.* 62 ("Membership in a CBP [TTP] requires application of strict standards for multiple convictions that can [no] longer be assessed for applicants residing in the State of NY.").  It explains that the law "prevents DHS from accessing relevant information that only New York DMV maintains, including some aspects of an individual's criminal history."  AR 2; *see also id.* 62 ("The NY Green Light law would prevent CBP from receiving information relating to criminal convictions involving motor vehicles (DWIs, misdemeanors or felonies).").  And it explains that "CBP has needed New York DMV records to establish ownership and thus to determine whether a used vehicle is approved for export."  *Id.* 1; *see also id.* 12 ("CBP must determine eligibility of vehicles titled in NY, specifically to verify clear ownership of the vehicle by the exporter.").

DHS conducted a detailed operational assessment of the Green Light Law.  DHS components analyzed the law and explained how it impacted their programs.  Those impacts were summarized by Policy, who proposed "options to consider in response to the impact of the NY Green Light Law."  AR 39.  The TTP Decision implemented a course of action consistent with two of those options.  *Id.* l; *see also id.* 40, 41.  In other words, the TTP Decision was "supported by a weight of considered and carefully articulated expert opinion."  *County of Westchester v. U.S. Dep't of Housing and Urban Development*, 802 F.3d 413, 431 (2d Cir. 2015) (quotation marks omitted).  It relied upon "such relevant evidence as a reasonable mind might accept as adequate to support [its] conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quotation

marks and citation omitted). And it reflects the "informed judgment of agency officials whose obligation it is to assess risks to national security," commanding particular deference. *See Olivares*, 819 F.3d at 462. The TTP Decision therefore was not arbitrary nor capricious and did not violate the APA.

Plaintiffs challenge the TTP Decision on a number of grounds, none of which establish its invalidity. First, Plaintiffs argue that the TTP Decision was not rational because it did not specifically identify the information uniquely available to CBP through New York DMV records, NY Compl. ¶¶ 74-75, or how CBP vets applicants without New York DMV records, *id.* ¶ 74. In doing so, Plaintiffs attempt to impose upon DHS a degree of specificity that is not applicable to informal agency actions. An agency's decision need only "be adequately explained in the administrative record to allow judicial review." *New York Institute of Dietetics, Inc. v. Riley*, 966 F. Supp. 1300, 1311 (S.D.N.Y. 2011). An explanation may be "curt" so long as it "indicate[s] the determinative reason for the final action taken" and is "sustainable on the administrative record made." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). Here, the TTP Decision provided a "determinative reason for the final action taken." *Id.* TTP applications would be denied because the Green Light Law impacted CBP's ability to conduct risk assessments by, among other things, restricting access to criminal history available only in DMV records. AR 1-2. Vehicle exports would be delayed because CBP's ability to establish vehicle ownership had been hampered. *Id.*

Moreover, TTP regulations demonstrate CBP's need for access to DMV records for all TTP applicants, irrespective of whether or not an applicant possesses a New York driver's license. Even if CBP ultimately learns that the New York DMV does not have records for any individual applicant, CBP cannot fulfill its duty to determine that an applicant can "satisfy CBP of his or her low-risk status or meet other program requirements," 8 C.F.R. § 235.12(b)(2)(vii),

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see* AR 56; *see also* Acosta Decl. ¶ 20 (explaining importance of DMV record check even for unlicensed individuals).   New York's Green Light Law precluded CBP from determining whether a TTP applicant was low-risk.   *See* AR 52 ("*Generally, if low-risk status cannot be determined, the application must be denied.*") (emphasis in original).   In other words, application of the TTP Decision to individuals without New York licenses was reasonable.

Plaintiffs also criticize the TTP Decision for discussing the impact of the Green Light Law on ICE operations.  NY Compl. ¶¶ 77-78.  But, as expressed, the TTP Decision's impacts on TTPs and vehicle exports were imposed because "the Act prevents DHS from accessing New York DMV records in order to determine whether a TTP applicant or re-applicant meets program eligibility requirements," and because "the Act hinders DHS from validating documents used to establish vehicle ownership[.]"  *See* AR 3.  And "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."  *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).  The TTP Decision includes discussion of the impact of the Green Light Law on ICE operations, but the APA does not bar an agency from voicing concerns ancillary to its ultimate decision, particularly where, as here, DHS informed New York that it was considering further action "to assess and mitigate the Act's adverse impact on national security and law enforcement."  AR 3.

