UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br><br>                    Plaintiff,<br><br>    -v-<br><br>CHAD F. WOLF, *in his official capacity as Acting Secretary of Homeland Security,* et al.,<br><br>                    Defendants. | No. 20 Civ. 1127 (JMF) |
| R. L'HEUREUX LEWIS-MCCOY et al., *on behalf of themselves and all similarly situated individuals*<br><br>                    Plaintiffs,<br><br>    -v-<br><br>CHAD F. WOLF, *in his official capacity as Acting Secretary of Homeland Security*, et al.,<br><br>                    Defendants. | No. 20 Civ. 1142 (JMF) |

**DECLARATION**

I, Pete R. Acosta, hereby state as follows:

1. I am currently the Director of Trusted Traveler Programs, Admissibility and Passenger Programs, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I began my career with the U.S. Immigration and Naturalization Service in 1996, specifically assigned at that time to Los Angeles International Airport. In 2007, I transferred to a position in CBP Headquarters in Washington, D.C. I was then the Director of the Immigration Advisory, Joint Security, and OFO Police Liaison Officer Programs for the period spanning from 2014

through 2017. Since October 2017, I have been employed in my current role as the Director of Trusted Traveler Programs.

2. In my role as Director of Trusted Traveler Programs, I am responsible for establishing policy to ensure that individuals who apply for participation in one of CBP's Trusted Traveler Programs meet all appropriate qualifications for the program and do not pose a risk to the United States. I am therefore responsible for executing the missions of CBP and, in particular, OFO. The CBP mission includes the enforcement of the customs, immigration, and agriculture laws of the United States and hundreds of other laws on behalf of numerous federal agencies. CBP is the primary law enforcement agency responsible for securing the U.S. border at ports of entry (POEs) and preclearance locations outside the United States, while facilitating lawful international trade and travel. Among other things, OFO is responsible for coordinating the enforcement activities of CBP at POEs to deter and prevent terrorists and other criminals from entering the United States. The Trusted Traveler Programs (TTPs) are a key part of CBP's law enforcement mission and are designed specifically to facilitate lawful travel by eligible low-risk individuals.

3. I am familiar with the complaints filed in *State of New York v. Wolf*, Case No. 20-cv-1127 and *Lewis-McCoy v. Wolf*, Case No. 20-cv-1142, filed in the United States District Court for the Southern District of New York and plaintiffs' claims therein.

4. The purpose of this declaration is to provide operational background for the February 5, 2020 letter from Acting Secretary Wolf to New York State (February 5 Letter) announcing that New York residents are no longer eligible to enroll or re-enroll in CBP's TTPs because New York State terminated CBP's access through the International Justice

and Public Safety Network (Nlets) to information maintained by the New York State Department of Motor Vehicles (DMV) pursuant to the New York Driver's License Access and Privacy Act, also known as the "Green Light" Law.

5. This declaration is based on my personal knowledge, as well as information conveyed to me by my staff and other knowledgeable CBP personnel in the course of my official duties and responsibilities.

### A. CBP Trusted Traveler Programs

6. The Admissibility and Passenger Programs Office (APP) within OFO is responsible for overseeing the Trusted Traveler Programs Office. The Trusted Traveler Programs Office is responsible for operation of all aspects of the TTPs, including determining policy for eligibility.

7. TTP is a voluntary membership program operated by CBP that provides pre-approved, low-risk travelers with facilitated processing into the United States through dedicated lanes and kiosks. CBP operates the following TTPs: Global Entry; NEXUS; Secure Electronic Network for Travelers Rapid Inspection (SENTRI); and the trusted traveler/trusted shipper program, Free and Secure Trade (FAST) for commercial drivers.

8. Enrollment in these programs enables CBP to expedite the inspection process for pre-vetted, low-risk travelers, allowing CBP to focus resources toward providing additional scrutiny to individuals who present a higher risk. Low-risk travelers are directed to dedicated lanes or kiosks at airports, as applicable, for facilitated processing (unless the traveler has items to declare, there is a specific enforcement issue to address, or he/she is chosen for a selective or random secondary referral for further processing).

