# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br><br>        Plaintiff,<br><br>v.<br><br>CHAD F. WOLF et al.,<br><br>        Defendants. | No.  20 Civ. 1127 (JMF) |
| R. L'HEUREUX LEWIS-MCCOY et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>CHAD WOLF et al.,<br><br>        Defendants. | No. 20 Civ. 1142 (JMF) |

## BRIEF OF NEW JERSEY, CONNECTICUT, DELAWARE, ILLINOIS, MARYLAND, MASSACHUSETTS, MINNESOTA, NEVADA, NEW MEXICO, OREGON, VERMONT, VIRGINIA, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

GURBIR S. GREWAL
*Attorney General of New Jersey*



*Attorneys for Amicus Curiae*
*State of New Jersey*

MAYUR P. SAXENA
Assistant Attorney General
TIM SHEEHAN
Deputy Attorney General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625-0080
Phone: 973-648-3283
Mayur.Saxena@law.njoag.gov

(additional counsel continued from front cover)

WILLIAM TONG
*Attorney General of Connecticut*
55 Elm Street
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General of Delaware*
820 N. French Street, 5th Floor
Wilmington, DE 19801

KWAME RAOUL
*Attorney General of Illinois*
100 W. Randolph St., 12th Fl.
Chicago, IL 60601

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

MAURA HEALEY
*Attorney General of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

HECTOR BALDERAS
*Attorney General of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609-1001

MARK R. HERRING
*Attorney General of Virginia*
202 North Ninth Street
Richmond, VA 23219

ROBERT W. FERGUSON
*Attorney General of Washington*
1125 Washington Street SE, PO Box 40100
Olympia, WA 98504-0100

KARL A. RACINE
*Attorney General for the*
*District of Columbia*
441 4th Street NW, Suite 630 South
Washington, DC 20001

## <u>TABLE OF CONTENTS</u>

IDENTITY OF AMICI CURIAE ................................................................................. 1

ARGUMENT ............................................................................................................... 2

I.  THE TRUSTED TRAVELER BAN WILL HAVE FAR-REACHING AND
    NEGATIVE CONSEQUENCES FOR THE STATES.......................................... 2

II.  THE TRUSTED TRAVELER BAN IS UNLAWFUL. ...................................... 7

    A.  The Ban Violates The Tenth Amendment. ................................................. 7

    B.  The Ban Violates The APA. ...................................................................... 10

        1.  The Ban Is Not A Matter Committed To Agency Discretion By Law. ............. 11

        2.  The Ban Is Arbitrary And Capricious Because DHS Ignored Important
            Aspects Of The Problem................................................................. 14

        3.  The Ban Is Contrary To Law Because It Conflicts With IRTPA's Mandate
            That DHS Apply "Clear And Consistent Eligibility Guidelines."................... 16

CONCLUSION........................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994) ........................................................... 12

*Cmty. Refugee & Immigration Serv. v. Petit*, 393 F. Supp. 3d 728 (S.D. Ohio 2019) .................. 9

*County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017).................................... 18

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ............................................................. 11

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ................. 14, 16

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ..................................................... 14

*Molycorp, Inc. v. EPA*, 197 F.3d 543 (D.C. Cir. 1999) ................................................................. 14

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463
    U.S. 29 (1983) ........................................................................................................ 14

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018) ........................................... 9

*Nat'l Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519 (2012) ................................................. 7

*New York v. United States*, 505 U.S. 144 (1992) .......................................................................... 7

*Printz v. U.S.*, 521 U.S. 898 (1997) ............................................................................................. 9

*Schneider v. Feinberg*, 345 F.3d 135 (2d Cir. 2003) .................................................................. 12

*Sec. of Labor v. Twentymile Coal Co.*, 456 F.3d 151 (D.C. Cir. 2006)....................................... 11

*Spencer Enter., Inc. v. U.S.*, 345 F.3d 683 (9th Cir. 2003)......................................................... 12

*United States v. California*, 921 F.3d 865 (9th Cir. 2019)........................................................... 18

*United States v. Snyder,* 852 F.2d 471 (9th Cir. 1988) ................................................................ 8

*United States v. Thurman*, 316 F. App'x 599 (9th Cir. 2009) ...................................................... 9

*Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412 (2d Cir. 2015)....................... 12

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361 (2018)..................................... 11

*White v. Shalala*, 7 F.3d 296 (2d Cir. 1993) .............................................................................. 14


**Statutes**

2013 Cal. Legis. Serv. Ch. 524 ...................................................................................................... 2

2013 Colo. Legis. Serv. Ch. 402...................................................................................................... 2

ii

2013 Conn. Legis. Serv. P.A. 13-89 ............................................................................ 2

2013 Md. Laws Ch. 309 ............................................................................................... 2

2013 N.M. Laws Ch. 31 ............................................................................................... 2

2013 Nevada Laws Ch. 282 ......................................................................................... 2

2015 Del. Laws Ch. 67 ................................................................................................ 2

2015 Hawaii Laws Ch. 172 .......................................................................................... 2

2019 N.J. Laws Ch. 271 ...................................................................................... 2, 5, 15

2019 Wash. Laws Ch. 440 .......................................................................................... 18

5 ILCS 805/1 ........................................................................................................ 10, 18

