

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 4, 2020

**By ECF**                                                    **To Be Filed Under Seal**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

     **Re:**   ***New York v. Chad F. Wolf, et al.*, No. 20 Civ. 1127 (JMF) (S.D.N.Y.)**
             ***Lewis-McCoy, et al. v. Chad Wolf, et al.*, No. 20 Civ. 1142 (JMF) (S.D.N.Y.)**

Dear Judge Furman:

The Government respectfully submits this report in response to the Court's Orders of July 29 and August 11, 2020.

## I.  Introduction

Following is an overview of the issues addressed in this report and in the supplemental declarations that address those issues.

### A.  Issues Regarding DMV Information and TTP Vetting

In support of their motion for partial summary judgment, the Defendants, through their counsel ("the Government")[1] submitted declarations from Pete R. Acosta, the Director of Trusted Traveler Programs, Admissibility and Passenger Programs, Office of Field Operations, within U.S. Customs and Border Protection ("CBP"), a component of the Department of Homeland Security ("DHS"); and Robert E. Perez, the Deputy Commissioner of CBP.[2] Director Acosta's declaration,

---

[1] "Counsel for the Defendants" consist of former United States Attorney Berman and Acting United States Attorney Strauss, acting through Assistant U.S. Attorneys Christopher K. Connolly, Zachary G. Bannon, and Elizabeth J. Kim. For ease of reference, and to distinguish them from the many attorneys within DHS who provided input into this matter, Counsel for the Defendants will generally be referred to as "the Government."

[2] The Government also submitted a declaration executed on June 19, 2020, by Scott Glabe, an Assistant Secretary in the Office of Strategy, Policy, and Plans within DHS. That declaration addressed the importance of information sharing among components of DHS and the negative impact of New York's criminal and other restrictions on certain information-sharing under New York's Green Light Law, as amended April 3, 2020. *See* NY Vehicle & Traffic Law § 201. The

executed June 19, 2020, explained the various Trusted Traveler Programs that CBP administered, the importance of DMV information in determining the eligibility of an applicant for a Trusted Traveler Program, and the manner in which CBP would, and otherwise did, access DMV information in connection with vetting individual applicants. Deputy Commissioner Perez's declaration, executed June 17, 2020, addressed the operational difficulties of attempting to restrict the flow of information from CBP to other components, with particular emphasis on New York State's criminal and other restrictions on the disclosure of information to an agency that enforces immigration law. The Government submitted these declarations on June 19, 2020.

On July 10, 2020, Plaintiffs filed their Memorandum of Law in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment and in Opposition to Defendants' Motion for Partial Summary Judgment. In their memorandum Plaintiffs asserted, among other things, that "the AR is replete with examples of states and localities that restrict or otherwise do not provide DMV data access— all without any indication that CBP's ability to vet TTP applicants is inhibited," and that "Defendants continue to vet TTPs applicants from numerous states and territories that do not share DMV information." *See id.* at 24-27 (containing like assertions).



All of these matters are discussed in detail in the supplemental declarations being submitted today.

---

declaration by Mr. Glabe (who is currently Senior Official Performing the Duties of Under Secretary and Assistant Secretary for Trade and Economic Security Office of Strategy, Policy & Plans) does not require any correction. Mr. Glabe has specifically confirmed that, while he was not aware, at the time he executed his declaration, of the "CLETS Agreements" discussed below, the existence of those agreements does not affect anything set forth in his declaration.

[4] In particular, in February 2020, in an effort to determine if any other state had cut off CBP access to DMV information in NLETS, CBP ran a test query for Driver's License (DL) information across all 50 states, and determined that all states but New York responded to that query.

