September 11, 2020

<u>Via ECF</u>

Honorable Jesse M. Furman
United States District Judge
United States District Court
Southern District of New York
40 Centre Street, Room 2202
New York, New York 10007

<u>Re:</u>   *New York v. Wolf*, 20 Civ. 1127, and *Lewis-McCoy v. Wolf*, 20 Civ. 1142

Dear Judge Furman:

Pursuant to the Court's July 29, 2020 order, ECF No. 92,[1] and in response to the publicly filed version of Defendants' September 4, 2020 report, ECF No. 113 ("Defs.' Report"), Plaintiffs write jointly to inform the Court "whether they have reason to believe that Defendants made inaccurate or misleading statements beyond those identified in the report." ECF No. 92 at 6.  In short, the report's glaring deficiencies confirm that Plaintiffs do have such reason.

As Plaintiffs have explained, Defendants' extensive redactions to the report prevent Plaintiffs from fully assessing its content.[2] *See generally* ECF No. 114. Yet the unredacted portions of the report alone demonstrate that Defendants continue to evade a full and accurate accounting of their misrepresentations to Plaintiffs and this Court. The central shortcoming of Defendants' report is that it fails or refuses to deal with the fundamental problem here: DHS implemented an extremely consequential policy change that affected the lives of millions of people, harmed New York's economy, injured small businesses, and threatened national security, and there's no evidence *at all* that the stated reason for that decision was either remotely true (it wasn't) or that Defendants even believed it was true at the time of the decision and this months-long lawsuit. At some point in this litigation, Defendants' counsel came to the belated view that they could no longer defend an indefensible and unlawful policy; but the report does essentially nothing to explain why it took more than half a year — after considerable investment of resources by Plaintiffs and the Court, and considerable pain to ordinary New Yorkers — to come to that view. Even a cursory review of the Administrative Record would have made plain the obvious factual and legal invalidity of the ban.[3]

---

[1] All docket references are to *New York v. Wolf*, No. 20-cv-1127, unless otherwise indicated.

[2] Accordingly, Plaintiffs respectfully seek leave to supplement this response should the Court deny Defendants' pending motion for a protective order in whole or in part.

[3] Because Defendants' report does not meaningfully account for their inaccurate and misleading statements in this litigation, the Court should either conduct a further inquiry of its own or permit limited discovery by the Plaintiffs (*see* ECF No. 91 at 2), to determine how an agency decision that Defendants now admit was illegal came to be implemented and defended for so long.

First, Defendants fail to grapple with the fact that the Administrative Record repeatedly and consistently undermines their prior assertions that DMV information is necessary for TTP vetting, and that New York's Green Light Law uniquely prevents CBP from accessing relevant DMV information.  According to Defendants, "CBP did not originally address the fact that several state (and territories) did not provide to Nlets certain DMV information . . . because CBP was simply not aware of that until in response to Plaintiffs' memorandum in mid-July it performed additional tests beyond what it had previously performed."  Defs.' Report at 3.  The report thus indicates that "[Plaintiffs'] arguments prompted the Government to inquire further with DHS and CBP," *id.* at 14, by identifying "factual and analytical gaps in the Government's submission," *id.* at 16–17.  Plaintiffs' arguments, however, simply referred to the conclusions of DHS's own operational assessment, in an Administrative Record fewer than 80 pages in length, which on their face contradict Defendants' position.  *See* Pls.' Mem. Summ. J. (ECF No. 79) at 23–28.[4]  The report's assertion that Defendants were "simply not aware" of these fundamental discrepancies until Plaintiffs cited back to Defendants their own Administrative Record is implausible, and, if true, raises more troubling questions about Defendants' diligence in implementing the ban in the first place.

