UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br><br>                             Plaintiff,<br><br>    -v-<br><br>CHAD F. WOLF, *in his official capacity as Acting Secretary of Homeland Security*, et al.,<br><br>                             Defendants. | No. 20 Civ. 1127 (JMF) |
| R. L'HEUREUX LEWIS-MCCOY et al., *on behalf of themselves and all similarly situated individuals*<br><br>                             Plaintiffs,<br><br>    -v-<br><br>CHAD F. WOLF, *in his official capacity as Acting Secretary of Homeland Security*, et al.,<br><br>                             Defendants. | No. 20 Civ. 1142 (JMF) |

### DECLARATION OF WILLIAM A. FERRARA

1. I am currently the Executive Assistant Commissioner for the Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP). I have held this position since August 30, 2020. I began my career with the U.S. Customs Service in 1989 as a Customs Inspector at the Calexico Port of Entry at the Southern Border. Since then, I have held various positions at OFO, both at headquarters and in the field. While stationed at CBP headquarters between 2011 and 2014, I served as Acting Executive Director, Office of Admissibility and Passenger Programs; Acting Executive Director, Mission Support; Deputy Executive Director, Planning, Program Analysis, and Evaluation; and Director of Logistics. Between 2016 and 2019, I was Director, Field Operations (DFO), for the

Boston Field Office where I oversaw CBP operations of the New England six-state region, directing the activities of 1,100 employees and overseeing the arrival of more than 9.5 million international travelers and over $61 billion in imported goods. Additionally, I served as the DFO for the Chicago Field Office, leading the activities of more than 1,100 employees throughout most of the Midwest, covering 32 ports of entry, 8 user fee airports, an international mail facility, and 3 express consignment hubs in 12 states. Immediately prior to my current position, I served as the Executive Assistant Commissioner, Operations Support, between July 2019 and August 2020.

2. In my role as the Executive Assistant Commissioner, I am responsible for executing the missions of CBP and OFO. The CBP mission includes the enforcement of the customs, immigration, and agriculture laws and regulations of the United States and the enforcement of hundreds of laws at the border on behalf of numerous federal agencies. OFO is the primary CBP office responsible for securing the U.S. border at ports of entry (POEs) while facilitating lawful trade and travel. In my position, I supervise more than 32,000 employees, with operations at 20 major field offices, 328 POEs, and 70 locations in over 40 countries internationally.

3. As Executive Assistant Commissioner, I am familiar with CBP's administration and enforcement of legal requirements at the border, including the enforcement and administration of customs and immigration laws. In my position, I also oversee the administration of various programs and initiatives that facilitate travel and trade, including CBP's Trusted Traveler Programs (TTPs).

4. The effectiveness of CBP's mission is dependent to a large extent on the use of sensitive investigative and law enforcement techniques and methods that are not known to the

general public. The disclosure of these techniques and methods would seriously compromise CBP's ability to perform its law enforcement mission to enforce U.S. law at the border.

5. This declaration is based on my personal knowledge, my personal review and appraisal of the claims of law enforcement privilege hereby asserted, and the factual background of these cases, as well as information conveyed to me by my staff and other knowledgeable CBP personnel in the course of my official duties and responsibilities.

6. I am aware of the Court's September 14, 2020, order in *State of New York v. Wolf*, Case No. 20-cv-01127 (S.D.N.Y.), and *Lewis-McCoy v. Wolf*, Case No. 20-cv-1142 (S.D.N.Y.), requiring DHS to "identify with specificity the grounds upon which they assert privilege with respect each proposed redaction in their report and declarations." Dkt. No. 116 at 2.[1]

7. The purpose of this declaration is to assert law enforcement privilege over redacted information in paragraphs 20 and 21 of the Declaration by Pete R. Acosta, Dkt. No. 113-1 ("Acosta Declaration"). The same information is quoted on page 6 of the Government's Report in Response to the Court's July 29, 2020 Order ("Report"), under the subheading "Corrections Regarding the Vetting Process." Dkt. No. 113, at 6.

