## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br><br>        Plaintiff,<br><br>   v.<br><br>CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security, et al.,<br><br>        Defendants. | No. 20 Civ. 1127 (JMF) |
| R. L'HEUREUX LEWIS-MCCOY, et al., on behalf of themselves and all similarly situated individuals,<br><br>        Plaintiffs,<br><br>   v.<br><br>CHAD WOLF, in his official capacity as Acting Secretary of Homeland Security, et al.,<br><br>        Defendants. | No. 20 Civ. 1142 (JMF) |

## PLAINTIFFS' JOINT MEMORANDUM OF LAW IN FURTHER OPPOSITION TO DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

LETITIA JAMES
*Attorney General of the State of New York*

Matthew Colangelo
Elena Goldstein
Daniela L. Nogueira
28 Liberty Street
Office of the New York Attorney General
New York, New York 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

*Counsel for Plaintiff in 20 Civ. 1127*

NEW YORK CIVIL LIBERTIES FOUNDATION

Antony P.F. Gemmell
Molly K. Biklen
Jessica Perry
Jordan Laris Cohen
Christopher T. Dunn
125 Broad Street, 19th Floor
New York, New York 10004
212-607-3300
agemmell@nyclu.org

*Counsel for Plaintiffs in 20 Civ. 1142*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

ARGUMENT ..............................................................................................................1

  I.   Standard for Review. ...........................................................................................1

  II.  Defendants have not met their burden of establishing that any privilege or work-product protection applies. ....................................................................................................2

        A.  The attorney-client privilege does not apply or is overcome by strong public policy requiring disclosure. ....................................................................................2

        B.  The work-product doctrine does not shield the report and declarations from disclosure. ..................................................................................................10

        C.  The deliberative process privilege does not apply or is overcome. .................13

        D.  Plaintiffs' compelling need overcomes the law enforcement privilege. ..............16

        E.  Defendants cannot establish good cause to redact the names of certain agency employees involved in issuing the Ban. ...........................................................20

  III.  Defendants waived any claims of privilege or work-product protection by disclosing the purportedly protected information to the Court without leave. .........................................22

CONCLUSION..........................................................................................................24

# TABLE OF AUTHORITIES

**Cases**................................................................................................................................Page(s)

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 14-CV-7126 (JMF), 2017 WL 280816 (S.D.N.Y. Jan. 20, 2017)....................................................................................................................24

*Am. Civil Liberties Union v. Nat'l Sec. Agency*, 925 F.3d 576 (2d Cir. 2019) .............................14

*Bowne of N.Y.C., Inc. v. AmBase Corp.*, 150 F.R.D. 465 (S.D.N.Y. 1993) .................4, 10, 12, 22

*Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184 (2d Cir. 2012) ...................................................2, 4

*Children First v. Martinez*, No. 04-CV-0927, 2007 WL 4344915 (N.D.N.Y. Dec. 10, 2007) .....13

*Citizens Union of City of N.Y. v. Attorney Gen. of N.Y.*, 269 F. Supp. 3d 124 (S.D.N.Y. 2017)...15

*Dipace v. Goord*, 218 F.R.D. 399 (S.D.N.Y. 2003) .....................................................................23

*Fisher v. United States*, 425 U.S. 391 (1976) .................................................................................8

*F.T.C. v. Grolier Inc.*, 462 U.S. 19 (1983).....................................................................................12

*Gleason v. Jandrucko*, 860 F.2d 556 (2d Cir. 1988).......................................................................8

*Hickman v. Taylor*, 329 U.S. 495 (1947).........................................................................10, 11, 12

*HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64 (S.D.N.Y. 2009)...........................23

*In re City of New York*, 607 F.3d 923 (2d Cir. 2010) ...................................................................16

*In re County of Erie*, 473 F.3d 413 (2d Cir. 2007) .........................................................................4

*In re Delphi Corp.*, 276 F.R.D. 81 (S.D.N.Y. 2011) ...............................................................13, 15

*In re Gen. Motors LLC*, 14-MD-2543 (JMF), 2015 WL 7574460 (S.D.N.Y. Nov. 25, 2015)........5

*In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521 (S.D.N.Y. 2015).....................4

*In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223 (2d Cir. 1984)..............................2

*In re Grand Jury Subpoena Dated October 22, 1991, and November 1, 1991*, 959 F.2d 1158 (2d Cir. 1992) ...................................................................................................................10

*In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180 (2d Cir. 2007) ............................10

*In re Kellogg Brown & Root, Inc.*, 756 F.3d 754 (D.C. Cir. 2014) .................................4

*In re N.Y. Times Co.*, 828 F.2d 110 (2d Cir. 1987)................................................20, 21

*In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995)..................................................5, 8

*In re Sealed Case*, 754 F.2d 395 (D.C. Cir. 1985)........................................................8

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997).......................................................16

*In re Steinhardt Partners, L.P.*, 9 F.3d 230 (2d Cir. 1993)..........................................24

*Jakobleff v. Cerrato, Sweeney & Cohn*, 97 A.D.2d 834 (2d Dep't 1983).....................22

*Joy v. North*, 692 F2d 880 (2d Cir. 1982) ....................................................................21

*Koch v. Specialized Care Servs.*, 437 F. Supp. 2d 362 (D. Md. 2005)............................8

*Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006)..................1, 20, 21

*Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616 (S.D.N.Y. 2011)..................................21

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002) ..........................9

*New York v. United States Dep't of Commerce*, No. 18-CV-2921 (JMF), 2018 WL 4853891 (S.D.N.Y. Oct. 5, 2018) ..................................................................................15

*New York v. Wolf*, No. 20-CV-1127 (JMF), 2020 WL 2049187 (S.D.N.Y. Apr. 29, 2020) ..........9

*N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)...............................................14

*N.Y. Times Co. v. U.S. Dep't of Justice*, 939 F.3d 479 (2d Cir. 2019)....................12, 22

*Pub. Citizen Health Research Grp. v. Brock*, 823 F.2d 626 (D.C. Cir. 1987).................9

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-cv-4394, 2016 WL 2977175 (S.D.N.Y. May 20, 2016)......................................................................................5

*Shelby County, Ala. v. Holder*, 570 U.S. 529 (2013) ....................................................................18

*Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 621 F. Supp. 2d 55 (S.D.N.Y. 2007) ..........................................................................................................................................20

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867 (1st Cir. 1995) ..................16

*Tummino v. Von Eschenbach*, 427 F. Supp. 2d 212 (E.D.N.Y. 2006)..............................................7