Plaintiffs also characterize the TTP Decision as irrational because it was issued without notice and comment rulemaking and without discussion with New York officials concerning different sources from which DHS could get necessary information.   NY Compl. ¶ 79.  As discussed in detail above, the TTP Decision was not required to undergo notice and comment rulemaking.   While New York might have preferred that DHS contact it before issuing the TTP

Decision, DHS reasonably concluded that it needed "to take immediate action to ensure DHS's efforts to protect the Homeland [were] not compromised."   AR 2; *see also id.* 62.   Moreover, Plaintiffs cite to no legal authority for the proposition that DHS was required to "consult with" New York before issuing the TTP Decision.   Arbitrary and capricious review "does not permit a reviewing court to displace [an agency's] choice between conflicting views," so long as the agency's choice was rational.   *American Wrecking Corp. v. Secretary of Labor,* 351 F.3d 1254, 1261 (D.C. Cir. 2003).

Finally, Plaintiffs' claim that DHS failed to consider "the foreseeable risk that the [TTP Decision] will increase threats to public safety," NY Compl. ¶ 80, lacks merit.   The TTP Decision was issued pursuant to an agency-wide assessment undertaken because the Green Light Law "may detrimentally impact the ability of the Department to perform our security-related missions" and so that "the Department is prepared to deal with and counter these impacts as we protect the homeland."   AR 4.   The TTP Decision explained that the Green Light Law "and the corresponding lack of security cooperation from the New York DMV require[d] DHS to take immediate action to ensure DHS's efforts to protect the Homeland are not compromised."   *Id.* 2.   While Plaintiffs may disagree with DHS's assessment of public safety, there is no basis to claim that DHS "failed to consider" it.   Far from ignoring threats to public safety, those threats were the impetus for the TTP Decision.

New York's Amendment to the Green Light Law during the course of this litigation does not change the result.   New York has not restored CBP's access to its DMV records, and has thus failed to alter the status quo.   Perez Decl. ¶ 6.   And even if it had restored access, CBP could not make use of DMV records to vet TTP applications without either subjecting its officers to potential criminal liability or siloing DMV information in a manner that runs contrary to DHS' mission.   *Id.*

¶ 15.    That mission is informed by the findings of the 9-11 Commission.    *See* The 9-11 Commission Report at 418, available at https://govinfo.library.unt.edu/911/report/911Report.pdf ("We propose that information be shared horizontally, across new networks that transcend individual agencies"); DHS's statutory mandates, *see* 6 U.S.C. § 122(d)(2) ("The Secretary . . . shall work to ensure that intelligence or other information . . . is appropriately shared with the elements of the Federal Government . . ., as well as with State and local governments, as appropriate."); and DHS's longstanding operational policies, *see* One DHS Policy, available at https://www.hsdl.org/?abstract&did=469772 ("I direct all DHS components . . . to ensure that each DHS employee has access to all information pertinent to his or her responsibilities. . . . No component of DHS shall promulgate information-handling guidelines or enter into agreements that are inconsistent with any aspect of this policy.").   The APA does not require DHS to accept the Hobson's choice posed by the Green Light Law Amendment.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment over Plaintiffs' APA claims in favor of Defendants.

Dated: June 19, 2020
      New York, NY

Respectfully,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:         /s/ Zachary Bannon
      ZACHARY BANNON
      ELIZABETH J. KIM
      CHRISTOPHER K. CONNOLLY
      Assistant United States Attorneys
      86 Chambers St. 3rd Floor
      New York, New York 10007
      Tel.:    212-637-2728, 2745, 2761
      Fax:    212-637-2717
      E-mail: Zachary.Bannon@usdoj.gov
               Elizabeth.Kim@usdoj.gov
               Christopher.Connolly@usdoj.gov

26