9. Global Entry allows for facilitated clearance of pre-approved, low-risk international air travelers through participating U.S. airports. All individuals who apply for Global Entry membership must undergo a rigorous background check and an interview conducted by a CBP officer. Global Entry members who register their vehicles with CBP may use the dedicated SENTRI lanes when entering the United States from Mexico and NEXUS lanes when traveling between Canada and the United States.

10. NEXUS allows members traveling between the United States and Canada to take advantage of facilitated processing by U.S. and Canadian officials through dedicated processing lanes at U.S. preclearance locations at airports in Canada and at designated northern border POEs and marine reporting locations. NEXUS is a reciprocal program that requires that applicants be interviewed by officers from both CBP and the Canada Border Services Agency (CBSA) and approved independently by each agency. NEXUS members may use Global Entry kiosks when entering the United States by air.

11. SENTRI members have the benefit of access to dedicated primary lanes that allow facilitated entry into the United States from Mexico at designated U.S. southern border POEs. SENTRI applicants also voluntarily undergo a thorough background check against law enforcement databases and an in-person interview with a CBP officer.

12. FAST allows members to enter the United States by land and affords facilitated processing at designated U.S. land POEs to approved commercial truck drivers who make fully qualified FAST trips between the United States and Canada, from Mexico to the United States, and from Mexico through the United States to Canada. In addition to the vetting requirement for commercial truck drivers, generally, each company whose cargo the driver is carrying is also vetted.

13. All applicants for TTP memberships must complete and submit an online application and submit payment of a non-refundable application fee. CBP processes the applicant's information and checks the information against various government databases. *See infra* ¶¶ 19-20. Following initial vetting by CBP, applicants that are conditionally approved may be directed to schedule an in-person interview. The final approval for program membership is contingent on the final decisions regarding the vetting of the application, the submission of fingerprints, and the results of the interview. The memberships are valid for five years, after which the member must re-apply and undergo additional vetting. All members are also vetted against a set of law enforcement databases on a recurrent basis, which could result in membership being revoked at any time.

14. Eligibility criteria for TTPs are set forth by regulation and Federal Register Notices.[1] CBP also publishes these criteria on its website.[2]

15. Absent any disqualifying factors, TTPs are open to U.S. citizens, U.S. nationals, and U.S. lawful permanent residents (LPRs), as well as certain non-immigrant aliens from countries that have entered into arrangements with CBP.

16. Individuals are ineligible to participate in TTPs if CBP, at its sole discretion, determines that the traveler is not sufficiently low risk or otherwise does not meet program requirements. An individual may meet application eligibility criteria, *i.e.*, be a U.S. citizen or an LPR and possess a valid passport, but may not qualify for membership based on a risk assessment. The disqualifying factors include but are not limited to:

---

[1] *See* 8 C.F.R. § 235.12; Utilization of Global Entry Kiosks by NEXUS and SENTRI Participants, 75 Fed. Reg. 82202, December 29, 2010; Announcement of Trusted Trader Program Test, 79 Fed. Reg. 34334, June 16, 2014. Current program eligibility requirements for SENTRI are found at http://www.cbp.gov/travel/trusted-traveler-programs/sentri.
[2] Eligibility criteria can be found at https://www.cbp.gov/travel/trusted-traveler-programs by navigating through the links on the left side of the screen to each respective TTP.

    (i) The applicant provides false or incomplete information on the application;

    (ii) The applicant has been arrested for, or convicted of, any criminal offense or has pending criminal charges or outstanding warrants in any country;

    (iii) The applicant has been found in violation of any customs, immigration, or agriculture regulations, procedures, or laws in any country;

    (iv) The applicant is the subject of an investigation by any federal, state, or local law enforcement agency in any country;

    (v) The applicant is inadmissible to the United States under applicable immigration laws or has, at any time, been granted a waiver of inadmissibility or parole;

    (vi) The applicant is known or suspected of being or having been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism; or

    (vii) The applicant cannot satisfy CBP of his or her low-risk status or meet other program requirements.[3]

17. Approximately 9.5 million travelers are currently enrolled in CBP's TTPs. The importance of thoroughly vetting the applicants for TTPs cannot be overstated. TTP members enjoy the privilege of expedited customs and immigration processing, to the extent applicable, in many cases with very limited interaction with a CBP officer. A thorough background check ensures that only individuals who present a low risk are approved for membership and that the membership is not taken advantage of by those individuals engaged in criminal activity or attempting to evade detection by CBP officers.