5 U.S.C. § 706 ...................................................................................................... 14, 19

8 C.F.R. § 235.12 ....................................................................................................... 19

8 U.S.C. § 1365b ................................................................................................. *passim*

49 U.S.C. § 30301 ....................................................................................................... 1

625 ILCS 5/6-105.1 ..................................................................................................... 2

Ch. 37, 2019 N.Y. Laws ............................................................................................... 2

Conn. Gen. Stat. § 54-192h ........................................................................................ 18

D.C. Code § 50-1401.05 ............................................................................................... 2

N.Y. Veh. & Traf. Law § 201 ...................................................................................... 5

P C0900, 9 P.R. Laws Ann. § 5063 ............................................................................. 2

Part YYY, N.Y. Sen. Bill No. 7508B ................................................................. 7, 8, 17

**Regulations**

77 Fed. Reg. 5681 (Feb. 6, 2012). ............................................................................ 16

**Other Authorities**

Bill Chappell, *ICE Uses Facial Recognition To Sift State Driver's License Records,
Researchers Say*, NPR (July 8, 2019) ................................................................... 5

Brett Neely, *Trump Repeats Unfounded Claims About Mail-In Voting, Threatens
Funding To 2 States*, NPR (May 20, 2020) .......................................................... 13

Collin Binkley, *Trump to US schools: Reopen or you may lose federal funds*,
ASSOCIATED PRESS (July 9, 2020)........................................................................... 13

Colorado Fiscal Institute, *The Impact of Allowing All Immigrants Access to
Driver's Licenses* (Feb. 2017) ................................................................................... 4

Hans Lueders et al., *Providing Driver's Licenses to Unauthorized Immigrants in California
Improves Traffic Safety*, Proceedings of the National Academy of Sciences (Apr. 2017) ......... 3

New Jersey Policy Perspective, *Top Six Reasons to Expand Access to Driver's
Licenses* (Dec. 2019) ................................................................................................. 4

Personal Insurance Federation of California, *AB 60 Driver Licenses Believed To
Cause 2015 Bump In Insured Vehicles* (Nov. 17, 2016)............................................ 3

Steven Escobar, *Allowing Undocumented Immigrants to Obtain Driver's Licenses in
New Mexico: Revising, Not Abandoning, the System*, 43 Wash. U. J. L. & Pol'y 285 (2014) ... 4

Sukhvir S. Brar, *Estimation of Fatal Crash Rates for Suspended/Revoked and Unlicensed
Drivers in California*, Cal. Dep't of Motor Vehicles (Sept. 2012) ............................. 2

U.S. Dep't of Transportation, Federal Highway Administration, *Year of First State
Driver License Law & First Driver Exam.* (Apr. 1997).............................................. 3

WGBH News, *Licenses for Undocumented Immigrants Seem to be Showing
Benefits in Connecticut* (Apr. 16, 2019)................................................................... 3

## IDENTITY OF AMICI CURIAE

Amici States New Jersey, Connecticut, Delaware, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Mexico, Oregon, Vermont, Virginia, Washington, and the District of Columbia are among the eighteen states and territories that enacted laws to extend the driving privilege to residents who meet the requirements for a state credential,[1] regardless of immigration status ("Green Light Laws"). These state laws, while not all identical, create a class of basic driving credentials for those who otherwise meet all the conditions but cannot establish lawful presence in the United States—and they do so within the framework set forth by the federal REAL ID Act. 49 U.S.C. § 30301 note. The amici that have enacted Green Light Laws rely on these laws to protect public safety and to integrate all of their residents into their local communities and economies. As separate and equal sovereigns, amici thus have a legitimate interest in being able to exercise their traditional prerogative to pass such laws to meet state and local needs, free from federal interference. And they especially have an interest in seeing that their residents who rely on federal Trusted Traveler programs are not arbitrarily excluded from these programs on the basis of states' implementation of such Green Light Laws, and that these and other federal programs are not wielded as a political cudgel to coerce states to adopt policies favored by the federal government.

Amici submit this brief in support of New York's arguments that the Trusted Traveler ban should be invalidated under the Tenth Amendment coercion doctrine and under the Administrative Procedure Act (APA), and to explain the grave consequences of the federal government's decision to retaliate against New York in this manner.

---

[1] The brief refers to driving "credentials" rather than "licenses," to reflect the diversity of terms on which states rely when authorizing individuals to drive without requiring proof of immigration status. *Compare* Utah Dep't of Public Safety, *Driving Privilege Card*, https://tinyurl.com/rf6f4gr, *with* Nevada Dep't of Motor Vehicles, *Driver Authorization Cards*, https://dmvnv.com/dac.htm.

## ARGUMENT

I.   **THE TRUSTED TRAVELER BAN WILL HAVE FAR-REACHING AND NEGATIVE CONSEQUENCES FOR THE STATES.**

This case involves the federal government's efforts to retaliate against New York residents on account of the state's implementation of its Green Light Law, but the ramifications of this decision go well beyond New York's borders.