In my review of these events, which included reviewing more than two thousand emails and documents, and speaking with Director Acosta, Deputy Commissioner Perez and Senior Official Glabe, as well as attorneys and other DHS and CBP personnel and the Government attorneys on this case, I came across no indication of any intent to deceive the Court. While I have not mastered, in the given time, every detail pertinent to the development of this litigation, given the volume of communications that took place concerning this matter, and that I have reviewed, I feel confident that if there had been any proposal to deliberately hide information from the Court, it would have been reflected in the communications that I reviewed. Rather, and as discussed at greater length below, CBP did not originally address the fact that several states (and territories) did not provide to Nlets certain DMV information key to Trusted Traveler vetting, particularly Driver History information, because CBP was simply not aware of that until in response to Plaintiffs' memorandum mid-July it performed additional tests beyond what it had previously performed. The CLETS Agreements, on the other hand, were (somewhat) known, but did not come to the fore as something that needed to be addressed at the outset. It is always difficult to explain why something was not noticed, or realized to be pertinent, but I will note that the CLETS Agreements were not at all pertinent to the Green Light Law as originally enacted, and not particularly pertinent even after the Green Light Law was amended. That is because the original Green Light Law completely shut off New York's DMV information, and the Green Light Law amendment imposed statutory (and criminal) restrictions on sharing information within DHS, beyond mere use restrictions. WPP

When these agreements did resurface, in connection with the mid-July re-examination of what DMV data was being provided to Nlets, their significance to this litigation was immediately recognized and acted on.[5]

## B.  Issues Regarding Sensitivity of Risk Assessment Query Codes

In support of their response to Plaintiffs' motion to compel Defendants to complete the administrative record, the Defendants, through the Government, submitted a declaration from, *inter alia*, John P. Wagner, then[6] the Deputy Executive Assistant Commissioner, Office of Field Operations, CBP. Former Deputy Executive Assistant Commissioner Wagner's declaration was submitted for the purpose of asserting law enforcement privilege over certain documents in the Administrative Record (as filed under seal on June 29, 2020), including DHSGLL056 of the Consolidated Trusted Traveler Programs Handbook ("TTP Handbook"). DHSGLL056 included a chart entitled, "Risk Assessment Queries," which included codes ("Risk Assessment Query Codes") that CBP, at the time of the submission of the declaration, believed it used to initiate

---

[5] I have not, in the time given, devoted substantial attention to the corrections to vetting procedures detailed by Director Acosta in his supplemental declaration. These appear to be subsidiary to the larger issue of what DMV information was important and available to CBP in the first place; and, while it is not an excuse, this seems to me to be no more than an example of the commonplace issues that can arise when central authorities attempt to address, based on policy and experience, actual practice in the field.

[6] Mr. Wagner retired on July 18, 2020.

queries in the TECS system[7] in order to conduct risk assessments for TTP applicants. As related to DHSGLL056 and several other pages of the TTP Handbook, Former Deputy Executive Assistant Commissioner Wagner's declaration stated that the document contained information which would "reveal sensitive law enforcement techniques and procedures that if disclosed would undermine the effectiveness of TTP and have a negative impact on CBP's border security mission. (¶ 11.) In addition, reference to DHSGLL056 was inadvertently omitted from ¶ 14, which explained that certain pages from the TTP Handbook contained "law enforcement sensitive information on specific codes utilized within law enforcement databases to denote certain types of records or to conduct queries within various law enforcement systems that CBP consults when assessing risk on TTP membership applications. Disclosure of such information could facilitate access to, and navigation through, CBP and other government agencies' law enforcement databases." The Government submitted this declaration on May 22, 2020. Former Deputy Executive Assistant Commissioner Wagner executed his declaration on May 21, 2020.

Consistent with the assertions set forth in former Deputy Executive Assistant Commissioner Wagner's May 21, 2020, declaration, the Government asserted law enforcement privilege over certain portions of the Administrative Record, including the Risk Assessment Query codes. In an Order dated June 10, 2020, the Court determined, among other things, that the Risk Assessment Query Codes on DHSGLL056 would be disclosed pursuant to a protective order agreed-upon by the parties based on its conclusion that the law enforcement privilege attached to DHSGLL056, but the strong presumption against disclosure was overcome.



In view of former Deputy Executive Assistant Commissioner

---

[7] TECS is the principal system used by officers at the border to assist with screening and determinations regarding admissibility of arriving persons. https://www.dhs.gov/sites/default/files/publications/privacy-pia-cbp-tecs-sar-update_0.pdf

Wagner's retirement, these corrections, including a new page DHSGLL056, are addressed in Director Acosta's supplemental declaration. Again, we see no indication of any intent to deceive the Court in these matters. Instead, this correction reflects the difficulty of determining, in a very large agency, the level of sensitivity and confidentiality, which may change over time, of a set of computer codes.