While Defendants fail to address statements in the Administrative Record that should have alerted them to the falsity of their assertions, they cite to other, extra-record evidence as the basis for their continued failure to realize that jurisdictions other than New York had similar restrictions on DMV data.  The report explains that CBP's Nlets representative "ran test queries against all other states" to determine whether New York's restrictions were unique. Defs.' Report at 11.  Because the representative queried the wrong information, however, those queries failed to show that driver history information was unavailable from jurisdictions other than New York.  *Id.*  Defendants do not disclose whether these test queries were performed prior to the TTP Decision or formed any part of that decision, but indicate they were performed as part of "due diligence" in February 2020.  *See id.* at 11, 2 n.4.  Putting aside whether documentation of those test queries should have been included in the Administrative Record, those tests do not explain how Defendants failed to realize that the Administrative Record extensively undermined

_____

[4] For example, during DHS's operational assessment of the effect of New York's Green Light Law, each subcomponent agency that addressed whether other states had restrictions similar to those in New York reported in the affirmative that multiple other states or territories had similar restrictions. *See, e.g.*, DHSGLL018 (listing 10 states or territories that are "[n]ot sharing DMV information with Nlets," and further stating, "[s]ome states do not participate in Nlets"); DHSGLL027 (listing nine states with DMV data restrictions); DHSGLL029 (reporting that Illinois, Puerto Rico, and the Virgin Islands do not share driver history, and several additional states do not share driver's license photos); DHSGLL032 (listing five states other than New York "provide varying degrees of more limited or incomplete access to DMV information to DHS Components"); DHSGLL074 (noting CBP lacked access to DMV database information from California and Connecticut prior to the effective date of New York's Green Light Law). In addition, nowhere during that operational assessment did DHS officials indicate that any criminal history data contained in New York's DMV databases was in fact used much less necessary for vetting TTP applicants. *See generally* DHSGLL006–007 (CBP Operational Assessment), -009–13 (Morgan Memo), -031–041 (Policy Memo).

"*the* rationale" for the TTP Decision and for Defendants' "defense" of that decision.  *See* Defs.' July 23rd Ltr. (ECF No. 89) at 1 (emphasis added).

Defense counsel's purported efforts at due diligence also fail to address statements in the Administrative Record that should have alerted them to the falsity of their representations to this Court.  In justifying their continued assertion that other jurisdictions did not restrict DMV data relevant to TTP vetting, counsel for Defendants rely on a statement in John Wagner's April declaration in *DiMaio v. Wolf*, No. 20-cv-445 (D.D.C.) that "New York is the only state that has terminated CBP's access to driver license and vehicle data via Nlets," and similar statements in Pete Acosta's June declaration in this case. Defs.' Report at 12–13.  Yet, as Plaintiffs explained in support of their cross-motion for partial summary judgment, these and other statements relied upon by Defendants do not contradict evidence in the Administrative Record that other jurisdictions also restrict DMV data. *See* Pls.' Mem. Summ. J. (ECF No. 79) at 25 & n.15.  At a minimum, therefore, defense counsel's explanation fails to demonstrate proper due diligence, and raises further questions about their continued candor to this Court.

In addition, neither Defendants' explanation of their or their counsel's misstatements regarding DMV data restrictions in other jurisdictions addresses Plaintiffs' argument — apparent since the filing of their complaints on February 10, 2020 — that the TTP Decision was irrational in light of CBP's continued processing of TTP applications from residents of foreign countries for which the agency lacks access to contemporaneous DMV information.  *See Lewis-McCoy* Complaint (*Lewis-McCoy* ECF No. 1) ¶ 60 ("Under the New York Ban, a U.S. citizen currently residing in New York could become eligible to apply by moving abroad and establishing residence in *any* foreign in country in the world, regardless of CBP's ability to obtain intelligence regarding persons residing in the country.  Similarly, under the ban, citizens of Argentina or Germany or India are eligible to apply for Global Entry *if they reside in their home country*, but would lose that eligibility if they moved to New York.").  Even if Defendants and their counsel mistakenly believed that the New York DMV data restrictions were unique among U.S. states and territories, they were thus on notice since February 2020 about the way in which processing of applications from foreign jurisdictions likely undermined the assertion that DMV data is necessary and consistently available for vetting TTP applicants.  Yet Defendants' report entirely fails to address this issue, and does not attempt to suggest that Defendants or their counsel made any attempts to verify the accuracy of their statements in light of that issue.