8. The information redacted in paragraphs 20 and 21 of the Acosta Declaration and on page 6 of the Report contains sensitive investigative techniques and procedures related to the vetting of applicants for CBP's Trusted Traveler Programs that is conducted by CBP's National Targeting Center (NTC). Specifically, the redacted information reveals the

---

[1] All docket entries refer to the docket of *New York v. Wolf*, No. 20 Civ. 1127 (JMF) (S.D.N.Y.).

procedures for conducting queries on TTP applications and the types of queries CBP may conduct.

9. If revealed, this information could enable TTP applicants to pick and choose what information they will provide on their TTP applications, potentially hiding information that they perceive as disqualifying. Such behavior would potentially deprive CBP of valuable information used by CBP to assess whether an applicant is low risk and should be approved for membership in TTPs. Further, providing additional information on how the TTP vetting process operates may permit those seeking to avoid detection to exploit the TTP application process itself for improper purposes. Consequently, such actions would frustrate the purpose of TTPs, which is to expedite and facilitate processing of known, low risk "trusted travelers" arriving into the United States by allowing CBP officers additional time to focus on higher risk, unknown travelers; such a result would make it more difficult for CBP to secure the border and enforce various laws, including customs and immigration laws.

10. Further, information redacted in paragraph 21 of the Acosta Declaration and page 6 of the Report reveals the weight CBP affords to certain information on a TTP application, and discretionary steps CBP may take to obtain additional information on an applicant. Public disclosure of this information would reveal CBP's sensitive vetting techniques, such as the kind of information considered important to the exercise of officer discretion, and the relative weight given to different factors. The release of such information would have the undesirable effect of placing CBP's law enforcement techniques and strategies in the public domain and at the disposal of illicit actors, advising them as to the vetting techniques used and thereby assisting them to devise methods to gain membership in a

TTP. Further, disclosure of such information would allow such actors to obtain facilitative benefits of TTP membership and use such privileges to attempt to evade detection and apprehension. Disclosure would therefore impair the effectiveness of those law enforcement techniques.

11. Disclosure of the redacted information in paragraphs 20 and 21 of the Acosta Declaration and on page 6 of the Report would identify law enforcement priorities and how resources are allocated. If revealed, that information could be exploited and used to develop and employ more effective counter-measures to diminish the effectiveness of CBP's vetting efforts. Accordingly, such information is protected by the law enforcement privilege.

12. Public interest weighs in favor of nondisclosure of the redacted information. As discussed above, if the information were to become public, individuals applying for TTP memberships could exploit the TTP vetting process and manipulate the information they submit to CBP, thereby thwarting CBP's efforts to properly vet TTP applications. The border security implications of providing opportunity to potentially illicit actors to exploit CBP's vetting processes and improperly gain membership in CBP's TTPs cannot be overstated since TTP members are generally afforded expedited processing at the border because CBP has already conducted thorough vetting of their applications. As such, public interest in border security outweighs plaintiffs' interests to access the sensitive law enforcement privileged information that was submitted to the Court to comply with the Court's July 29, 2020 order.

## Conclusion

13. The disclosure of the redacted information discussed herein would allow potential illicit actors to discover or circumvent CBP investigative techniques and endanger the integrity

of CBP border security operations. Specifically, the disclosure of these vetting techniques would enable potential illicit actors to evade CBP vetting processes, gain membership in a TTP and exploit the benefits of such membership for illicit purposes.

14. Accordingly, the disclosure of the redacted information would impede law enforcement and impair CBP's ability to facilitate lawful trade and travel by affording low-risk individuals expedited processing at the border, jeopardizing the overall effectiveness of the CBP mission.

15. Accordingly, I respectfully assert the law enforcement privilege with respect to the redacted information.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 21 day of September, 2020

/s/ William A. Ferrara

William A. Ferrara
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs and Border Protection