*United States v. Amodeo*, 71 F.3d 1044 (2d Cir. 1995) ............................................................1, 2

*United States v. Bilzerian,* 926 F.2d 1285 (2d Cir. 1991)............................................................23

*United States v. Deloitte LLP*, 610 F.3d 129 (D.C. Cir. 2010)....................................................11

*United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501 (2d Cir. 1991) ...................................8

*United States v. Mejia*, 655 F.3d 126 (2d Cir. 2011) ....................................................................3

*United States v. Nejad*, No. 18-cr-224 (AJN), 2020 WL 5549931 (S.D.N.Y. Sept. 16, 2020) .......6

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) ........................................................................3

*Vardon Golf Co. v. Karsten Mfg. Corp.*, 213 F.R.D. 528 (N.D. Ill. 2003)...................................24

*White v. City of New York*, No. 09 Civ. 9901 (BSJ) (THK), 2020 WL 2899665 (S.D.N.Y. July 23, 2010) ..........................................................................................................................................23

*Wultz v. Bank of China Ltd.*, 304 F.R.D. 384 (S.D.N.Y. 2015).....................................................2

**Statutes, Rules, and Regulations**

Fed. R. Civ. P. 26(b)(3).................................................................................................................11

Individual Rule 7(C)(i) .................................................................................................................22

## PRELIMINARY STATEMENT

On July 23, a half year after this litigation began, Defendants admitted what was obvious from the outset and unambiguous from the Administrative Record: that the sole rationale for implementing the unprecedented ban on New Yorkers' applications for the Trusted Traveler Programs had been a lie all along.  Following that extraordinary and "deeply troubling" revelation, the Court ordered Defendants to file a comprehensive and detailed report explaining what had gone wrong, and how, and why.

But the report Defendants filed obscures, rather than accounts for, Defendants' misconduct in this litigation.  And through a series of assertions of privilege that range from the merely erroneous to the downright implausible, Defendants now seek to withhold vast swaths of their report from public scrutiny—all while flouting the procedural requirements that any other litigant is bound to observe in seeking to overcome the strong presumption of public access to judicial records like Defendants' report.

This Court should not countenance Defendants' transparent attempt to frustrate the spirit, if not the word, of its July 29 order by permitting Defendants to shield the "comprehensive record" of their misconduct in this litigation from the light of day.  The Court should deny Defendants' motion for a protective order.

## ARGUMENT

### I.      Standard of review.

The "presumption of access" to judicial documents "is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice."  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)).  Courts apply the presumption of access by determining the weight of the presumption based on "the role of the

material at issue in the exercise of Article III judicial power," and "balancing competing considerations" against access. *Id.* at 119–20 (quoting *Amodeo*, 71 F.3d at 1049).

Defendants' supplemental memorandum in support of their motion for a protective order does not address this standard or contest Plaintiffs' argument that the report of Defendants' misrepresentations and accompanying declarations are central to the Court's exercise of its Article III judicial power. *See* Defs.' Mem. Supp. Defs.' Ltr. Mot. Prot. Order 6–7, ECF No. 117; Pls.' Ltr. Opp. Defs' Ltr. Mot. Prot. Order 2, ECF No. 114. The Court should weigh competing considerations against access—here, Defendants' claims of privilege or work-product protection—by reference to the strongest presumption in favor of disclosure.

Defendants bear the burden of establishing that any privileges apply. *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224 (2d Cir. 1984) ("It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship[.]"). As the party invoking privilege, Defendants also have the burden to show that any privileges have not been waived. *See Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 391 (S.D.N.Y. 2015).

## II. Defendants have not met their burden of establishing that any privilege or work-product protection applies.

### A. The attorney-client privilege does not apply or is overcome by strong public policy requiring disclosure.

The attorney-client privilege "protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." *Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184, 207 (2d Cir. 2012). The privilege must be narrowly construed because it shields pertinent information from disclosure and thereby operates as an obstacle to the truth-finding process. *See United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (citing cases). The Court should conclude that

the attorney-client privilege does not shield the redacted information from disclosure for several reasons.

First, Defendants' privilege log makes clear that the redacted information includes factual material not protected by the privilege.  The attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."  *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981).

Here, Defendants have applied extensive redactions to what appears to be purely factual information.  For example, the privilege log discloses that Defendants are withholding:

- summaries of emails and other communications regarding "CBP's access to the DMV data of various states and jurisdictions through Nlets and the research conducted by CBP OIT to determine the extent of such access," Priv. Log (redacted) 1–2, 6–7, 9–10, Sept. 21, 2020, ECF No. 117-3 (entries for Defs.' Report 2 n.4, 6, 15, Sept. 4, 2020, ECF No. 113;  Pete R. Acosta Decl. ¶¶ 8, 10, 15, 16, 10, Sept. 4, 2020, ECF No. 113-1);

- information regarding "restrictions under California laws" and "CBP's access to California DMV information," Priv. Log 3, 18 (entries for Defs.' Report 7; Robert E. Perez Decl. ¶¶ 22, 23, Sept. 4, 2020, ECF No. 113-2) ;

- factual materials regarding "CBP's access to DMV data," *id.* at 3–5, 9–10 (entries for Defs.' Report 12, 13–14 & n.11; Acosta Decl. ¶¶ 16, 18, Sept. 4, 2020);

- "DHS and CBP's understanding of the facts when Acting Secretary Wolf's February 5, 2020 decision . . . was issued," *id.* at 4 (entry for Defs.' Report 12);

- "CBP's access to various domestic jurisdictions' DMV records through Nlets and CBP information sharing agreements," *id.* at 12–13 (entries for Perez Decl. ¶¶ 5–6, Sept. 4. 2020); and

- "[h]ow the lack of access to other jurisdictions' DMV data was uncovered," *id.* at 15 (entry for Perez Decl. ¶ 13, Sept. 4, 2020).

This information—some of which Defendants themselves characterize as "facts"—appears to contain purely factual material that is not protected by the attorney-client privilege and should accordingly be disclosed.

Second, communications made after this Court's July 29 Order directing preparation of a report are not privileged because they were not "for the purpose of obtaining or providing legal assistance." *Brennan Ctr.*, 697 F.3d at 207. Instead, they were for the purpose of complying with the Court's order to provide additional information regarding Defendants' inaccurate and misleading statements, "[f]or the sake of ensuring an accurate record and to help the Court in deciding how to proceed down the line." Mem. Op. and Order ("July 29 Order") 5, July 29, 2020, ECF No. 92.