---

[3] *See* 8 C.F.R. § 235.12(b)(2).

18. Since the inception of the Global Entry program in 2008,[4] CBP has determined whether each applicant meets eligibility requirements for membership by checking the information supplied by the applicant against information contained in various law enforcement databases, including DMV records, and conducting an in-person interview of individuals who are conditionally approved. These steps are necessary in order to verify whether, *inter alia*, an applicant has any prior arrests or convictions, or pending charges, or is under investigation by any federal, state, or local law enforcement agency. If CBP determines that an applicant is not qualified for membership, CBP will deny the application. Further, CBP conducts recurrent vetting for all enrolled members and will revoke an individual's membership if CBP becomes aware that disqualifying factors exist for a current TTP member (*e.g.*, a member becomes a subject of an investigation or commits a customs violation). The denial of an application or revocation of TTP membership alone has no effect on the individual's ability to travel internationally.

19. CBP conducts checks against data available through TECS[5] (not an acronym) and the Automated Targeting System (ATS),[6] CBP-maintained platforms, for enforcement records and records of previous international travel and travel documents. These systems provide access to records from over 20 federal agencies, such as records from the Terrorist Screening Database and the Department of State. CBP also conducts checks against Federal Bureau of Investigation (FBI) databases for criminal history background information, which involves the submission of fingerprints; the National

---

[4] *See* Announcement of Program Pilot: International Registered Traveler (IRT) 73 Fed. Reg. 19861 (April 11, 2008) and Establishment of Global Entry Program, 74 Fed. Reg. 59932 (November 19, 2009).
[5] *See* DHS/CBP/PIA-021, TECS System: CBP Primary and Secondary Processing (August 12, 2016), available at www.dhs.gov/privacy; DHS/CBP/PIA-009(a) TECS System: CBP Primary and Secondary Processing (TECS) National SAR Initiative (August 5, 2011), available at www.dhs.gov/privacy.
[6] *See* DHS/CBP/PIA-006, Automated Targeting System, available at https://www.dhs.gov/publication/automated-targeting-system-ats-update.

  Crime Information Center (NCIC) for wants and warrants; and the Automated Biometric Identification System (IDENT) for immigration-related records.

20. In addition to the above databases, CBP queries Nlets for driver license and certain vehicle data.[7]  CBP does so regardless of whether the Trusted Traveler applicant has provided driver license information or whether the applicant has indicated that he or she has a driver license.  Nlets query for DMV information captures information in the applicant's state of residence as well as information from several neighboring states, to the extent such states allow CBP access to DMV information through Nlets.  In instances where driver license information is not provided on the application, Nlets may be queried by using other information that the applicant provides, such as his/her address.  This permits CBP to validate the applicant's identity and to identify certain information pertaining to vehicle-related violations, even if the individual does not have a driver's license.  Driver license and vehicle data allow CBP to detect information regarding violations that the applicant has failed to disclose, which could include driving without a license.  Along with the information obtained from other law enforcement databases listed above, driver license and vehicle data help CBP to develop a complete picture of an individual's background and determine whether that individual satisfies the low-risk status requirement for membership.  The driver license and vehicle data in Nlets is the only means for CBP to obtain the real-time and accurate versions of such information.

---

[7] Such driver license information includes—but is not limited to—customer name, date of birth, mailing address, gender, and license status.  Vehicle information includes—but is not limited to—data such as year, make, model, vehicle weight, vehicle identification number, vehicle registration number, effective registration date, registration expiration date, status and certain vehicle related criminal and offenses.