As noted above, eighteen states and territories have all reached the conclusion that granting driving privileges to all qualified residents, regardless of immigration status, will promote public safety for all residents.[2] Such laws lead to direct improvements in road safety. The reason is simple: individuals with driving credentials have necessarily taken courses, and passed examinations, to ensure that they will behave safely when on the road. By contrast, one state's Department of Motor Vehicles drew the conclusion, based on two decades of data, that unlicensed drivers are even more dangerous on the road than drivers who have had their licenses suspended or revoked. *See* Sukhvir S. Brar, *Estimation of Fatal Crash Rates for Suspended/Revoked and Unlicensed Drivers in California* at vi, Cal. Dep't of Motor Vehicles (Sept. 2012), available at https://tinyurl.com/y652fscl. Because driving is often essential in large parts of the country in order to fully participate in a broad range of economic and societal activity, enabling individuals to get driving credentials regardless of immigration status ensures a greater percentage of drivers in a given state will be credentialed, and thus be safer drivers. *See* U.S. Dep't of Transportation, Federal

---

[2] The eighteen state laws are as follows: 2013 Cal. Legis. Serv. Ch. 524, and as amended; 2013 Colo. Legis. Serv. Ch. 402, and as amended; 2013 Conn. Legis. Serv. P.A. 13-89, and as amended; 2015 Del. Laws Ch. 67; D.C. CODE § 50-1401.05; 2015 Hawaii Laws Ch. 172, § 2; 625 ILCS 5/6-105.1; 2013 Md. Laws Ch. 309; 2019 N.J. Laws Ch. 271, §§ 5, 8; 2013 N.M. Laws Ch. 31; Ch. 37, 2019 N.Y. Laws; 2013 Nevada Laws Ch. 282; 2019 Or. Laws Ch. 701; P C0900, 9 P.R. LAWS ANN. § 5063; 2015 Utah Laws Ch. 20, and as amended; 2013 Vermont Laws No. 74, and as amended; 2020 Va. Laws Ch. 1246 (S.B. 34); 1993 Wash. Laws Ch. 452, § 1.

Highway Administration, *Year of First State Driver License Law & First Driver Exam.* (Apr. 1997), https://tinyurl.com/w594d87. That benefits everyone.

At the same time, because more residents are licensed, their incentives to flee the scene of an accident are reduced. It thus should come as no surprise that Green Light Laws have been linked to a decrease in hit-and-run accidents. *See, e.g.,* Hans Lueders et al., *Providing Driver's Licenses to Unauthorized Immigrants in California Improves Traffic Safety* at 5, Proceedings of the National Academy of Sciences (Apr. 2017), available at https://doi.org/10.1073/pnas.1618991114 (concluding that "unauthorized immigrants with a valid form of in-state driving authorization have weaker incentives to flee the scene after an accident, because they are less likely to fear deportation"). For example, California's AB 60, which went into effect in 2015, "led to an average decrease in the rate of hit and run accidents between 7 and 10%" over 2014 levels—approximately 4,000 fewer hit-and-run crashes. *Id.* at 4; *see also id.* (noting that AB 60 therefore also led to the transfer of $17 million in hit-and-run costs to at-fault drivers that would otherwise have been borne by innocent accident victims). Connecticut, whose Green Light Law went into effect in 2015, similarly saw "hit-and-run crashes drop[] by 9 percent between 2016 and 2018." *See* WGBH News, *Licenses for Undocumented Immigrants Seem to be Showing Benefits in Connecticut* (Apr. 16, 2019), available at https://tinyurl.com/wtgchs8.

Green Light Laws also benefit a state's broader population by increasing the percentage of drivers on the road who have insurance. Indeed, California, New Mexico, and Utah each saw large increases in rates of insured driving after enacting their laws. *See* Personal Insurance Federation of California, *AB 60 Driver Licenses Believed To Cause 2015 Bump In Insured Vehicles* (Nov. 17, 2016) (finding "number of insured vehicles increased by 200,000 more vehicles than would have been expected"), available at https://tinyurl.com/uln3ltf; Steven Escobar, *Allowing Undocumented*

*Immigrants to Obtain Driver's Licenses in New Mexico: Revising, Not Abandoning, the System*, 43 Wash. U. J. L. & Pol'y 285, 288 (2014) (concluding that after New Mexico's law was enacted, "the state's rate of uninsured vehicles decreased from 33 percent in December 2002 to less than 10 percent in December 2008"); Colorado Fiscal Institute, *The Impact of Allowing All Immigrants Access to Driver's Licenses* 2 (Feb. 2017) (finding rate of uninsured driving in Utah fell from 28% to 8% after enactment of its law), available at https://tinyurl.com/y5vjag35. And increasing the percentage of insured drivers can help stabilize insurance premiums for all drivers, because when "uninsured drivers are in an accident, the associated costs are covered by drivers who are insured." New Jersey Policy Perspective, *Top Six Reasons to Expand Access to Driver's Licenses* at 2 (Dec. 2019), available at https://tinyurl.com/w3rdw2y.