## II.   Identification and Explanation of Inaccurate or Misleading Statements

This section will address questions 1 and 2, and the first part of question 3, of the Court's July 29 Order: to list any and all inaccurate or misleading statements or representations in the record; to explain, with respect to each such statement, why it is inaccurate or misleading; and who made the statement. As to statements made in declarations filed with the Court, the Government would respectfully refer the Court, for full detail, to the supplemental declarations executed on September 4, 2020, by Director Acosta and Deputy Commissioner Perez. But in an effort to maintain this letter as a largely self-standing report, I have also extracted below, in more compact form, pertinent original statements, and corrections or supplemental information, contained in those declarations. (Many of the original statements extracted below are completely correct, but are included to provide the context for the supplemental information.)

### A.   Director Acosta Declaration—TTP Vetting Procedures

**Original Statements.** In his June 17, 2020, declaration, Director Acosta made the following statements that require correction or supplementation: Since the inception of the Global Entry program in 2008, CBP has determined whether each applicant meets eligibility requirements for membership by checking the information supplied by the applicant against information contained in various law enforcement databases, including DMV records, and conducting an in-person interview of individuals who are conditionally approved. (¶ 18.) In addition to the above databases, CBP queries Nlets for driver license and certain vehicle data. CBP does so regardless of whether the Trusted Traveler applicant has provided driver license information or whether the applicant has indicated that he or she has a driver license. In instances where driver license information is not provided on the application, Nlets may be queried by using other information that the applicant provides, such as his/her address. Driver license and vehicle data allow CBP to detect information regarding violations that the applicant has failed to disclose, which could include driving without a license. Along with the information obtained from other law enforcement databases listed above, driver license and vehicle data help CBP to develop a complete picture of an individual's background and determine whether that individual satisfies the low-risk status requirement for membership. The driver license and vehicle data in Nlets is the only means for CBP to obtain the real-time and accurate versions of such information. (¶ 20.) Currently, New York is the only state that has terminated CBP's access to driver license and vehicle data via Nlets, impacting CBP's vetting of TTP applications of New York residents. (¶ 22.) Without access to an applicant's driver license and vehicle data, CBP does not have complete information about an applicant for a TTP. Specifically, CBP is no longer able to access information regarding certain vehicle-related and other violations that only the DMV maintains. Such a gap in information precludes CBP from being able to conduct a full assessment of whether the applicant is low risk. This is true even if the applicant does not have a driver license because individuals without driver licenses could still have a record of violations with the DMV (e.g., driving without a license). (¶ 23) Without access to the

information maintained by the New York DMV, CBP can no longer conduct comprehensive vetting of any New York resident TTP applicant. As a result, all pending TTP applications for New York residents were cancelled and application fees refunded as those individuals could no longer satisfy CBP of their low-risk status because CBP could not undertake a complete assessment of any of their applications without the driver license and vehicle data. (¶ 26.)

**Supplemental Information Regarding New York's Termination of Access to DMV Information.** ACP/WPP



**Corrections Regarding the Vetting Process.** [W]hile available DMV records may be manually queried through Nlets by TTP vetting officers to complete risk assessments and determine program eligibility and admissibility for TTP applicants, LEP

TTP does not, as a matter of policy, require that vetting officers initiate manual queries of Nlets for every TTP applicant, but as a matter of practice, a vetting officer may, at their discretion, initiate a manual query of available DMV records through Nlets. The manual query also allows the TTP vetting officer to select a region in order to query multiple states at the same time. The vetting officers are experts in assessing risk and LEP

It is, therefore, correct that LEP However . . . such queries LEP Instead, the driver's license query may be manually done as part of the option to query DMV records. Moreover, whether or not such a manual query is conducted is based upon the TTP vetting officer's risk assessment of the TTP applicant. [T]o clarify the fourth sentence regarding searches of Nlets using an address[:] Nlets cannot be searched solely by address, but rather the address is often used by the analyst to determine the specific location or region within which to begin a search in Nlets by name. These queries assist the officer performing vetting to determine if an individual had violations or other information that would potentially preclude the individuals from being approved for TTP participation. This also allows for validation of identity, address and others factors that assist in the full vetting of the application. In order to be fully transparent, I would like to point out that the address is used to support a search and by this statement in my declaration, I did not intend to suggest that an address can be used to search Nlets on its own.