Equally implausible is Defendants' contention that they and their counsel failed to realize, issuing and defending a ban predicated on the necessity of DMV information for TTP vetting, that the agency does not consider such information necessary for vetting.  Defendants make the startling revelation that "TTP does not, as a matter of policy, require that vetting officers initiate manual queries for every applicant, but as a matter of practice, a vetting officer may, at their discretion, initiate a manual query of available DMV records through Nlets. . . . [W]hether or not such a manual query is conducted is based upon the TTP vetting officer's risk assessment of the TTP applicant."  Defs.' Report at 6; *accord* Acosta Decl. (ECF No. 113-1) ¶¶ 20–21.  Defendants aver that Pete Acosta, TTP Director, mistakenly believed at the time of his June 19 declaration that such DMV queries were performed for all TTP applicants.  Acosta Decl. ¶ 24.  Yet this is no small oversight: The *entire basis* for the TTP Decision was CBP's purported need for DMV information to vet TTP applicants, which need ostensibly *drove* that decision.  That the

TTP Director failed to understand the program's own "policy" of not requiring officers to query DMV information, but leaving that option to the discretion of individual officers, defies logic— particularly where the agency conducted an operational assessment that disclosed no such need, and where the agency's decision was subject to months of litigation prior to Director Acosta's June declaration.

Even in explaining their misstatements regarding the role of DMV data in TTP vetting, Defendants omit key details.  Despite Director Acosta's revelation, the report gives no indication as to how frequently or on what basis TTP vetting officers query Nlets DMV data; where the above "policy" regarding such queries is memorialized; how that policy was eventually disclosed to Director Acosta; why that policy was only disclosed to the TTP Director after months of enforcing and defending an agency decision for which the policy formed the purported basis, but which it fatally undermined; whether that policy was disclosed to other DHS officials prior to the TTP Decision; and why that policy was not included in the Administrative Record.

Strikingly, in a transparent attempt to lay the groundwork for future agency action baselessly tying TTP eligibility to DMV data sharing, Defendants repeatedly resist the conclusion — apparent in the Administrative Record, and in Director Acosta's new revelation — that such data is unnecessary for TTP vetting.  *See* Defs.' Report at 14 ("[I]t must be made clear that such information remains important to TTP vetting."); *id.* at 16 (stating that while "[t]he new information discussed above substantially undercut the factual underpinnings of [Defendants' arguments in their motions to dismiss and for summary judgment,] . . . many of the arguments would retain validity in full context").  Defendants' continued refusal to fully acknowledge that their position is without factual basis confirms that the report does not comprehensively address their misstatements.

***

For the foregoing reasons, Plaintiffs respectfully submit that Defendants' September 4 report inadequately accounts for Defendants' misconduct in this litigation and supports the imposition of sanctions, which remedy Plaintiffs will address more fully in their forthcoming motion for attorney's fees and costs.[5]  We thank the Court for its consideration of this letter and would be happy to address any questions or concerns the Court may have.

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION FOUNDATION

By: */s/ Jordan Laris Cohen*

---

[5] Per the Court's order, Plaintiffs have limited this response to whether they believe Defendants made inaccurate or misleading statements beyond those identified in the report.  We have not attempted to catalog in full our concerns with other aspects of the report, including that in many instances it presents as advocacy rather than as a neutral statement of facts.  *See, e.g.*, Defs.' Report at 11 (inaccurately stating that "New York's Green Light Law abruptly and conspicuously" terminated access to New York DMV information — the law took effect a full six months after it was enacted, which is hardly abrupt).

Jordan Laris Cohen
Antony P.F. Gemmell
Molly K. Biklen
Jessica Perry
Christopher T. Dunn
125 Broad Street, 19th Floor
New York, NY 10004
212-607-3300
agemmell@nyclu.org

Attorneys for Plaintiffs in 20-CV-1142


LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*
Matthew Colangelo, *Chief Counsel for Federal Initiatives*
Elena Goldstein, *Deputy Chief, Civil Rights Bureau*
Daniela L. Nogueira, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

Attorneys for Plaintiff in 20-CV-1127