The attorney-client privilege attaches only if "the *predominant purpose* of the communication is to render or solicit legal advice." *In re County of Erie*, 473 F.3d 413, 420 (2d Cir. 2007) (emphasis added). In the context of an internal investigation, this Court has held that the presence of "other purposes for the investigation" does not vitiate the attorney-client privilege "[s]o long as obtaining or providing legal advice was one of the significant purposes of the internal investigation." *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 530 (S.D.N.Y. 2015) (quoting *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 758 (D.C. Cir. 2014)). Defendants contend that "a significant concern that animated the Government's investigation was 'the very prospect of [further] legal action.'" Defs.' Mem. 7 (quoting *In re Gen. Motors*, 80 F. Supp. 3d at 530). But Defendants provide no factual support—through affidavit or otherwise—for their assertion that the prospect of further legal action was a significant (or any) concern, and counsel's assertion in a legal brief does not suffice to meet the federal government's burden here. *See Bowne of N.Y.C., Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y. 1993) (the burden of proof to establish that a privilege applies "can be met only by an evidentiary showing based on competent evidence"); *see also Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-cv-4394, 2016 WL 2977175, at *4–*5 (S.D.N.Y. May 20,

4

2016) (collecting cases).  And the privilege logs expressly indicate that these communications were undertaken for the purpose of "responding to the Court's orders."  *See* Priv. Log (privilege log entries for the Defs.' Report 4 ¶ 2, 12 ¶ 1, 15–16; Acosta Decl. ¶¶ 19, 23, 30; Perez Decl. ¶ 6); *see also* Defs.' Mem. 6–7 (discussing those redactions).[1]  Because these communications relate to the purpose of responding to the Court's orders "[f]or the sake of ensuring an accurate record" and "to aid the Court in deciding later whether and to what extent a more detailed inquiry is warranted," July 29 Order 4, the Court should order the disclosure of all communications withheld on attorney-client privilege grounds that relate to the report and accompanying declarations.

Third, there is sufficient evidence to conclude that the crime-fraud exception should apply.  Defendants' interests in protecting the confidentiality of attorney-client communications "are minimal or non-existent when they are 'made for the purpose of getting advice for the commission of a fraud or crime.'"  *In re Gen. Motors LLC*, 14-MD-2543 (JMF), 2015 WL 7574460, at *3 (S.D.N.Y. Nov. 25, 2015) (quoting *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995)).  A party seeking disclosure pursuant to the crime-fraud exception must show "probable cause to believe that a . . . fraud has been attempted or committed," and that "the communications were in furtherance thereof."  *Id.* at *4 (quoting *Roe*, 68 F.3d at 40).

Defendants respond that there is no evidence the withheld communications were in furtherance of a fraud, because Mr. McEnany's report "found 'no indication of any intent to deceive the court.'"  Defs.' Mem. 7 (quoting Defs.' Report 3).  But neither Plaintiffs nor the Court are required to rely on this say-so, particularly where the report and declarations are

---

[1] Although identified in Defendants' supplemental memorandum as a "communication made during the course of the Government's investigation" pursuant to the July 29 Order, the privilege log entry for page 4 ¶ 2 of the Report indicates that that communication predates the Order.

extensively redacted.  Indeed, Judge Nathan concluded just a few weeks ago that a similar report

from the U.S. Attorney's Office was insufficient to remedy potentially systemic problems that

required a comprehensive response.  *United States v. Nejad*, No. 18-cr-224 (AJN), 2020 WL

5549931, at *1–*2, *11, *13–*15 (S.D.N.Y. Sept. 16, 2020) (directing further fact-finding

regarding the government's conduct in a criminal prosecution where "[u]nfortunately, the

response from the [USAO] has been inadequate").

Defendants also respond that counsel only became aware of their misleading and

inaccurate statements to this Court on July 17 and then "promptly" took efforts to disclose and

correct those errors.  Defs.' Mem. at 9.  Even were this characterization accurate,[2] it

misunderstands the fraud on the Court that Plaintiffs believe is supported by at least the probable

cause standard.  Plaintiffs have alleged from the beginning of this litigation that the agency's

stated reason for the Trusted Traveler Ban—that DMV information was necessary for security

vetting—was pretextual.  Defendants' redacted report and declarations make clear (particularly

---

[2] Defendants assert that "as soon as Defendants learned that their prior positions were untenable, they voluntarily disclosed that information and changed their policy."  Defs.' Mem. 9.  But the "notice of correction" and subsequent report filed by the U.S. Attorney's Office indicate that counsel learned of the inaccuracies in their prior papers on July 17, *see* Defs.' Ltr., July 28, 2020, ECF No. 90; Priv. Log 19, and did not advise the Court or Plaintiffs for nearly a *full week*, until July 23.  *Cf. Nejad*, 2020 WL 5549931, at *2 ("Instead of immediately disclosing [a potentially exculpatory] file, Government lawyers spent almost twenty hours strategizing how best to turn it over.").  And they notified the Court of these errors only *after* DHS issued a press release falsely stating that the reinstatement of Trusted Traveler eligibility was due to the Green Light Law amendment—the exact same amendment counsel had previously told this Court was categorically insufficient to support lifting the ban.  *Compare* U.S. Dep't of Homeland Sec., *New York Amends Dangerous Green Light Law to Cooperate with Federal Law Enforcement on DMV Record* (July 23, 2020), at https://www.dhs.gov/news/2020/07/23/new-york-amends-dangerous-green-light-law-cooperate-federal-law-enforcement-dmv (quoting statement from Defendant Wolf that "[w]e appreciate the information sharing to CBP for the trusted travel program, which enables DHS to move forward and begin once again processing New York residents under the Trusted Travel Program."), *with* Defs.' Mem. Supp. Summ. J. 8, ECF No. 68 (asserting that the Green Light Law "Amendment does not make DMV information available to CBP unless it agrees to fundamentally alter its operations, in contravention of policy and statute").

in combination with the Administrative Record) that not only was it never true that the Green

Light Law impaired vetting, but that Defendants may not even have believed it was true

themselves.  Instead, the record discloses numerous indications that the agency was trying to

establish a factual basis for its decision to justify its actions after the fact.  The DHS official in

charge of the agency's Office of Strategy, Policy, and Plans first proposed intentionally targeting

New Yorkers as a way to compel changes in New York law, writing in a memo to the Acting

Secretary that one "[o]ption for addressing laws that restrict access to state DMV information"

was to "[e]xclude residents of uncooperative states from participating in DHS Trusted Traveler

Programs."  DHSGLL031, 039-040.  On the morning of February 4, 2020—the day of the

President's State of the Union, and one day before the Trusted Traveler Ban was announced—

the DHS Deputy General Counsel asked for a phone call with CBP officials "to discuss the

impact of the New York DMV law on the Global Entry process from the operational

perspective."  DHSGLL063.  Only *after* the decision was announced is there any indication that

CBP sought "to determine if any other state had cut off CBP access to DMV information in

NLETS."[3]  Defs.' Report at 2 n.4.  Searching for explanations to justify a decision that has

already been made is the definition of bad faith.  *See Tummino v. Von Eschenbach*, 427 F. Supp.