21. CBP provides notice to individuals applying for CBP's TTPs that CBP conducts checks against the databases discussed above, through the application website as well as various publicly available Privacy Impact Assessments and Systems of Records Notices (SORNS) that CBP and DHS have published.  *See* Appendix A.  By submitting the application, the applicants provide consent to CBP to conduct these checks.[8]

### B.  Impact of the New York "Green Light Law"

22. On December 12, 2019, four days before New York's "Green Light" Law went into effect, New York took action to deny CBP access through Nlets to information maintained by the state DMV.  Prior to December 12, CBP was able to access real-time driver license and vehicle data from New York through Nlets.  As a result of the changes New York implemented pursuant to the "Green Light" Law, when CBP queries Nlets for information pertaining to a New York resident, CBP is no longer able to view that individual's driver license and vehicle data.  Currently, New York is the only state that has terminated CBP's access to driver license and vehicle data via Nlets, impacting CBP's vetting of TTP applications of New York residents.

23. Without access to an applicant's driver license and vehicle data, CBP does not have complete information about an applicant for a TTP.  Specifically, CBP is no longer able to access information regarding certain vehicle-related and other violations that only the DMV maintains.  While CBP is still able to view certain criminal vehicle-related violations that are reflected in other federal law enforcement databases, real-time, non-

---

[8] *See* DHS/CBP/PIA-002 Privacy Impact Assessment, Global Enrollment System (January 2013) *available at* https://www.dhs.gov/publication/global-enrollment-system-ges; DHS/CBP/PIA-002 Privacy Impact Assessment (April 2006) at p.6, *available at* https://www.dhs.gov/publication/global-enrollment-system-ges (demonstrating that CBP has notified the public that it conducts checks against DMV records through Nlets since the inception of the Global Entry program).  Privacy Act of 1974, System of Records, 85 Fed. Reg. 14214, March 11, 2020.

criminal driver license and vehicle data about New York residents, as well as some aspects of any New York applicant's criminal history, such as misdemeanor traffic arrests, are only available through the New York DMV feed to Nlets. In addition, CBP checks the information obtained through Nlets against other law enforcement databases available to CBP to determine whether the applicant presents a risk. Such a gap in information precludes CBP from being able to conduct a full assessment of whether the applicant is low risk. This is true even if the applicant does not have a driver license because individuals without driver licenses could still have a record of violations with the DMV (e.g., driving without a license).

24. At this time, for purposes of vetting TTP applicants, CBP is unable to obtain, from any source, an up-to-date feed for driver license and vehicle data that the New York DMV maintains. While the "Green Light" Law contains an exception for providing access to DMV information pursuant to a court order, it is unclear whether background vetting would be grounds for obtaining such an order under that law. As of February 5, 2020, over 80,000 New York residents had pending TTP applications. Even if court orders for background vetting were allowed, undertaking such a process for each application would take months and be immensely burdensome, inefficient, and extremely impractical for purposes of vetting TTP applicants. In addition, CBP would only obtain historical, not current, information pursuant to a court order. An average Global Entry application takes up to seven months to process due to the large number of applications CBP receives. This additional process, which, if allowed, would be required for all New York resident applications and would further delay processing of all applications.

25. Even if at the time an application is submitted to CBP an applicant were to provide CBP with a copy of his/her driver license and vehicle data that the applicant obtained from the New York DMV, such information would only reflect historical information, instead of up-to-date data at the time of application vetting, and CBP would not have any means to validate that such information is accurate. Further, if CBP were to receive such information from a third party, CBP would not be able to validate that the information is accurate or up-to-date. Finally, any other alternative method of obtaining the information maintained by the DMV that would not provide CBP with current information would be impracticable and burdensome for CBP and operationally insufficient to facilitate the necessary risk assessments.

26. Without access to the information maintained by the New York DMV, CBP can no longer conduct comprehensive vetting of any New York resident TTP applicant. As a result, all pending TTP applications for New York residents were cancelled and application fees refunded as those individuals could no longer satisfy CBP of their low-risk status because CBP could not undertake a complete assessment of any of their applications without the driver license and vehicle data.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed on this 19th day of June, 2020

/s/ *Pete R. Acosta*
Pete R. Acosta
Director, Trusted Traveler Programs
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection

**APPENDIX A**

Figure 1: Login.gov Disclaimer



Figure 2: Acknowledgement of Application Requirements



Figure 3:  Privacy Act Statement

- Select "○ **Yes**".