The benefits of Green Light Laws extend beyond the roads. Among other things, many amici rely on Green Light Laws to assimilate undocumented immigrants into their local communities by improving access to jobs and education. Particularly in states with limited mass transit options, lacking a drivers' license restricts the geographic area in which a resident can search for a job. *See id.* at 4. For the same reason, "many low-income families without licenses cannot fully participate in early education and care programs," notwithstanding that many children of these families are themselves United States citizens. *Id.* By removing these barriers to mobility, these states sensibly have found, expanding the driving privilege can improve access to early education and increase the economic contributions of immigrant families. *Id.* at 1, 4.

Multiple states have also reached the conclusion that their Green Light Laws can only be implemented effectively with sufficient privacy protections in place. As these states have found, their undocumented residents would be unwilling to seek such licenses if doing so would reveal themselves to federal civil immigration enforcement agents. That is not a speculative concern in

light of Immigration and Customs Enforcement's (ICE) practice of mining driver's license records in states that have enacted Green Light Laws, so that ICE can identify undocumented immigrants who ICE can pursue for removal. *See* Bill Chappell, *ICE Uses Facial Recognition To Sift State Driver's License Records, Researchers Say*, NPR (July 8, 2019), available at https://tinyurl.com/y475l4jt. And if residents are unwilling to seek the driving credentials to which they are entitled, then they will no longer pass examinations and obtain insurance, and will be more likely to flee the scene of an accident. That is why New York prohibits its Department of Motor Vehicles (DMV) from disclosing such motor vehicle records to federal immigration enforcement agencies, except when authorized by a court order or warrant signed by a federal judge. *See* N.Y. Veh. & Traf. Law § 201(12)(a). And that is why New Jersey, among others, similarly precludes its Motor Vehicle Commission from disclosing personal information obtained from a driver's license applicant "for any purpose related to Title 8 of the United States Code," except with the applicant's informed consent, or when authorized by a warrant signed by a judge or a court order or subpoena. 2019 N.J. Laws Ch. 271, § 8. As the Legislature found in adopting this provision, such protections are necessary to enable the law to achieve its purpose to "improve roadway safety and automobile insurance coverage by making driver's licenses and permits available to any safe driver who meets all of the requirements." 2019 N.J. Laws Ch. 271, § 3(b).

The federal government's decision to retaliate against New York on account of the privacy protections it included in its Green Light Law thus has consequences for a broad range of states, and calls into question their ability to achieve the above-described benefits for their residents. The federal government recognizes as much: a January 27, 2020 memorandum prepared by the U.S. Department of Homeland Security (DHS), Office of Strategy, Policy, and Plans, identified several amici as states that also restrict DHS's access to motor vehicle records and discussed New Jersey's

law in detail. DHSGLL031-032. A section of this memo labeled "Options for addressing laws that restrict access to state DMV information" identifies at least two proposals aimed at "uncooperative states": "[e]xclude residents of uncooperative states from participating in DHS Trusted Traveler programs" and "[d]e-prioritize the export of uncooperative state-titled vehicles." DHSGLL040-41. While this section is heavily redacted, it indicates that one or more of the amici are considered "uncooperative states" by DHS and may be the target of similar Trusted Traveler bans in the future. It suggests that the federal government has only just begun in its efforts to punish the states that have found it necessary to include privacy protections as part of their Green Light Laws. Indeed, DHS's internal correspondence about New York's law confirms this broader objective. A December 16, 2019 email sent by Acting ICE Director Matthew Albence to Acting CBP Commissioner Mark Morgan suggested that DHS "try to take a consolidated approach to look at what services we can immediately pull back from NY as a result of" New York's law. DHSGLL065. The email continued: "[W]e need to be aggressive, as this will likely spread to other localities if there is not a strong response from us." *Id.* Acting Commissioner Morgan replied: "Agreed." *Id.*[3]

The available evidence also suggests that the federal government is refusing to work hand-in-hand with states as they look for a middle ground to address the federal government's concerns while nevertheless protecting the integrity of their Green Light Laws. In DHS's letter announcing the Trusted Traveler ban ("the Ban"), Secretary Chad Wolf claimed that New York's privacy protections prevent it from accessing records necessary to verify eligibility for the Trusted Traveler programs. *See* Dkt. 1-1. But even though New York subsequently amended its law to permit

---

[3] This brief refers to the publicly available Administrative Record filed at docket entry 65-1 in No. 20 Civ. 1127. All citations to the docket refer to that case number.

disclosure of records "as necessary for an individual seeking acceptance to a trusted traveler program," Part YYY, N.Y. Sen. Bill No. 7508B, DHS has since made clear it views that action as insufficient. Dkt. 68 at 24-25. In other words, the only thing New York can do (in DHS's view) to restore its residents' eligibility for the Trusted Traveler programs is provide all DHS agencies unfettered access to all DMV records—the very policy that would deter undocumented immigrants from obtaining licenses, which thus would undermine the very benefits the states have sought to obtain through their Green Light Laws.

## II.    THE TRUSTED TRAVELER BAN IS UNLAWFUL.

In seeking to require New York to drop the privacy protections that form a core part of its Green Light Law, the federal government has contravened fundamental principles of constitutional law and administrative law. With respect to the former, the federal government has violated the Tenth Amendment's prohibition on unlawful coercion; with respect to the latter, it violates black letter procedural and substantive rules under the APA.