**B.  Deputy Commissioner Perez Declaration—TTP Vetting**

**Original Statements.** In his June 19, 2020, declaration, Deputy Commissioner Perez stated:[8] Accordingly, as of the date of this declaration, CBP cannot vet TTP applicants from the State of New York to determine their eligibility for TTPs. (Statement A, ¶ 6.) Even if CBP were to receive New York DMV information for use in TTP vetting, in order to shield CBP employees from potential criminal liability, the Amendment would require CBP to silo that information from its databases, preventing law enforcement officers who may be conducting critical investigations, including those related to terrorism, from identifying connections between individuals or relevant information. (Statement B, ¶ 15.) New York's Green Light Law would require CBP to reverse decades of efforts to achieve the fluid network of information sharing across the government that was deemed critical by the 9-11 Commission to avoid future threats to our nation's security. (Statement C, ¶ 16.) Not only would New York law require CBP to alter its systems, but its policies and culture would also need to be drastically changed, in direct contravention of the 9-11 Commission's findings and recommendations, to create partitions between CBP operational offices and DHS components as well as between CBP and its inter-agency partners. (Statement D, ¶ 17.)

**Supplemental Information.** DMV data is not, and was not at the time of my signature on my previous declaration, available, either in whole or in part, to the TTP vetting officers for a number of jurisdictions, including New York. As such, Statement A needs to be placed in the context of this new information. Despite other jurisdictions not providing DMV access via Nlets (in whole or in part), CBP continued to process and approve applications for TTPs without access to such information—including applications from Guam and the Virgin Islands, which are the two jurisdictions that do not provide any DMV data to any user via Nlets (excluding New York which has specifically cut off CBP's access to such information). As a result, Statement A must be clarified to the extent that the statement suggests broadly that TTP applications cannot be processed without access to DMV data. However, it must be made clear that such information remains important to TTP vetting—the agency was just not aware that certain data was not being provided at the time. [As to Statements B, C, & D:] WPP                                           Although, as noted above, I was generally aware of the CLETS agreements at the time I signed the prior declaration, I did not connect them to the provisions of the Green Light Law as amended. It is my understanding that the restrictions imposed by the CLETS agreements and the California Nlets banner are very different from and much less burdensome than the restrictions imposed by the Green Light Law and its amendment. The CLETS agreements and related restrictions only prohibit CBP from using non-criminal history information for immigration enforcement purposes. Unlike the New York law, they do not prevent DHS from sharing information amongst its components and with other authorities or from using that information otherwise, and they certainly do not make it a felony to do so. Therefore, in my opinion, the CLETS agreements and related restrictions are different in scope and kind to the limitations of the Green Light Law as amended, which, in contrast, purports to impose criminal penalties for sharing information with CBP for any purpose

---

[8] In the interest of compactness, quotation marks and ellipses have been largely omitted in the following extracts from Deputy Commissioner Perez's original and supplemental declarations.

and terminated CBP's access to any DMV data except in very limited instances. I now understand how the existence of these agreements and conditions upon sharing may require clarification in the context of the instant litigation, and I further understand that New York is not the only state which restricts CBP's use of DMV data for certain purposes.

**C.   Former Deputy Executive Assistant Commissioner Wagner Declaration—Risk Assessment Query Codes**

Former Deputy Executive Assistant Commissioner Wagner's May 21, 2020, declaration explained the basis for assertion of law enforcement privilege over various portions of the Administrative Record. Paragraphs 11, 14, and 15 of his declaration discuss the Risk Assessment Query Codes published in the TTP Handbook and state as follows:

> 11. While CBP has made a considerable amount of information public regarding how vetting is conducted,[] the information redacted from DHSGLL050, DHSGLL052, DHSGLL054-59, and DHSGLL61 of the Trusted Traveler Handbook as well as information contained in PRIV_141 reveal sensitive law enforcement techniques and procedures that if disclosed would undermine the effectiveness of TTP and have a negative impact on CBP's border security mission.…The documents also reveal CBP's priorities when it analyzes vetting information for purposes of adjudicating TTP membership. In sum, disclosure of these records would reveal law enforcement privileged information about vetting activities generally, including: the kind of information CBP considers and evaluates, the categories of information deemed of significance and communicated to officers to inform their discretion, how officers exercise discretion in adjudicating applications, and the relative importance of the different factors in determining whether a person should be deemed to be sufficiently low risk for purposes of TTP membership. Such information that is critical to how TTP applications are adjudicated, if unprotected, can enable individuals to alter their behavior or manipulate their applications to thwart CBP officers to secure the border and effectively make eligibility determinations per 8 C.F.R. § 235.12.