2d 212, 233 (E.D.N.Y. 2006).

Implementing and then defending a bad-faith agency decision—with no evidence that

agency decisionmakers ever believed the rationale counsel advanced in litigation—is the fraud

Plaintiffs believe may have been established by probable cause.  Having admitted to inaccurate

---

[3] The Report states only that this test query was conducted in February 2020.  *See* Defs.' Report
2 n.4.  Plaintiffs believe that this test query took place *after* the Ban was announced because no
information regarding the query appears anywhere in the Administrative Record, indicating
(unless Defendants certified to the completeness of an incomplete record) that the query did not
inform the decision to implement the Ban.

and misleading representations to the Court that "undermine a central argument in defendants' briefs and declarations to date," Defs.' Ltr. ("July 23 Letter") 2, July 23, 2020, ECF No. 89, and "formed '*the* rationale' for DHS's original decision and went to the heart of the issues in dispute," July 29 Order 2, 4, Defendants cannot seriously dispute that there is at least probable cause to conclude that their conduct amounted to fraud upon the Court.[4]  *See Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988) (defining "fraud upon the court" as a "fraud which seriously affects the integrity of the normal process of adjudication").

Finally, strong public policy requires disclosure even if the privilege would otherwise attach.  The Second Circuit has explained that the attorney-client privilege "cannot stand in the face of countervailing law or strong public policy."  *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir. 1991).  Here, the Court should consider both the purposes of the underlying report and declarations, as well as the collective impact of the extensive redactions Defendants propose, and should conclude that those withholdings are inconsistent with a strong policy favoring public disclosure of the federal government's explanation for how it misled the Court regarding the basis for its decision "to exclude every resident of the country's fourth largest state from enrolling or re-enrolling in a program mandated by the Intelligence Reform

---

[4] For purposes of applying the crime-fraud exception, it is immaterial that Plaintiffs rely on probable cause to believe "fraud upon the court" has occurred, rather than criminal or civil fraud prohibited by statute or common law.  *See, e.g.*, *In re Sealed Case*, 754 F.2d 395, 399–402 (D.C. Cir. 1985); *Koch v. Specialized Care Servs.*, 437 F. Supp. 2d 362, 372–77 (D. Md. 2005) (collecting cases).  And the purposes underlying the crime-fraud exception support its application here: "Although there is a societal interest in enabling clients to get sound legal advice, there is no such interest when the communications or advice are intended to further the commission of a crime or fraud."  *Roe*, 68 F.3d at 40.  Likewise, there is no societal interest in enabling federal agencies to get sound legal advice from their attorneys for the purpose of "seriously affect[ing] the integrity of the normal process of adjudication."  *Gleason*, 860 F.2d at 559; *see also Fisher v. United States*, 425 U.S. 391, 403 (1976) (the attorney-client privilege applies "only where necessary to achieve its purpose").

and Terrorism Prevent Act." *New York v. Wolf*, No. 20-CV-1127 (JMF), 2020 WL 2049187, at

*2 (S.D.N.Y. Apr. 29, 2020); *see, e.g.*, *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 37

(D.C. Cir. 2002) (noting "the strong public interest in knowing 'what the government is up to'")

(citation omitted).

The Court ordered Defendants to prepare the report and accompanying declarations in

light of "Defendants' deeply troubling revelations that statements and representations they made

in these cases . . . were 'inaccurate' and 'misleading.'" July 29 Order at 4–5. These statements

"formed '*the* rationale' for DHS's original decision and went to the heart of the issues in

dispute." *Id.* at 4. And the underlying decision is one that disrupted the lives of thousands of

New Yorkers and put our safety at risk—*for no reason*. This litigation was not a garden-variety

dispute, but one about whether the federal government exercised its tremendous power

vindictively and arbitrarily. And these privilege assertions are not garden-variety privilege

claims either; they conceal from public examination DHS's explanation for how the federal

government strayed so far from its core obligations to uphold the law and protect its residents.

Yet when ordered to explain itself, the U.S. Attorney's Office filed declarations from agency

decisionmakers that withhold more than they disclose. *See* Acosta Decl., ECF No. 113-1

(redacting 15 of 33 paragraphs in full or in part on claim of attorney-client privilege); Perez

Decl., ECF No. 113-2 (redacting 17 of 24 paragraphs in full or in part on claim of attorney-client

privilege). Public policy favors maximum disclosure here. *Cf. Pub. Citizen Health Research

Grp. v. Brock*, 823 F.2d 626, 627 (D.C. Cir. 1987) ("At some point, we must lean forward from

the bench to let an agency know, in no uncertain terms, that enough is enough.").

## B.    The work-product doctrine does not shield the report and declarations from disclosure.

Similarly, Defendants fail to meet their "heavy burden" to show that the work product protection applies to the report and related declarations. *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007).  "The work product privilege protects 'work product of the lawyer' by prohibiting 'unwarranted inquiries into the files and the mental impressions of an attorney.'" *In re Grand Jury Subpoena Dated October 22, 1991, and November 1, 1991*, 959 F.2d 1158, 1166 (2d Cir. 1992) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947)).  But "the rule does not protect from disclosure the underlying facts known to the party or his counsel, even if acquired in anticipation of litigation." *Bowne*, 150 F.R.D. at 471.  Because the Court's inquiry into Defendants' misstatements is both justified and grounded in fact, the work product doctrine does not prohibit disclosure here.