### A.    The Ban Violates The Tenth Amendment.

The Ban is unconstitutionally coercive because it seeks to place undue pressure on a state to change its law by excluding its residents from Trusted Traveler programs. The Supreme Court has made clear that Congress may incentivize "States to act in accordance with federal policies," but that there are situations in which "pressure turns into compulsion," and thus where a federal action "runs contrary to our system of federalism." *Nat'l Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519, 577-78 (2012); *see also id.* at 578 (noting this doctrine holds "whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own"); *New York v. United States*, 505 U.S. 144, 178 (1992) ("[T]he Constitution simply does not give Congress the authority to require the States to regulate."). It is hard to think of a more

obvious example of coercion than this: a novel, severe compulsion that seeks to force New York to change its law by making collateral damage out of its residents. Indeed, as New York explains, whatever incentives might be allowed to encourage cooperation with ICE, that is not what the federal government has done; the Ban "is all stick, no carrot." Dkt. 46 at 18. Rather than use inducements, the federal government used draconian measures to put New York to this stark and unacceptable choice: give up privacy protections for its undocumented residents, protections that it found necessary to implement its Green Light Law, or accept a punitive rule barring its residents from Trusted Traveler programs. This violates the Tenth Amendment coercion doctrine.

Indeed, the Tenth Amendment violation is particularly clear given the "nature of the threat and the programs at issue," and lack of a sufficient justification for this retaliation. *NFIB*, 567 U.S. at 580. This is *not* a case in which the measure taken by the government is tied to the specific federal interests it seeks to serve, as when Congress conditions receipt of certain funds on "restrictions on the use of those funds"; to the contrary, the actions here "take the form of threats to terminate other significant independent grants." *Id.* Whatever case DHS might have originally been able to make regarding the need to limit New Yorkers' access to Trusted Traveler programs because the agency lacked access to the records necessary to verify their eligibility, and that case is slight, that argument has vanished: New York will disclose records "as necessary for an individual seeking acceptance to a trusted traveler program." Part YYY, N.Y. Sen. Bill No. 7508B. In other words, even leaving aside the unconstitutional form of this compulsion, there is no linkage between the punishment and the goal.

Still more, the federal government is seeking to coerce New York to change a policy that lies at the heart of its police powers. *See, e.g., United States v. Snyder,* 852 F.2d 471, 475 (9th Cir. 1988) (concluding that "[d]rivers' licenses are issued pursuant to the states' police powers, and the

federal government has no constitutional authority to interfere with a state's exercise of its police power"); *United States v. Thurman*, 316 F. App'x 599, 602 (9th Cir. 2009) (noting that issuance of driving credentials is a "core state police power"); *Cmty. Refugee & Immigration Serv. v. Petit*, 393 F. Supp. 3d 728 (S.D. Ohio 2019) (same). New York sensibly concluded that the best way for it to exercise that power was through a Green Light Law, and that it could most effectively maintain that law if the state included privacy protections to ensure full participation by its residents. The fact that New York acted well within its traditional police powers casts even greater doubt on the validity of the federal government's coercive response.

The federal government's responses are unavailing. DHS's argument that coercion cannot apply outside the context of financial inducements is shocking in its scope, and it fails as a matter of precedent and principle. As a matter of principle, there is no reason why coercion would only apply in the financial context: instead, the point of this constitutional doctrine is that it provides a structural protection against federal efforts seeking to divert accountability for federal policies onto state officials, and that it frees state officials to "regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation." *New York*, 505 U.S. at 169. Those concerns apply any time the federal government seeks to compel state behavior, and there is no logical reason to think that these concerns are triggered only when money is involved. If anything, the lack of a financial inducement here only confirms just how coercive the federal government's unusual retaliation is. And precedent confirms what principles already made plain: this structural protection is applicable to any exercise of federal power. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018) (invalidating federal law that prohibits state laws authorizing sports gambling); *Printz v. U.S.*, 521 U.S. 898 (1997) (invalidating federal law compelling state law enforcement officers to perform background checks on handgun purchasers); *New York*, 505 U.S.

at 174-77 (invalidating provisions of statute requiring states to either take title to nuclear waste or regulate nuclear waste disposal according to Congress's instructions). This Ban—which offers no carrot, punishes a state's residents directly, weaponizes a federal program that Congress instead intended as a way to make international travel more convenient, and does all of this without a tie to the specific interests the government seeks to advance—cannot be saved on this basis.

DHS's other argument, that the "motivations underlying the TTP Decision are not relevant" to the coercion analysis, only underscores the alarming legal and practical ramifications of the Ban for amici. *See* Dkt. 30 at 16. If DHS's argument were adopted, DHS could ban an entire state's residents from Trusted Traveler programs *for any reason*, even a reason wholly unrelated to these programs. Thus CBP could impose a statewide ban to coerce a state to cease providing any services to undocumented immigrants, or to coerce a state to agree to honor all ICE detainer requests. *See, e.g.,* 5 ILCS 805/1 *et seq.* (prohibiting law enforcement from complying with ICE detainer requests). And the stated desire of senior DHS officials "to be aggressive" with New York, "as this will likely spread to other localities if there is not a strong response from us," DHSGLL065, shows that these are real possibilities. DHS's theory also applies to other federal programs: agency officials could terminate TSA PreCheck in every airport in a state, or cease processing passport renewal applications from all citizens of a state, without running afoul of the Tenth Amendment. Accepting DHS's theory would create the potential for DHS to wield these and similar retaliatory measures against amici. There is no support for this sweeping rule, and the Ban should instead be struck down under the Tenth Amendment.