> 14. Finally, pages DHSGLL054 and DHSGLL57 of the Trusted Traveler Handbook contain law enforcement sensitive information on specific codes utilized within law enforcement databases to denote certain types of records or to conduct queries within various law enforcement systems that CBP consults when assessing risk on TTP membership applications. Disclosure of such information could facilitate access to, and navigation through, CBP and other government agencies' law enforcement databases. Public dissemination of access codes would reveal the technical capabilities of the systems and if the systems were inappropriately accessed, could permit unauthorized users to manipulate records, including manipulating the way certain records are created and maintained, to avoid recognition, detection, and apprehension and interfere with the TIP application adjudication process. Therefore, disclosure of these codes could put at risk ongoing investigations and border security operations, as well as undermine the integrity of the TTPs.

15. Although several factors considered by CBP officers when processing TTP applications have been incorporated into the relevant regulations and otherwise published in the public domain, the redacted information in the Trusted Traveler Handbook contains specific information regarding law enforcement methods, techniques, and procedures, not generally known to the public, which are employed by CBP to identify high-risk travelers that threaten border security and national security.

We understand the reference to page DHSGLL57 in ¶ 14 above to be a typographical error, and that ¶ 14 was intended to refer to DHSGLL054 and DHSGLL056. That being said, and as explained in Director Acosta's supplemental declaration, further inquiry following the Court's July 29, 2020, Order has revealed that the majority of the codes as well as sources of information CBP may consult for TTP vetting referenced on DHSGLL056 have in fact become generally known to the public and as a result assertion of law enforcement privilege, or the need for sensitive law information protection is no longer justified. Accordingly, ¶ 14 should refer only to page DHSGLL054, and ¶ 11 should only refer to remaining redactions on DHSGLL056. In addition, it should be noted that the reference to the "redacted information in the Trusted Traveler Handbook" in ¶ 15 does not include the previously redacted Risk Assessment Query Codes and information concerning other "system checks" that may be conducted on a case-by-case basis.

### D.  Arguments Made by the Government

**Statements Relating to DMV Information.** In its Memorandum of Law in Support of Defendants' Partial Motion to Dismiss New York's Complaint and the Class-Action Amended Complaint, filed April 15, 2020, the Government argued: "no other state has adopted a policy barring CBP's access to records to vet TTP applicants or to verify vehicle registrations for export" (*id.* at 14); and "the TTP Decision's geographic scope is tailored to the data restriction that New York implemented in the Green Light Law." (*id.* at 15). In its Reply Memorandum of Law in Further Support of Defendants' Partial Motion to Dismiss New York's Complaint and the Class Action Amended Complaint, filed May 6, 2020, the Government argued: "Plaintiffs cannot argue that other jurisdictions have implemented similar or more-restrictive data policies than New York, but remain uncovered;" (*id.* at 2) and "That no other state has implemented a data restriction like that imposed by the Green Light Law 'confirms the rationality of the formula.'" (*id.* at 3). In its May 22, 2020, letter in support of the defendant's assertion of privilege, the Government argued: "Membership in a CBP Trusted Traveler Program requires application of strict standards for multiple convictions that can no longer be assessed for applicants residing in the State of NY." (*Id.* at 5.) In its Memorandum of Law in Support of Defendants' Partial Motion for Summary Judgment, filed June 19, 2020, the Government argued: "New York is the only state that has restricted CBP's access to driver's license and vehicle data via Nlets." (*Id.* at 5.) In its introductory argument, the Government argued at greater length: "Even following the amendment to New York's Green Light Law, "if access were restored, "[t]he Amendment presents CBP officers with a choice of either following NY law or properly fulfilling their statutory mandates" (id. at 7); and "In order to utilize DMV information, CBP would be required "to silo that information from its databases, preventing law enforcement officers who may be conducting critical investigations, including those related to terrorism, from identifying connections between individuals or relevant