First, the Court's inquiry is not "unwarranted." *Hickman*, 329 U.S. at 510.  By their own admission, Defendants withdrew their motion to dismiss, motion for summary judgment, every supporting brief, and every supporting declaration because those documents contained "inaccurate and misleading statements" that "undermine[d] . . . the rationale for" the Ban. *See* July 23 Letter 2–3.  These admissions already "establish adequate reasons to justify production through a subpoena or court order," *Hickman*, 329 U.S. at 512, but this Court has not even ordered production of any documents yet.  Instead, this Court ordered a "limited inquiry" requiring Defendants to provide an accounting of their false and misleading statements in order to ascertain whether further inquiry might be needed down the line.  July 29 Order at 5.  This limited inquiry into the facts underlying Defendants' misstatements is the type of "reasonable and necessary" court-ordered inquiry that overcomes any work product protection that might attach in the regular discovery context. *Hickman*, 329 U.S. at 497 (explaining the need to

properly balance "unwarranted excursions into the privacy of a [person's] work" against "public policy support[ing] reasonable and necessary inquiries").

Indeed, this is not a case where a court has ordered the production of work product based on Plaintiffs' "mere demand." *Id.* at 511. The report and declarations are neither "documents and tangible things that are prepared in anticipation of litigation," *see* Fed. R. Civ. P. 26(b)(3), nor intangible work product, *see Hickman*, 329 U.S. at 510–11; *United States v. Deloitte LLP*, 610 F.3d 129, 136 (D.C. Cir. 2010) (holding that "*Hickman* provides work-product protection for intangible work product independent of Rule 26(b)(3)"), sought in the ordinary course of fact discovery. Rather, they are court-ordered factual explications to help determine whether Defendants have defrauded Plaintiffs and this Court. Work product protections do not apply.

Second, in several instances, Defendants have redacted what appears to be purely factual information on work-product grounds. Indeed, as noted above, Defendants themselves characterize some of the redacted information as reflecting objectively factual information. For example, Defendants have redacted information or communications about:

- "CBP's access to the DMV data of various states and jurisdictions through Nlets and . . . the extent of such access," Priv. Log at 1 (entry for Report 2); *id.* (entry for Report n.4); *see also id.* at 2 (entry for Report 6); *id.* at 5 (entry for Report 13, 14); *id*. at 6 (entry for Report 15); *id*. at 7 (entries for Acosta Decl. ¶¶ 8, 10); *id*. at 8 (entry for Acosta Decl. ¶ 14); *id*. at 9 (entries for Acosta Decl. ¶¶ 15–16); *id*. at 10 (entry for Acosta Decl. ¶ 18); *id*. at 12 (entries for Perez Decl. ¶ 5); *id*. at 13 (entry for Perez Decl. ¶ 6); *id*. at 18 (entries for Perez Decl. ¶¶ 22–23);

- "restrictions under California laws," *id.* at 3 (entry for Report 7);

- "how the previous Perez Declaration was reviewed for accuracy and the due diligence that was conducted during drafting," *id*. at 14 (entry for Perez Decl. ¶ 9); *id*. at 16 (entries for Perez Decl. ¶¶ 16–17);

- "how the lack of access to other jurisdictions' DMV data was uncovered," *id*. at 14 (entry for Perez Decl. ¶ 10); *id.* at 15 (entry for Perez Decl. ¶ 13);

- "Deputy Commissioner's knowledge of the effect and application of New York's Green Light Law and its amendments," *id*. at 15 (entry for Perez Decl. ¶ 12);

- "operational information" and "what factual inquiries were necessary, particularly regarding access to California DMV data and local information sharing agreements," *id.* at 17 (entry for Perez Decl. ¶ 20); *id.* at 18 (entry for Perez Decl. ¶ 21); and

- "newly discovered factual information," *id.* at 19 (entry for Perez Decl. ¶ 24).

In their brief, Defendants fail to acknowledge that these entries contain factual information that should be disclosed.[5] *See generally* Defs.' Mem.; *see Bowne*, 150 F.R.D. at 471.  Instead, Defendants suggest that work-product protections shield anything reflecting "communications and documents" prepared for litigation.  *See* Defs.' Mem. 9.  But even during the regular discovery process, the work-product doctrine provides only "a qualified immunity."  *F.T.C. v. Grolier Inc.*, 462 U.S. 19, 24 (1983) (explaining that *Hickman* "recognized a qualified immunity from discovery for the 'work product of the lawyer'") (citation omitted); *N.Y. Times Co. v. U.S. Dep't of Justice*, 939 F.3d 479, 494 (2d Cir. 2019) ("Like the other civil discovery privileges, however, the protection afforded by the work product privilege is not absolute.") (internal quotation marks omitted).  Here, that qualified protection is overcome by Defendants' own admissions and the fact-based nature of this Court's inquiry, which focuses not on defense counsel's legal analysis and work product, but on process.[6]  And as discussed above, *see supra* Part II.A, the crime-fraud exception and public policy also favor disclosure.

---

[5] Nor have Defendants provided evidence that these communications do not contain factual information—a failure that alone warrants disclosure.  *See Bowne*, 150 F.R.D. at 470 (party asserting privilege bears a "burden [that] can be met only by an evidentiary showing based on competent evidence and cannot be discharged by mere conclusory or ipse dixit assertions") (internal citations and quotation marks omitted).

[6] Indeed, this Court ordered Defendants' report to list the offending statements, explain why they are inaccurate or misleading, identify who is responsible for each statement, summarize any due diligence undertaken, and identify who, when, and how at both the agency and counsel's office learned of the misstatements.  July 29 Order 5–6.  The Court also ordered Defendants' declarants to "describe[e], with particularity, (1) how the prior declaration came to include such statement or statements; (2) what steps the declarant took, prior to signing the declaration, to confirm the accuracy of the statement or statements; and (3) when and how the declarant learned that the statement or statements were inaccurate or misleading."  *Id*. at 6.

C.     **The deliberative process privilege does not apply or is overcome.**

Defendants also repeatedly invoke the deliberative process privilege to justify redacting portions of the report and Perez declaration.  *See* Defs.' Mem. 13–14.  But those invocations are inappropriate in light of both the purpose of the Court's inquiry here and the specific information over which Defendants assert the privilege.