## B.     The Ban Violates The APA.

There are also multiple straightforward bases under the APA to find the Ban unlawful and to enjoin its enforcement. As a threshold issue, DHS's contention that the Ban is immune from

review lacks merit. Unfortunately, because DHS viewed this as unreviewable agency action, it did not engage in notice-and-comment rulemaking, which caused DHS to commit two substantive APA violations. For one, the Ban is arbitrary and capricious because DHS failed to consider important aspects of the problem. And for another, the Ban is contrary to law because it contravenes the text of the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA").

### 1. The Ban Is Not A Matter Committed To Agency Discretion By Law.

DHS's sweeping argument that its decision to exclude an entire state's residents from Trusted Traveler programs is committed to agency discretion fails. *See* Dkt. 68 at 9-10. The Supreme Court has "long applied a strong presumption favoring judicial review of administrative action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). Courts thus interpret the exception for action committed to agency discretion "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (finding decision to add question to Census was reviewable because statute "constrain[ed] the Secretary's authority to determine the form and content of the census" in several identifiable ways). Those cases are the truly rare ones in which there are "no legal norms pursuant to which to evaluate the challenged action," and so there are "no concrete limitations to impose on the agency's exercise of discretion." *Sec. of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006).

This is not one of those cases, because the plain text of the IRTPA constrains the agency's discretion in two discrete ways. The statute begins by mandating that DHS "shall establish an international registered traveler program … to expedite the screening and processing of international travelers, including United States Citizens and residents, who enter and exit the

United States." 8 U.S.C. § 1365b(k)(3)(A). The statute then instructs DHS to ensure this program "includes as many participants as practicable by" following two mandates: "making program enrollment convenient and easily accessible" and "providing applicants with clear and consistent eligibility guidelines." *Id.* § 1365b(k)(3)(E). The decision to ban all residents of the nation's fourth largest state from Trusted Traveler programs can easily be reviewed for compliance with these specific mandates. *Compare Beno v. Shalala*, 30 F.3d 1057, 1067 (9th Cir. 1994) (holding that statute allowing the agency to grant waivers of requirements related to a public benefits program only to the extent necessary to implement experimental projects "likely to assist in promoting the objectives" of the program provided meaningful standards), *with Schneider v. Feinberg*, 345 F.3d 135, 149 (2d Cir. 2003) (finding agency procedures were non-reviewable because the statute "does not guide or limit" the agency's discretion such that there was "no law to apply" aside from APA arbitrary-and-capricious review).

DHS overlooks the statutory text, instead focusing on the implementing regulations which it says afford CBP unlimited discretion to deny individual applications. Dkt. 68 at 10. That is beside the point. First, this case concerns the separate issue of DHS's authority to impose *categorical* bans on Trusted Traveler eligibility. Moreover, since IRTPA itself supplies meaningful standards against which the Ban can be reviewed, whether the agency's regulations themselves lack standards is immaterial. *See Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412, 422 (2d Cir. 2015) ("The agency's adoption of regulations that might appear to give the agency unfettered discretion does not act to nullify the meaningful standards which exist in the governing statute."); *Spencer Enter., Inc. v. U.S.*, 345 F.3d 683, 688 (9th Cir. 2003) ("[W]e need not look to regulations or agency practice because the statutory framework provides meaningful standards by which to review INS's action").

DHS's argument is not only wrong as a matter of statutory interpretation, it raises serious federalism and rule of law concerns. DHS's argument that excluding all New York residents from Trusted Traveler programs is non-reviewable has no limiting principle. If a ban on all New Yorkers is non-reviewable, so too is a ban on all residents of New Jersey, or any other individual state. (That is a concrete concern, as the same DHS memo threatening retaliation against "uncooperative states" also highlights New Jersey's law). For that matter, a ban on the residents of all states that limit law enforcement cooperation with ICE would be non-reviewable, as would a ban on the residents of states that adopt an education or public health policy that the federal government disfavors. Thus, DHS could shut off access to Trusted Traveler programs in an entire state to coerce that state to cease mailing absentee ballots to voters, or to coerce that state to rescind public health restrictions imposed in response to a pandemic. *See, e.g.,* Brett Neely, *Trump Repeats Unfounded Claims About Mail-In Voting, Threatens Funding To 2 States*, NPR (May 20, 2020), http://www.npr.org/2020/05/20/859333693/trump-repeats-unfounded-claims-about-mail-in-voting-threatens-funding-to-some-st (reporting that the federal government threatened to withhold federal funding to Michigan if it expands access to mail-in voting); Collin Binkley, *Trump to US schools: Reopen or you may lose federal funds*, ASSOCIATED PRESS (July 9, 2020), https://tinyurl.com/ybuoal4s (reporting that the federal government considered conditioning federal aid to states on the rescission of emergency measures related to schools imposed to mitigate the spread of COVID-19). The Trusted Traveler programs are intended to be designed to include as many participants as practicable, not designed to help DHS achieve any political goals it happens to have in mind. But under DHS's theory, the courts cannot ensure they are complying with that intent. Nothing in the APA or IRTPA supports that result.