information;" "Compliance with 'New York's Green Light Law would require CBP to reverse decades of efforts to achieve the fluid network of information sharing across the government that was deemed critical by the 9-11 Commission to avoid future threats to our nation's security;'" and "The Amendment does not make DMV information available to CBP unless it agrees to fundamentally alter its operations, in contravention of policy and statute." (id. at 8). The Government further argued: "In other words, without DMV information, DHS determined that TTP applicants from New York could not satisfy TTP eligibility requirements;" (id. at 12); "Had CBP continued processing applications, it would not have been able to ensure that TTP applicants from New York were low-risk;" (id. at 14); "New York was the only state that has terminated CBP's access to driver license and vehicle data via Nlets" (*id.* at 20); "New York's Green Light Law precluded CBP from determining whether a TTP applicant was low-risk" (*id.* at 23.) The Government's closing argument (*id.* at 24-25), also argues that "even if it [the Green Light Law amendment] had restored access, CBP could not make use of DMV records to vet TTP applications without either subjecting its officers to potential criminal liability or siloing DMV information in a manner that runs contrary to DHS' mission." (*Id.* at 24).

**Clarification.** The new information discussed above substantially undercut the factual underpinnings of these arguments. While many of the arguments would retain validity in full context, it was the Government's view that it could not maintain these arguments without addressing the failure of some states and territories to provide any DMV information at all in certain crucial categories, such as Driver History; and that the significance (or lack thereof) of the CLETS Agreements would also have to be addressed.

**Statements Regarding the Sensitivity of Risk Assessment Query Codes.** In its May 22, 2020, response to Plaintiffs' motion to compel Defendants to complete the administrative record, which was submitted in support of DHS's assertion of privilege over various portions of the Administrative Record, the Government did not make any specific assertions regarding the Risk Assessment Query Codes at DHSGLL056 that are the subject of the instant correction. Rather, the Government made more general reference to portions of the Trusted Traveler Handbook that included DHSGLL056. The Government was most specific in this regard when it stated that "CBP asserts LEP over non-public information detailing the manner in which CBP vets TTP applicants (DHSGLL 050-61)." With the clarification that the Risk Assessment Query Codes at AR DHSGLL056 have been "unredacted," or are no longer asserted to be privileged, the Government's May 22, 2020, letter does not require any further clarification. (Note that certain information on DHSGLL056 remains redacted.)

## III.  Responsibility for the Content—Due Diligence within DHS

The second part of the Courts question 3 asks for identification, with respect to each such [inaccurate or misleading] statement, who made the statement and/or was responsible for the content of the statement. Of course, the declarants themselves, as to statements in their respective declarations, are responsible for the statements in question. But we have understood the Court's question to seek information regarding what the declarants relied on in making the statements. This is addressed in Deputy Commissioner Perez's, and Director Acosta's supplemental declarations (and by Director Acosta as well for former Deputy Executive Assistant Commissioner Wagner). It is my evaluation, based on the extensive materials that I have reviewed, and my

conversations with DHS and CBP personnel, that there were indeed substantial efforts and communications made to verify the facts underlying the declarations at issue here.[9] Following is a summary of the vetting that took place and how it appears that the information pertinent here was missed.

### A.  Jurisdictions That Simply Did Not Provide Certain Information to Nlets

New York's Green Light Law abruptly and conspicuously terminated the access of CBP (and of other DHS components) to New York DMV information. In order to confirm continuing CBP access to DMV information from other states, CBP's Nlets representative ran test queries against all other states. It bears noting that, while the "KQ" query for driver history is very important for the specialized work of the Trusted Traveler Programs, the DQ query, together with the "RQ" Vehicle Registration Query by License Plate, are more important DMV queries for CBP as a whole, given for example the significance of the cross-border vehicular traffic that CBP must deal with. And running the DQ test query showed that no other states had shut off CBP access to that DMV information—i.e., to DQ information. (Omission of the territories seems to be a simple oversight based on inquiries that focused on other "states.") Unfortunately, at this time the information technology and other personnel involved in vetting this information did not know or realize that some states (and territories) simply did not provide to Nlets the Driver History (KQ) information pertinent to TTP vetting, and so the desirability of running a 50-state (plus territories) test using additional KQ queries was not recognized. Ultimately, and understandably, CBP personnel focused on what the New York Green Light Law did: terminating CBP's access to New York's otherwise fairly comprehensive set of DMV information. And that was not enough to raise the separate question as to whether other states (and territories) simply did not provide KQ data to Nlets.