The deliberative process privilege does not shield Defendants' decision-making process from public scrutiny where, as here, that very process "is the 'central issue'" of the inquiry ordered by the Court.  *In re Delphi Corp.*, 276 F.R.D. 81, 85 (S.D.N.Y. 2011); *see also Children First v. Martinez*, No. 04-CV-0927, 2007 WL 4344915, at *7 (N.D.N.Y. Dec. 10, 2007) ("[W]hen the decision-making process itself is the subject of litigation, the deliberative process privilege cannot be a bar to discovery.").  To be sure, the Court previously rejected this argument in the context of Plaintiffs' motion to complete the Administrative Record, reasoning that the cited authority did not involve Administrative Procedure Act litigation, which "ordinarily do[es] not concern the agency decision-maker's subjective intent."  July 29 Order 3.  But the same logic militates the opposite conclusion here, where Defendants' subjective intent *is* at issue.  The report and declarations required by the Court's July 29 Order were prepared for the express purpose of disclosing all instances of inaccurate representations by Defendants in this litigation. *See id.* 4–6.  Any deliberative information they contain bears directly on what Defendants knew and when about the illegitimacy of the Ban's purported rationale, and are thus indispensable to any meaningful inquiry into Defendants' misconduct in this litigation.

Even were the deliberative process privilege not categorically inapplicable to the Court's inquiry into Defendants' conduct, Defendants' assertion of the privilege is overbroad here.  It is axiomatic that the deliberative process privilege attaches only to deliberative materials prior to the time a decision is made.  *See Am. Civil Liberties Union v. Nat'l Sec. Agency*, 925 F.3d 576,

593 (2d Cir. 2019) (citing *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975)).  "By contrast, there is little need to preserve the confidentiality of discussions that take place after a decision has been made."  *Am. Civil Liberties Union*, 925 F.3d at 593.  Here, Defendants assert the privilege with respect to "communications between CBP and DHS assessing data-restriction laws enacted by other states" referenced in paragraph 10 of the Perez Declaration.  *See* Defs.' Mem. 13 (citing David R. Dorey Decl. ¶ 4, ECF No. 117-2); *see also* Priv. Log 14.  But notwithstanding Defendants' conclusory assertion that these communications were "pre-decisional," Defs.' Mem. 13, there is no decision as to which the communications could plausibly have come prior in time:  Defendants concede the communications in question occurred as late as February 19, 2020—two weeks after the Ban was enacted.  *See* Priv. Log 14 (withheld communications occurred "after the decision was made").  And the only other "decision" Defendants identify—"the preparation of the original Perez Declaration," *id.*—relates to a document that accompanied Defendants' original iteration of the Administrative Record, which was not filed for over two months after the withheld discussions concluded.  *See* Robert E. Perez Decl., Apr. 24, 2020, ECF No. 36-1.  Because the withheld portions of the Perez Declaration do not contain communications that *preceded* the Ban or any other relevant decision, the privilege does not attach.

Moreover, to the extent the deliberative process privilege attaches to any of Defendants' redactions, the Court should find the privilege overcome.  The deliberative process privilege is qualified, not absolute, and "may be overridden in circumstances where reason and experience suggest that the claim of privilege should not be honored."  *Citizens Union of City of N.Y. v. Attorney Gen. of N.Y.*, 269 F. Supp. 3d 124, 159 (S.D.N.Y. 2017) (internal quotation marks and citation omitted).  Courts in this circuit consider five factors in determining whether the

deliberative process privilege should be overridden: "(1) the relevance of the evidence the agency seeks to protect; (2) the availability of other evidence; (3) the seriousness of the litigation; (4) the role of the agency in the litigation; and (5) the possibility that disclosure will inhibit future candid debate among agency decision-makers." *New York v. United States Dep't of Commerce*, No. 18-CV-2921 (JMF), 2018 WL 4853891, at *2 (S.D.N.Y. Oct. 5, 2018) (citing *In re Delphi Corp.*, 276 F.R.D. at 85).

The balance of these factors weighs in favor of overcoming the deliberative process privilege.  First, the evidence Defendants seek to withhold concerns two subjects about which Defendants concede they have misled the Court—state restrictions on DMV data and the impact of the Green Light Law amendment—and thus bears directly on the Court's inquiry here. Second, that evidence is unavailable from other sources.  Third, the Court's inquiry into Defendants' misrepresentations is of consequence to the millions of New Yorkers harmed by the Ban and the public's confidence in the integrity of the federal government and the judicial process.[7]  Fourth, DHS's decision-making process is centrally at issue in this litigation and the current inquiry before the Court.  And fifth, disclosure will not chill future candid communications, because this narrow disclosure relates to the unusual circumstance of admitted misrepresentations by a government agency in litigation.  "[W]here there is reason to believe the documents sought may shed light on government misconduct, 'the [deliberative process] privilege is routinely denied.'"  *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997) (quoting *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995)).

---

[7] Plaintiffs reject Defendants' implication that this inquiry is inconsequential.  *Compare* Defs.' Mem. 14 n.5 (characterizing sanctions as among the "only" remaining issues upon which the redacted information could bear), *with* July 29 Order 4 (describing Defendants' misrepresentations as "deeply troubling").

Because the report and declarations at issue here were prepared precisely to "shed light on government misconduct," any otherwise-valid assertion of the deliberative process privilege should be rejected.

> ### D.   Plaintiffs' compelling need overcomes the law enforcement privilege.

Defendants' reliance on the law enforcement privilege should also be rejected.  This privilege protects "information pertaining to law enforcement techniques and procedures," and is "qualified, not absolute."  *In re City of New York*, 607 F.3d 923, 944–45 (2d Cir. 2010) (internal quotation marks omitted).  The privilege can be overcome where (1) the suit is non-frivolous and brought in good faith, (2) the information sought is unavailable through other sources, and (3) the party seeking disclosure has a compelling need for the information.  *Id.* at 948.  Applying this balancing test, the Court already rejected multiple assertions of the law enforcement privilege by Defendants earlier in this litigation, *see* July 29 Order 9–10, and these considerations weigh even more strongly in favor of disclosure now: this suit is not frivolous (indeed, Defendants have conceded that the Ban was unlawful); the material is otherwise unavailable because it comes from Defendants' report and corrective declarations identifying misstatements in this litigation; and there is a compelling need for disclosure because the redacted information is the only way to shed light on the scope of those misstatements and goes directly to Defendants' justifications for the Ban.  *See id.*

The redactions for which Defendants assert law enforcement privilege "all concern the factors considered by CBP officers when determining whether it is necessary to query driver's records for a particular TTP applicant."  Defs.' Mem. 14.  Plaintiffs have a compelling need for this information because the extent to which CBP actually uses DMV data for TTP vetting goes to the heart of Plaintiffs' claims that the ban was unjustified, as well as the extent of Defendants' misrepresentations to Plaintiffs and this Court.  Defendants contend that Plaintiffs no longer have

a compelling need for the redacted information because "[t]he Government has conceded the merits of this case" and the information sought "has no bearing" on any remaining issues such as attorney fees or other sanctions. *Id.* at 14 & n.5, 15. They are wrong on both points.