### 2.   The Ban Is Arbitrary And Capricious Because DHS Ignored Important Aspects Of The Problem.

Since DHS improperly determined that the Ban is unreviewable, it also decided that notice-and-comment rulemaking was unnecessary.[4] But due to the absence of public input, DHS never evaluated or even considered alternative solutions to the issue at hand, and it never addressed the fact that the Ban upends a range of important reliance interests engendered by Trusted Traveler programs. DHS's failure to take these facts into account renders the Ban arbitrary and capricious under 5 U.S.C. § 706(2)(A).

An agency rule is arbitrary and capricious if, among other things, the agency has "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And where, as here, an agency changes course, "it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account … [i]t would be arbitrary and capricious to ignore such matters." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (internal citations omitted) (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)). That proves fatal to DHS's approach.

First, DHS gave no consideration to less punitive alternatives for verifying New York applicants' eligibility for Trusted Traveler programs. DHS asserts that as a result of losing access

---

[4] Amici states agree with New York that the failure to follow notice-and-comment rulemaking also requires setting this rule aside under the APA. The Ban establishes a categorical presumption that New York residents are ineligible for Trusted Traveler programs and strips customs officials of any discretion to depart from that position, and thus is a substantive rule requiring notice and comment. *See, e.g., Molycorp, Inc. v. EPA*, 197 F.3d 543, 546 (D.C. Cir. 1999)(asking "whether an agency intends to bind itself to a particular legal position" as part of the APA inquiry). And while DHS stresses that it consulted the views of its own policy staff, *see* Dkt. 68 at 21-22, that is no substitute for public comment. The APA's notice and comment procedures exist "to assure that the agency is presented with all information and suggestions relevant to the problem at issue." *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993).

to New York's DMV records, the agency is unable to obtain information needed to confirm an applicant's identity or "information relating to criminal convictions involving motor vehicles (DWIs, misdemeanors or felonies)." Dkt. 68 at 6. DHS's brief candidly notes that it dismissed the idea of consulting with state officials to obtain alternative sources for this information before enacting the Ban. *Id.* at 23-24. But had DHS afforded the public an opportunity to comment, amici would have proposed at least two alternative ways to verify these travelers' eligibility. First, CBP could add a page to the application form asking applicants to check a box reflecting their consent to the release of DMV records needed to verify their eligibility for the respective Trusted Traveler program. Submitting the application would automatically transmit a copy of this consent form to the state DMV, which would release the records to federal officials with no action by CBP. (New Jersey's law specifically authorizes such releases based on consent, *see* 2019 N.J. Laws Ch. 271, § 8, and a similar amendment to New York's law could have been proposed.) Second, CBP could work with state officials to perform the security assessments DHS contends have been precluded— namely, validating drivers' identities and reviewing criminal record histories for compliance with CBP's "strict standards for multiple convictions," as required for Trusted Traveler membership. Dkt. 68 at 6. States already regularly perform precisely these types of checks. For example, New Jersey's State Police has real-time access to state criminal records databases and to motor vehicle records in the NLETS database from which it could make these assessments, particularly given its expertise in conducting criminal background checks for state-law purposes. Because amici had no opportunity to submit public comments, DHS necessarily did not consider these reasonable suggestions, which would solve the federal government's stated concerns while still preserving the integrity and functioning of the states' Green Light Laws. It is hard to imagine a better example of an "important aspect of the problem" that the agency overlooked.

Second, DHS gave no consideration to the extent to which the Ban upends amici's and New Yorkers' reliance interests. When an agency changes policy, "it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913. Many amici have built up compelling reliance interests in the public safety benefits they have reaped from their Green Light Laws. Those interests are threatened by retaliatory measures like the Ban that seek to take a particular policy option off the table, as those policies may prove to be a more effective way for amici to maintain these public safety gains. The same is true for amici's residents, who have fairly relied on the longstanding availability of Trusted Traveler programs. The Global Entry program in particular has been operational since 2012, and during this period New Yorkers have built up substantial reliance interests in its continued availability. *See* 77 Fed. Reg. 5681 (Feb. 6, 2012). DHS's sudden decision to terminate New York's access to this program doubtless marked a drastic change in policy. The agency was thus required to consider "whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1915. DHS's failure to even consider these reliance interests before imposing the Ban is arbitrary and capricious.

### 3. The Ban Is Contrary To Law Because It Conflicts With IRTPA's Mandate That DHS Apply "Clear And Consistent Eligibility Guidelines."

There is a second, independently sufficient basis to invalidate the Ban—it conflicts with the plain meaning of IRTPA. The statute mandates that DHS include "as many participants as practicable" in the international registered traveler program by "providing applicants with *clear and consistent* eligibility guidelines." 8 U.S.C. § 1365b(k)(3)(E)(iii) (emphasis added). But DHS is no longer offering any clarity on which states and their residents can rely.