### B.  Jurisdictions Restricting the Sharing of Information within DHS

The CLETS Agreements that were entered into, during the first half of 2019, by the San Diego U.S. Border Patrol Agent-in-Charge, and the San Diego CBP Director of Field Operations, were not recognized as a matter to consider when the time came to defend the decision that DHS could not agree to the criminal restrictions on information sharing proposed by the Green Light Amendment. Indeed, there is a valid argument to be made that the information use restrictions of the CLETS Agreements are not pertinent to the criminal and procedural information sharing restrictions imposed by the Green Light Law. But because we believe those are arguments that should have been confronted and addressed in our filings, we address them here.

The timing of developments provides useful context. In particular, CBP Attorneys 1 and 2, among others, were consulted from time to time during the period October 2019-January 2020[10] regarding the new subscriber agreements and acknowledgements that CLETS began requiring users to enter

---

[9] Many persons were involved in vetting or providing factual input into the factual issues pertinent here. I have listed the ones I believe had the most significant input in Appendix A.

[10] I have not attempted to obtain all communications relating to the CLETS subscriber agreements but believe that the information I have suffices for the various time frames pertinent here.

into in or around 2019. These agreements provided, among other things, that "It is further agreed that federal, state or local law enforcement agencies shall not use any non-criminal history information contained within this database for immigration enforcement purposes." ACP



New York's Green Light Law went into effect on December 14, 2019. That version of the law completely cut off CBP's access to DMV information and would not naturally bring to mind examples of subscriber agreements that provided for access with restricted sharing. Thereafter, on April 3, New York enacted its amendment to the Green Light Law with a view to resumption of providing DMV information to CBP for limited purposes (including trusted traveler), subject to certification, record keeping, and inspection requirements, and to felony criminal penalties, concerning any use of such records for civil immigration purposes. ACP/DPP

DPP

Thereafter, declarations were prepared in support of the Government's motion for summary judgment in this matter. ACP

### C.  Due Diligence Conducted by the Government Attorneys

The Court's question 4 specifically requests a "Summar[y], with respect to each such statement, [of] what due diligence, if any, counsel for Defendants conducted before filing the document(s) containing the statement to determine whether the statement was accurate."

The Government's diligence into the uniqueness of New York's data restriction began in early February. ACP

ACP/WPP

**ACP/WPP** While preparing
Defendants' motion to dismiss the constitutional claims, the Government relied upon an April 6,
2020 declaration of John Wagner filed in related D.D.C. litigation, which stated: "New York is the
only state that has terminated CBP's access to driver license and vehicle data via Nlets" to argue
that New York had imposed a unique data restriction. And while developing the Administrative
Record ("AR"), the Government noted CBP's operational assessment, which indicated that states
imposing data restrictions on ICE did not impose comparable restrictions on CBP. *See*
DHSGLL009.

The Government's efforts to conduct diligence into the uniqueness of New York's data restriction
continued in the preparation of the AR. **ACP/WPP**



While preparing Defendants' partial summary judgment submission in June, statements about the
uniqueness of the data restrictions imposed by New York contained in the Acosta declaration
mirrored those in the April Wagner declaration submitted in the D.D.C. litigation, and did not raise
any new concerns. And each time the Government submitted a brief to the Court, it vetted that
submission with CBP and DHS. **ACP/WPP**

Plaintiffs' opposition brief to Defendants' motion for partial summary judgment identified statements made in several other DHS components' operational assessments that suggested that other states did not provide DMV data via NLETS. While plaintiffs' arguments did not ultimately accurately identify restrictions imposed on CBP (no state other than New York completely bars access to DMV records and the states with limited data restrictions differ from those identified by plaintiffs), these arguments prompted the Government to inquire further with DHS and CBP. The result of this further inquiry, discussed above, was an extensive analysis that led to the discovery of the information that ultimately prompted the Government's July 23 letter.