First, while Defendants concede the Ban was legally unsupportable for the narrow reason that New York's restrictions are not unique, they continue to resist the broader conclusion that DMV data is unnecessary for TTP vetting. *See, e.g.*, Defs.' Ltr., Aug. 31, 2020, ECF No. 110 (stating that CBP "is continuing to evaluate the means by which it can obtain DMV information in order to vet all Trusted Traveler Program applicants"); Defs.' Report 14 ("[I]t must be made clear that such information remains important to TTP vetting."). The information sought regarding CBP's (non-)use of DMV data in TTP vetting thus remains relevant to the scope of the Court's findings as to why the TTP Decision was arbitrary and capricious—which scope may inform Defendants' attempt to re-impose a similar ban. It also remains relevant to assessing Plaintiffs' claims that the decision was pretextual in violation of the Administrative Procedure Act, and singled out New York for differential treatment in a way that was not "sufficiently related" to the problem purportedly being targeted. *Shelby County, Ala. v. Holder*, 570 U.S. 529, 542, 544 (2013).

Defendants are also incorrect that the information withheld on purported law enforcement grounds has no bearing on this Court's inquiry into Defendants' misrepresentations, and on the related issues of attorney's fees and sanctions. In response to Defendants' "deeply troubling revelations" of their misrepresentations in this case, the Court ordered Defendants to "make a comprehensive record" of those statements "[f]or the sake of ensuring an accurate record and to help the Court in deciding how to proceed down the line." July 29 Order 4–5. The Court also sought to involve Plaintiffs in this inquiry by inviting them to respond. *Id.* at 5; *cf.* Defs.' Report

16–17 (describing truth-seeking benefits of the adversary system).  At the heart of those misrepresentations was CBP's purported (but apparently nonexistent) need for DMV data to vet TTP applicants.  It is thus necessary to "ensuring an accurate record" in this case that Defendants' belated revelations on this central issue be disclosed in their entirety, and that Plaintiffs be allowed to respond.  Furthermore, while Defendants continue to minimize the redactions regarding TTP vetting as "technical information," Defs.' Mem. 15, that information is necessary for determining the precise extent of Defendants' misrepresentations regarding *the* rationale for the challenged ban, and their culpability for the purpose of assessing attorney's fees or other sanctions.

Defendants' asserted interests in nondisclosure neither overcome Plaintiffs' compelling need nor are they even persuasive.  William A. Ferrera, Executive Assistant Commissioner for CBP's Office of Field Operations, states in his declaration that the redactions "reveal[] the weight CBP affords to certain information on a TTP application, and discretionary steps CBP may take to obtain additional information on an applicant." William A. Ferrera Decl. ¶ 10, ECF No. 117-1.  Yet as this Court previously concluded, such information, which "concerns the discretion exercised in the vetting process," does not involve "firm rules that could conceivably be exploited." Op. and Order 10, July 10, 2020, ECF No. 62.

More importantly, the contemplated scenario in which an individual exploits the redacted information is both outlandish and contrary to the record.  Defendants assert that the information could enable applicants to "pick and choose what information they will provide on their TTP applications" and "manipulate the information they submit to CBP" to "thwart[] CBP's efforts to properly vet TTP applications," Ferrera Decl. ¶¶ 9, 12—presumably by preventing a TTP officer from exercising their discretion to query an applicant's DMV records.  But as Defendants

18

concede, the agency now processes applications from multiple jurisdictions for which DMV data is unavailable, which apparently does not "thwart[] CBP's efforts to properly vet TTP applications." *Id.* In addition, Defendants' statement that applicants could "pick and choose what information they will provide" to thwart the vetting process is belied by the fact that *Defendants control* the information required on a TTP application, and Defendants give no indication as to what information applicants could choose to withhold.

For these reasons, Plaintiffs have a compelling need for disclosure of the law enforcement privilege redactions, which overcomes the qualified privilege.

### E.   Defendants cannot establish good cause to redact the names of certain agency employees involved in issuing the Ban.

Defendants also propose to withhold the names of DHS and CBP employees involved in issuing the Ban. *See* Defs.' Mem. 15–16. But Defendants lack good cause to do so and the Court should reject their request.[8]

There is no dispute that the document at issue here—a report this Court ordered Defendants to submit containing a comprehensive record of inaccurate and misleading statements made in their prior court submissions—is a judicial document to which a strong presumption of access attaches. *See Lugosch*, 435 F.3d at 121 (documents central to the court's review are "judicial documents to which a strong presumption of access attaches, under both the

---

[8] Defendants' claim that Plaintiffs conceded the redaction of these names by not addressing them in their September 10, 2020 letter is specious. *See See* Defs.' Mem 15, n.6 (citing Pls.' Ltr. Opp. Defs' Ltr. Mot. Prot. Order, ECF No. 114). Plaintiffs had already advised Defendants and the Court of their opposition to these specific redactions the week before. *See* Defs.' Ltr. Mot., Sept. 4, 2020, ECF No. 111 ("Defendants' request did not explain how their request to redact employee names is consistent with the Court's order of April 29, 2020, denying the same request in connection with the administrative record."). And as the Court recognized in ordering this very briefing, Defendants had failed at that time adequately to explain the basis for their redactions. *See* Order, Sept. 14, 2020, ECF No. 116.

common law and the First Amendment"). Under the First Amendment, sealing "may be justified

only with specific, on-the-record findings that sealing is necessary to preserve higher values and

only if the sealing order is narrowly tailored to achieve that aim." *Id.* at 121 (citing *In re N.Y.*

*Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)). Accordingly, Defendants may redact the names of

CBP and DHS employees only if they demonstrate "good cause" sufficient to overcome the

strong presumption of access afforded under both the First Amendment and the common law.

*Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 621 F. Supp. 2d 55, 61

(S.D.N.Y. 2007).

Defendants fail to identify any "higher values" that the redaction of names is necessary

"to preserve," much less that their redactions are a narrowly tailored means of achieving such

preservation. *Lugosch*, 435 F.3d at 121 (quoting *In re N.Y. Times Co.*, 828 F.2d at 116). Nor

could they. This report contains a record of factual inaccuracies and misrepresentations

Defendants made in prior court submissions, and the names of government employees involved

in such actions or their review "should not remain under seal absent the most compelling

reasons." *Id.* (quoting *Joy v. North*, 692 F2d 880 (2d Cir. 1982)).