16

DHS's own communications make this clear. Originally, DHS justified the Ban on two grounds: New York's law (1) impedes CBP's ability to verify Trusted Traveler eligibility, and (2) "will impede ICE's objective of protecting the people of New York from menacing threats to national security and public safety." Dkt. 1-1 at 2. DHS can no longer seriously maintain the former argument. As explained above, New York subsequently amended its statute to permit disclosure of records "as necessary for an individual seeking acceptance to a trusted traveler program," Part YYY, N.Y. Sen. Bill No. 7508B. Yet the Ban persists. That means the only remaining reason, the true basis for the Ban, must be the desire to prevent a state from "imped[ing] ICE's objective of protecting the people of New York from menacing threats to national security and public safety." In other words, DHS's eligibility guidelines to applicants now include that they must not reside in a state that is, in ICE's view, impeding the federal government's objective to prevent menacing threats to national security and public safety.[5]

The waters are further muddied by DHS's commitments in its brief that it will not rescind the Ban *even when New York restores access to its DMV database*. That is because the mere fact that New York law places *some* conditions on the use of DMV records means CBP would have to "silo[] DMV information in a manner that runs contrary to DHS' mission." Dkt. 68 at 24. How exactly is New York's law "contrary to DHS' mission"? How would New York have to amend its law to convince DHS to lift the Ban? And is New Jersey's law equally "contrary to DHS' mission" that its residents should expect an identical ban when their law goes into effect in 2021? Without knowing what criteria DHS applies to reach those conclusions, it is impossible for amici to discern

---

[5] Of course, if this is not the federal government's view, and if instead DHS is limiting its approach to New York and a limited number of other disfavored states, then the guidelines cannot possibly be seen as "consistent" and therefore contravene 8 U.S.C. § 1365b(k)(3)(E)(iii).

what steps they can take to limit disclosure of DMV records without triggering a similar statewide ban. This shows anything but a "clear and consistent" set of eligibility rules.

The issues go beyond access to motor vehicle records. Indeed, the justification to protect the mission of DHS, and to prevent menacing threats to national security and public safety, is so broad and so vague that it could encompass numerous state and local policies that limit local assistance to ICE operations in some way. *See, e.g., County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017) (discussing California local policies restricting information-sharing with ICE); 2019 Wash. Laws Ch. 440, §§ 5-6 (prohibiting jails and prisons from complying with voluntary immigration holds requested by federal authorities or from notifying federal authorities of an immigrant arrestee's release from custody); CONN. GEN. STAT. § 54-192h(b) (forbidding law enforcement to honor ICE administrative detainers or to share information with ICE about the target of such a detainer, except in limited circumstances); 5 ILCS 805/1 *et seq.* (prohibiting law enforcement from complying with ICE detainer requests). Would those laws qualify as contrary to DHS's mission? In the federal government's view, does a state fail to sufficiently support DHS's efforts to prevent menacing threats to national security and public safety when it refuses to take part in ICE raids, or when it declines to sign a so-called Section 287(g) agreement to "permit [state and local law enforcement] officers to perform limited immigration law enforcement functions"? *See United States v. California*, 921 F.3d 865 (9th Cir. 2019) (holding that requiring state participation in immigration enforcement would violate anti-commandeering principles under the Tenth Amendment), *cert. denied*, No. 19-532 (U.S. June 15, 2020). Beyond the context of immigration, what other laws qualify as contrary to DHS's mission, and what other policies fail to address menacing threats to public safety?

18

These programs used to be governed by a predictable, rule-based framework. Before the Ban, a Global Entry application coming from any state would be reviewed for compliance with the specific eligibility criteria enumerated in 8 C.F.R. § 235.12(b). These factors embody objective, provable facts, like whether the applicant made false statements on the application or has ever been charged with a crime. *Id.* § 235.12(b)(2)(i)-(ii). The Ban effectively adds a new requirement that disqualifies an applicant based on the federal government's subjective views of the quality and impact of their state's own policies. In the absence of any standards for measuring a state's law against those benchmarks, the agency will make those decisions on an *ad hoc* basis, and they will remain unclear and inconsistent.

In demanding clarity in eligibility, Congress did not contemplate the use of this program as a political weapon. Put simply, it is impossible to square a regime that allows DHS to bar entire states from this program on an *ad hoc* basis with IRTPA's command that DHS include "as many participants as practicable" by adhering to "clear and consistent eligibility guidelines." 8 U.S.C. § 1365b(k)(3)(E)(iii). The Ban is contrary to the plain text of IRTPA and therefore should be set aside under 5 U.S.C. § 706(2)(A).

<u>**CONCLUSION**</u>

The Court should deny Defendants' motion for summary judgment, and enter judgment in Plaintiffs' favor with respect to their APA claims.

Dated: July 17, 2020      Respectfully submitted,

              GURBIR S. GREWAL
              *Attorney General of New Jersey*

               /s/ Mayur P. Saxena
              MAYUR P. SAXENA
              Assistant Attorney General
              TIM SHEEHAN
              Deputy Attorney General