With respect to the data restriction issue related to the CLETS agreement, the Government engaged DHS and CBP extensively between April and July on the continued importance of the February 5, 2020 decision subsequent to the April amendment to New York's law.  Ultimately, that agreement was uncovered while CBP was conducting the follow-up research responsive in response to plaintiffs' opposition brief, discussed above.

Finally, with respect to the Risk Assessment Query Codes issue, the Government first received a draft declaration substantiating the cybersecurity risks associated with disclosure of the codes on May 15. That declaration detailed ordinary law enforcement security risks associated with the disclosure of information related to the internal structure of law enforcement databases and did not raise specific concerns, taken in the context of the numerous privilege assertions the Government and CBP were working to substantiate. When the Court ordered an inquiry into inaccurate and misleading statements made during the litigation, the Government asked CBP to follow up on this code issue. As discussed above, CBP's follow-up research ultimately revealed that several of the codes and related information had been publicly released by other DHS components such that they were no longer law enforcement privileged.

**IV.  How the Inaccurate or Misleading Statements were Identified**

The Court's questions 5 and 6 ask for identification of "when and how counsel for Defendants learned about the inaccurate and misleading statements, including but not limited to who at DHS contacted counsel about the statements on July 17, 2020;" and a description of "who, when, and how DHS discovered that the record in these cases contained inaccurate and misleading statements."

**A.  Identification of Issues Relating to DMV Information**



This new information led to the Government's July 23, 2020, letter to correct the record and to withdraw its motions to dismiss and for summary judgment.

**B.  Identification of Issues Concerning the Sensitivity of the Risk Assessment Query Codes**

---

[12] Personnel so referenced are identified in the attached Reference.



ACP/WPP

## V.  Steps to Avoid Similar Issues in the Future

In its August 11 Order, the Court directed that "the report should also address what steps, if any, the U.S. Attorney's Office (and the Department of Justice generally) is taking, or will take, to ensure that the problems identified in the review do not recur." As stated at the outset of this report, I have seen no indication of bad faith in all of these events. Rather, it appeared to me that all the attorneys and other personnel involved in vetting the facts underlying DHS's position, and the filings in this case, did so in a professional and workmanlike fashion. Nor have I identified any systemic failure of process that could usefully be corrected. In particular, I do not think that the two key items of information here—the failure of certain states and territories to provide driver history information to Nlets, and the failure timely to address the San Diego CLETS subscriber agreements—were improperly left out of the administrative record that underlay DHS's February 5, 2020, decision here. That some states and territories did not provide to Nlets the Driver History information needed for TTP vetting was simply not known to the relevant personnel, and I do not think it was obvious that more due diligence, on other DMV queries, should have been done at the time. (Learning about that missing information has been a painful benefit of this litigation.) And the CLETS Agreements would have had no pertinence to New York's original statutory termination of the provision of DMV information. As a general matter, I think it was reasonable for leadership, in making its determinations and policy decisions here, to rely on the facts as originally developed and presented to them; and I particularly note that when the factual landscape was shown to be materially incorrect, leadership quickly changed course to align with the facts.

Nor do I see anything nefarious in the failure to identify the CLETS Agreements as something that should have been raised much earlier in the case. They were in fact not directly pertinent to the Green Light Law, and as a general matter it is not particularly easy to identify information that is somewhat related, and somewhat not-related, to litigation, as something that should be brought to the attention of litigating counsel. In an effort to extract a lesson of potentially more general utility from these circumstances, one might consider that, when central authorities in an agency make a decision, in a given case, based on adherence to a strong agency policy, the need for inquiry into whether more flexible practices have developed in field offices should be taken into account.

We respectfully submit that in this case the adversary system functioned properly: the Government made a submission that addressed all the issues that it had identified and anticipated; the plaintiffs asserted factual and analytical gaps in the Government's submission; and the Government

confronted those claimed deficiencies, quickly correcting the record and abandoning positions that were no longer tenable. The Justice Department also believes this evaluation addresses the particular circumstances of this case and more general measures that could guide future litigation involving agency representation.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

by: _John m. mcEnany_

JOHN M. McENANY
Associate United States Attorney
(212) 637-2571

**References**



| DHS Attorney 1 | |
| --- | --- |
| CBP Attorney 1 | |
| CBP Attorney 2 | |
| CBP Attorney 3 | |
| CBP Attorney 4 | |
| CBP OIT Director 1 | |