Defendants offer virtually nothing to overcome this strong presumption of access. They

claim these employees' names must be redacted to prevent them from "being connected to . . .

the Court's investigation into fraud." Defs.' Mem. 16. But these employees are undoubtedly

already connected to the Court's present inquiry by virtue of their involvement in the inquiry and

Defendants' naming them in their report.[9] Defendants cite no other highly sensitive or

confidential employee privacy interest at stake here. Unlike in *Lugosch*, where the Court found

---

[9] Defendants refer to "low level" employees but do not provide any specifics as to rank or
position. *See* Defs.' Mem. 16–17.

that disclosure of records of non-party employees were potentially sensitive because the "records contain[ed] a variety of types of personal information," mere disclosure of employee names does not risk disclosure of any such additional sensitive personal information.  *See* Pls.' Joint Ltr. 1–2, Apr. 29, 2020, ECF No. 44 ("Names are not traditionally private.") (citing *Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 625 (S.D.N.Y. 2011)).  The balance therefore weighs in favor of denying the request to redact the CBP and DHS employee names.

## III.   Defendants waived any claims of privilege or work-product protection by disclosing the purportedly protected information to the Court without leave.

By failing to follow this Court's rules and placing allegedly privileged information at issue, Defendants have waived the right to assert privilege over portions of the report and related declarations.  This Court should order full disclosure of these materials.

First, Defendants' claim that they "complied with the Court's rules for filing documents subject to redaction" is false.  *See* Defs.' Mem. 16; *accord id.* at 19.  The Court's rules require Defendants to meet and confer with Plaintiffs prior to requesting to file documents under seal in order "to narrow the scope of the request."  Individual Rule 7(C)(i).  After the close of business on the day the report was due, Defendants apprised Plaintiffs of their intent to request redaction and sought Plaintiffs' "position" on the request.  Defendants neither asked, nor, in fact, conferred with Plaintiffs about how to limit the extent of redactions, and Defendants did not even identify their intended redactions in advance—Plaintiffs learned of the scope of those redactions only when Defendants filed the redacted report and declarations on the docket of this action.

Second, "[a] party waives the work product protection by . . . placing privileged documents 'at issue' in a litigation. . . ."  *N. Y. Times*, 939 F.3d at 494.  "The prototypical example of a waiver by assertion is seen in cases in which a party's claim that he relied on the advice of counsel is tantamount to a waiver of any privilege barring disclosure of his attorney's

communications with him on the subject matter." *Bowne*, 150 F.R.D. at 488.  "Nonetheless, this waiver principle sweeps more broadly.  As summarized by the New York courts, a waiver may be found 'where invasion of the privilege is required to determine the validity of the client's claim or defense and application of the privilege would deprive the adversary of vital information.'"  *Id.* (quoting *Jakobleff v. Cerrato, Sweeney & Cohn*, 97 A.D.2d 834, 835 (2d Dep't 1983)).

Here, Defendants placed the allegedly privileged information at issue when they filed their "notice of correction" on July 23, 2020, withdrawing all dispositive motions and supporting materials. *See generally* July 23 Letter.  They continue to rely on this privileged information to assert that they did not impose the Ban in bad faith, only on misinformation—a position that Defendants have admitted is relevant to this Court's resolution of Plaintiffs' motion for summary judgment, *see* Defs.' Ltr. 2, Aug. 7, 2020, ECF No. 95, and is certainly relevant to potential sanctions and attorney's fees.  Defendants have also conceded that this purportedly privileged information is necessary to determine the validity of their claim that they acted in good faith. *See* Defs.' Mem. 17 ("The Government simply could not provide a complete account of the inaccurate and misleading statements in its submissions without addressing attorney-client communications, pre-decisional and deliberative communications and materials, attorney work-product information, and law-enforcement information.").  This Court should order full disclosure of the redacted materials.  *See United States v. Bilzerian,* 926 F.2d 1285, 1292–93 (2d Cir. 1991) (holding that a defendant's testimony about his good faith regarding the legality his actions opened the door to cross-examination into communications with his attorney on this subject).

Third, Defendants waived privilege and work-product protection by voluntarily disclosing the purportedly protected information to a third party (here, the Court).  Disclosure to a third party waives the attorney-client, deliberative process, and law enforcement privileges. *See HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 70–71 (S.D.N.Y. 2009) (attorney-client privilege); *Dipace v. Goord*, 218 F.R.D. 399, 406–07 (S.D.N.Y. 2003) (deliberative process privilege); *White v. City of New York*, No. 09 Civ. 9901 (BSJ) (THK), 2020 WL 2899665, at *4 (S.D.N.Y. July 23, 2010) (law enforcement privilege not waived by disclosure only because disclosure was unauthorized).  And "voluntary disclosure of work product to an adversary waives the privilege as to other parties." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 14-CV-7126 (JMF), 2017 WL 280816, at *2–*3 (S.D.N.Y. Jan. 20, 2017) (quoting *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993)).  Here, Defendants voluntarily disclosed to the Court information they claim is protected, vitiating the privileges and work-product protection they invoke.

Defendants contend that "disclosure of privileged materials to a Court for *ex parte* review does not waive privilege," Defs.' Mem. 17, but they cite no authority for the proposition that their voluntary disclosure—neither directed nor authorized by the Court—does not amount to a waiver.  Having taken it upon themselves voluntarily to disclose allegedly protected information to the Court when not directed or authorized to do so—and without following the Court's proper procedures for placing that material under seal—Defendants have waived any protections that may have applied.  *See, e.g.*, *Vardon Golf Co. v. Karsten Mfg. Corp.*, 213 F.R.D. 528, 532–34 (N.D. Ill. 2003).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for a protective order.

Dated:  September 28, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION

<u>/s/ Matthew Colangelo</u>
Matthew Colangelo
Elena Goldstein
Daniela L. Nogueira
28 Liberty Street
Office of the New York Attorney General
New York, New York 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

<u>/s/ Antony P.F. Gemmell</u>
Antony P.F. Gemmell
Molly K. Biklen
Jessica Perry
Jordan Laris Cohen
Christopher T. Dunn
125 Broad Street, 19th Floor
New York, New York 10004
212-607-3300
agemmell@nyclu.org

*Counsel for Plaintiff in 20 Civ. 1127*

*Counsel for Plaintiffs in 20 Civ. 1142*