UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                           :

STATE OF NEW YORK,                      :

                      Plaintiff,         :

                                            :

                -v-                       :             20-CV-1127 (JMF)

ALEJANDRO MAYORKAS, *in his official capacity as* :
*Acting Secretary of Homeland Security*, et al.,   :

                                            :

                   Defendants.      :

                                            :
----------------------------------------------------------------------X
                                            :

R. L'HEUREUX LEWIS-MCCOY et al., *on behalf of* :
*themselves and all similarly situated individuals*, :

                      Plaintiffs,        :

                                            :             20-CV-1142 (JMF)

                -v-                       :

ALEJANDRO MAYORKAS, *in his official capacity as* :
*Acting Secretary of Homeland Security*, et al.,   :         OPINION AND ORDER

                   Defendants.      :

                                              :
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        Plaintiffs in these two lawsuits challenged a decision of the U.S. Department of

Homeland Security ("DHS"), announced in a February 5, 2020 letter (the "TTP Decision"), *see*

ECF No. 75-1 ("AR"), at 1-3, to suspend the eligibility of all New York residents to enroll or re-

enroll in the Trusted Traveler Programs ("TTPs") operated by U.S. Customs and Border

Protection ("CBP").[1]  On July 23, 2020, however, with motion practice underway, DHS

---

[1]       Unless otherwise noted, all references to docket entries are to 20-CV-1127.

announced that it was "lift[ing] its ban on the Trusted Traveler Program (TTP) for New York residents," effective immediately.  *New York Amends Dangerous Green Light Law to Cooperate with Federal Law Enforcement on DMV Records*, U.S. Dep't of Homeland Sec. (July 23, 2020), https://www.dhs.gov/news/2020/07/23/new-york-amends-dangerous-green-light-law-cooperate-federal-law-enforcement-dmv ("TTP Renewal Announcement").  Later that same day, Defendants wrote to the Court to "correct several statements in [D]efendants' briefs and declarations, and to withdraw [D]efendants' motion to dismiss and motion for summary judgment, along with the materials submitted in support of those motions."  ECF No. 89 ("Defs.' July 23 Ltr."), at 1 (citations omitted).[2]  In light of the "deeply troubling revelations that statements and representations [Defendants had] made in these cases — statements and representations that, by their own admission, formed *the* rationale for DHS's original decision and went to the heart of the issues in dispute — were inaccurate and misleading," the Court ordered Defendants to prepare and file a report detailing any and all inaccurate or misleading statements in prior filings as well as declarations from any declarants who needed to correct previously filed sworn statements explaining how inaccuracies came to be included in their prior declarations.  *New York v. Wolf*, Nos. 20-CV-1127 (JMF) et al., 2020 U.S. Dist. LEXIS 134512, at *7-10 (S.D.N.Y. July 29, 2020) ("*July 2020 Decision*") (ECF No. 92) (internal quotation marks omitted).

---

[2]      In both cases, the initial Defendants were DHS, CBP, Chad F. Wolf (in his official capacity as Acting Secretary of Homeland Security), and Mark A. Morgan (in his official capacity as Acting Commissioner of U.S. Customs and Border Protection).  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Wolf's and Morgan's successors — Alejandro Mayorkas and Troy Miller, respectively — were automatically substituted as Defendants.  *See* ECF No. 144.

In September 2020, Defendants submitted the required materials *ex parte* and under seal along with publicly filed versions containing significant redactions based on Defendants' assertion of various privileges and the work-product doctrine.  Now pending are Defendants' motions to seal portions of these documents.  20-CV-1127, ECF Nos. 111, 118, 131; 20-CV-1142, ECF Nos. 109, 116, 129.  Plaintiffs oppose the motions.  20-CV-1127, ECF Nos. 114, 120 ("Pls.' Opp'n"), 134; 20-CV-1142, ECF Nos. 112, 118, 132.  For the reasons that follow, Defendants' motions are granted in part and denied in part.

## BACKGROUND

The Court assumes familiarity with the background of these cases and the Court's prior decisions and, thus, will recount the relevant facts only briefly.

Pursuant to federal law, DHS operates several TTPs, which "allow pre-enrolled, low-risk participants to receive expedited border processing, enabling CBP to direct additional scrutiny to the unknown, potentially higher risk, travelers arriving at ports of entry.  By January 2020, more than 814,000 [New York] residents were CBP TTP members and over 62,000 [New York] residents had a TTP application pending vetting."  *New York v. Wolf*, Nos. 20-CV-1127 (JMF) et al., 2020 WL 6047817, at *2 (S.D.N.Y. Oct. 13, 2020) ("*October 2020 Decision*") (ECF No. 124) (cleaned up).  On June 17, 2019, New York enacted the Driver's License Access and Privacy Act, 2019 Sess. Laws of N.Y. ch. 37 (A. 3675-B), also known as the "Green Light Law." As relevant here, the Green Light Law authorized the New York State Department of Motor Vehicles ("DMV") to issue driver's licenses to New York State residents without regard to citizenship or immigration status and prohibited disclosing or making accessible records or information for driver's license applicants and holders to federal immigration authorities absent a

court order or judicial warrant from an Article III judge.  *See* N.Y. Veh. & Traf. Law §§ 201, 502(8)(b).  The law took effect on December 14, 2019.  AR 1.

On February 5, 2020, then-Acting Secretary Wolf announced the TTP Decision in a letter to two New York State officials, *see* AR 1-3, explaining that, effective immediately, "New York residents will no longer be eligible to enroll or re-enroll in CBP's Trusted Traveler Programs" because the Green Light Law "prevents DHS from accessing New York DMV records in order to determine whether a TTP applicant or re-applicant meets program eligibility requirements," *id.* at 3.  The Green Light Law, he wrote, "prevents DHS from accessing relevant information that only New York DMV maintains, including some aspects of an individual's criminal history" and therefore "compromises CBP's ability to confirm whether an individual applying for TTP membership meets program eligibility requirements."  *Id.* at 2.

Plaintiffs filed these two lawsuits shortly thereafter, alleging violations of both the Constitution and the Administrative Procedure Act ("APA").  A few months later, on April 3, 2020, New York amended its Green Light Law to provide for the sharing of DMV information with federal immigration authorities "as necessary for an individual seeking acceptance into a trusted traveler program, or to facilitate vehicle imports and/or exports."  Act of April 3, 2020, 2020 N.Y. Sess. Laws ch. 58, pt. YYY (S. 7508-B).  Twelve days after that, on April 15, 2020, Defendants moved to dismiss Plaintiffs' constitutional claims.  ECF No. 29.  In briefing on that motion, the parties disputed the significance of New York's changes to the Green Light Law, with Defendants taking the position that "New York's Amendment to the Green Light Law during the course of this litigation does not change the result."  *October 2020 Decision*, 2020 WL 6047817, at *3 (internal quotation marks omitted).  After producing the Administrative

Record in June 2020, Defendants moved for summary judgment on Plaintiffs' APA claims, ECF No. 67; Plaintiffs cross-moved for partial summary judgment on July 10, 2020, ECF No. 78.

On July 23, 2020, the day before Defendants' opposition to Plaintiffs' cross-motion was due, DHS issued the TTP Renewal Announcement.  Shortly thereafter, the Court issued an Order directing counsel to confer "and advise the Court what effect that announcement has on these cases, including whether or when they should be dismissed as moot."  ECF No. 88.  Less than one hour after the Court's Order, Defendants filed a letter correcting "several statements" in their "briefs and declarations" and withdrawing their pending motions to dismiss and for summary judgment, "along with the materials submitted in support of those motions."  ECF No. 89 ("July 23rd Gov't Ltr."), at 1.  The letter, however, did not purport to identify all of the problematic statements and representations in the record.  Instead, it cited only a few examples of statements — some appearing in sworn declarations — to the effect that "the data restrictions imposed by New York's Green Light Law . . . were unique and precluded [DHS] from conducting adequate risk assessments of New York applicants for TTPs."  *Id.* at 1.  These "statements and representations," Defendants revealed, "are inaccurate in some instances and give the wrong impression in others."  *Id.* at 2.  Defendants admitted that "[t]hese revelations undermine[d] a central argument in [D]efendants' briefs and declarations to date."  *Id.*  Indeed, Defendants went so far as to acknowledge that the newly disclosed facts undermined "*the* rationale" for DHS's original decision and for Defendants' "defense" of that decision.  *Id.* (emphasis added).

Five days later, the parties filed letters in response to the Court's July 23, 2020 Order.  In their letter, Plaintiffs took the position that the cases were not moot and noted that they intended to seek further relief, including payment of their fees and costs and, potentially, discovery into the nature of the misleading statements Defendants had concededly entered into the record.  *See*

ECF No. 91.  In their letter, meanwhile, Defendants argued that the TTP Renewal

Announcement had, indeed, rendered these cases moot.  *See* ECF No. 90.  Only days later,

however, Defendants reversed course, noting that, after "further consultation with CBP and

[P]laintiffs," they had determined that certain "residual operational effect[s]" of the TTP

Decision precluded them "from arguing that the effects of the TTP Decision [had] been

'completely and irrevocably eradicated,'" the relevant standard for whether a party's "voluntary

cessation of challenged conduct" renders a case moot.  ECF No. 94 (quoting *Mhany Mgmt., Inc.*

*v. County of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (quoting, in turn, *Granite State Outdoor*

*Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002) (per curiam)).

In light of these developments, the Court concluded that "a limited inquiry" into

Defendants' inaccurate submissions was "appropriate . . . , if only to aid the Court in deciding

later whether and to what extent a more detailed inquiry is warranted."  *July 2020 Decision*, 2020

U.S. Dist. LEXIS 134512, at *7-8 (noting the Court's "inherent authority to conduct an

independent inquiry into the matter" (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991))).

"For the sake of ensuring an accurate record and to help the Court in deciding how to proceed

down the line, therefore, it is necessary for Defendants to make a comprehensive record of any

and all 'inaccurate' or 'misleading' statements in their prior submissions."  *Id.* at *8.

Accordingly, the Court ordered Defendants to "file a comprehensive and detailed report" that:

1. Lists *any and all* inaccurate or misleading statements or representations in the record;

2. Explains, with respect to each such statement, why it is inaccurate or misleading;

3. Identifies, with respect to each such statement, who made the statement and/or was responsible for the content of the statement;

4. Summarizes, with respect to each such statement, what due diligence, if any, counsel for Defendants conducted before filing the document(s) containing the statement to determine whether the statement was accurate;

5. Identifies when and how counsel for Defendants learned about the inaccurate and
misleading statements, including but not limited to who at DHS contacted counsel about
the statements on July 17, 2020; and

6. Describes who, when, and how DHS discovered that the record in these cases
contained inaccurate and misleading statements.

*Id.* at *8-9.  The Court later added that "the report should also address what steps, if any, the U.S.

Attorney's Office (and the Department of Justice generally) is taking, or will take, to ensure that

the problems identified in the review do not recur."  ECF No. 103.  Additionally, "[t]o the extent

that any declaration was filed in these cases with inaccurate or misleading statements,"

Defendants were ordered to "file a new declaration from the same declarant describing, with

particularity, (1) how the prior declaration came to include such statement or statements;

(2) what steps the declarant took, prior to signing the declaration, to confirm the accuracy of the

statement or statements; and (3) when and how the declarant learned that the statement or

statements were inaccurate or misleading."  *July 2020 Decision*, 2020 U.S. Dist. LEXIS 134512,

at *9-10.  The Court explained that "Plaintiffs may file a letter in response to Defendants' report,

indicating whether they have reason to believe that Defendants made inaccurate or misleading

statements beyond those identified in the report."  *Id.* at *10.

On September 4, 2020, Defendants filed a redacted copy of the report, which was

authored by Associate U.S. Attorney John McEnany (the "Report"), along with redacted

declarations from Pete R. Acosta, Director of Trusted Traveler Programs, Admissibility and

Passenger Programs, Office of Field Operations, CBP, and Robert E. Perez, Deputy

Commissioner of CBP.  *See* ECF Nos. 113 ("Report"), 113-1 ("Acosta Decl."), 113-2 ("Perez

Decl.").  Defendants simultaneously submitted unredacted versions of these documents *ex parte*

to the Court for *in camera* review, ECF Nos. 112, 112-1, 112-2, and moved to seal the relevant

portions of the aforementioned documents, invoking the attorney-client, law enforcement, and deliberative-process privileges as well as the work-product doctrine, ECF No. 111 ("Defs.' Ltr.-Mot.").  Defendants acknowledged in their letter-motion that they had "provide[d] only high-level substantiation of [their] privilege assertions, rather than line-by-line analysis of the proffered redactions . . .  in the interest of timely submission of th[e] [R]eport and its corresponding declarations."  *Id.* at 5 n.1.

Plaintiffs filed a letter in response, arguing that the Report "inadequately accounts for Defendants' misconduct in this litigation and supports the imposition of sanctions," but noting that "Defendants' extensive redactions to the [R]eport prevent Plaintiffs from fully assessing its content."  ECF No. 115, at 1, 4.  In response, the Court ordered Defendants to substantiate their privilege assertions with greater specificity and directed them to "address whether, insofar as the Court did not order them to submit allegedly privileged documents in connection with the [R]eport, disclosure of the unredacted documents to the Court constitutes waiver of any or all of the privileges asserted."  ECF No. 116, at 2.  The Court subsequently received a privilege log from Defendants, ECF No. 117-3 ("Privilege Log"), along with formal briefing from both sides, ECF No. 117 ("Defs.' Mem."); Pls.' Opp'n.

On October 13, 2020, after concluding that the TTP Renewal Announcement had not rendered these cases moot, the Court granted Plaintiffs' unopposed motion for summary judgment on their APA claims "on the ground that the TTP Decision was arbitrary and capricious" because "Defendants' *own* admissions establish that, at the very least, DHS 'entirely failed to consider an important aspect of the problem' and 'offered an explanation for its decision that r[an] counter to the evidence before the agency.'"  *October 2020 Decision*, 2020 WL

6047817, at *6 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  More specifically, the Court explained that

> [t]he TTP Decision itself stated that New York residents would immediately be categorically ineligible for TTP applications or re-applications because the Green Light Law prevented DHS from accessing New York DMV records containing relevant information that only New York DMV maintains, including some aspects of an individual's criminal history.  According to DHS, the Green Light Law thereby compromised CBP's ability to confirm whether an individual applying for TTP membership meets program eligibility requirements.  As Defendants belatedly acknowledged, however, several states, the District of Columbia, and a territory do not currently provide access to driving history information, including driving-related criminal histories and two territories do not participate in NLETS DMV-related queries, such that DMV records are not available to CBP (or other NLETS users).  Nevertheless, CBP has continued to accept, vet, and, where appropriate, approve TTP applications from these states and territories.  As Defendants conceded, these facts contradict *the* rationale for the TTP Decision, *i.e.*, that CBP is not able to assure itself of an applicant's low-risk status because New York fails to share relevant DMV information with CBP for TTP purposes.

*Id.* (cleaned up).[3]  "By making a decision that may well have been pretextual, and was certainly arbitrary and capricious," the Court reasoned, "Defendants undermined the 'core constitutional and democratic values' underlying the APA."  *Id.* (quoting *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 518 (S.D.N.Y.), *aff'd,* 139 S. Ct. 2551 (2019)).  "To their credit," the Court continued, "Defendants eventually admitted that their decision had been legally indefensible. But it is hard to imagine that they would have done so but for the 'thorough, probing, [and] in-depth review' that they faced by virtue of Plaintiffs' lawsuits."  *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).  Accordingly, the Court declared the TTP Decision unlawful

---

[3]     NLETS is a third-party database that CBP queries when evaluating TTP applications for certain driver's license and vehicle data that "help CBP to develop a complete picture of an individual's background and determine whether that individual satisfies the low-risk status requirement for membership."  ECF No. 68-1, ¶ 20.

and formally vacated it and remanded to DHS for further proceedings.  The Court also directed

the parties to confer and address whether there was a need or basis for other remedies.  *See id.*

On November 24, 2020, Defendants filed a letter with the Court explaining that they had

just been informed by the Office of the Chief Counsel at CBP that it had learned the previous

week that the Report and associated declarations contained omissions.  In particular, Defendants

explained "that American Samoa and the Commonwealth  of the Northern Mariana Islands — in

addition to those jurisdictions previously identified by CBP in filings before  this court — have

not been returning information responsive to Nlets Driver's License, Vehicle Registration, and

Driver History queries."  ECF No. 130.  Defendants then filed a supplemental redacted

declaration from Acosta, along with an accompanying motion to seal and an unredacted copy

submitted *ex parte*, addressing and correcting these omissions.  *See* ECF Nos. 132 ("Supp.

Acosta Decl."), 133, 134.

Separately, Plaintiffs moved for entry of a permanent injunction prohibiting "Defendants

from reinstating any ban on TTP enrollment based on a state or individual's provision of DMV

records, unless the agency cures the defects identified by the Court in its summary judgment

opinion (*i.e.*, the agency considers all important aspects of the problem and makes a decision

consistent with the evidence before the agency)."  ECF No. 129, at 10.  In a Memorandum

Opinion and Order dated January 19, 2021, the Court denied Plaintiffs' motion, concluding that

"Plaintiffs fail[ed] to demonstrate that a departure from the APA's standard remedy of vacatur

and remand [wa]s warranted" and that "Plaintiffs' injuries have been, or will be, fully remedied

by the TTP Decision's rescission and vacatur."  *New York v. Wolf*, Nos. 20-CV-1127 (JMF) et

al., 2021 WL 185190, at *3 (S.D.N.Y. Jan. 19, 2021) (ECF No. 139).

The Court conducted a status conference remotely by telephone on May 14, 2021 "to discuss the impact, if any, of [recent] developments on the litigation," namely the Court's grant of summary judgment for Plaintiffs on their APA claims, the Court's denial of Plaintiffs' request for injunctive relief, and the "change in Administration and corresponding changes in the senior leadership of the Defendant agencies." ECF No. 142. At the conference, the parties agreed to continue to seek an amicable resolution of Plaintiffs' anticipated request for fees and potential further relief; they are currently required to file a status letter with the Court concerning those negotiations by July 14, 2021. ECF No. 148.

## DISCUSSION

Defendants seek leave to file redacted versions of the Report, the Acosta Declaration, the Perez Declaration, the Privilege Log, and the Supplemental Acosta Declaration on the grounds that the redacted portions are protected by various privileges and the work-product doctrine. In response, Plaintiffs raise three "global" arguments that, if accepted, would require near-complete disclosure. In addition, although not privy to the information redacted, they question whether all of Defendants' redactions are proper. The Court begins with Plaintiffs' "global" arguments and then assesses each of the grounds asserted by Defendants for their redactions.

### A. Global Arguments

Plaintiffs make three "global" arguments for disclosure: that Defendants waived any protections by voluntarily submitting the documents at issue to the Court for its *in camera* review; that they waived any protections by placing the relevant information "at issue" in the litigation; and that the crime-fraud exception applies. The Court will address each in turn.

1.  **Waiver Through Disclosure**

The Court begins with the question it posed to the parties following the submission of the Report — namely, "whether, insofar as the Court did not order them to submit allegedly privileged documents in connection with the [R]eport, disclosure of the unredacted documents to the Court constitutes waiver of any or all of the privileges asserted." ECF No. 116, at 2.  Upon review of the parties' submissions, the Court agrees with Defendants that submission of the unredacted documents to the Court did not waive their asserted privileges.

At the outset, it is worth noting that the question of whether Defendants waived any protections by submitting the documents at issue to the Court is not quite as consequential as one might think.  That is because the vast majority of Defendants' redactions to the documents invoke *both* the attorney-client privilege and work-product doctrine.  "Unlike the attorney-client privilege" — and, perhaps, the other privileges at issue here — "work product protection is not waived merely because the material is disclosed to a third party." *Pearlstein v. BlackBerry Ltd.*, No. 13-CV-7060 (CM) (KHP), 2019 WL 1259382, at *7 (S.D.N.Y. Mar. 19, 2019) (citing *United States v. Adlman*, 134 F.3d 1194, 1200 n.4 (2d Cir. 1998)).  "Rather, a waiver of work product protection occurs when the covered materials are used in a manner that is inconsistent with the protection[,] . . . [such as] when work product materials are either given to an adversary or used in such a way that they may end up in the hands of an adversary." *Bank of Am., N.A. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 170 (S.D.N.Y. 2002); *accord Pearlstein*, 2019 WL 1259382, at *7. Here, the *ex parte* submission of documents to the Court did not "substantially or materially increase[] the likelihood that an adversary w[ould] obtain the information," and, thus, was not inconsistent with the purposes of the protection. *Costabile v. County of Westchester*, 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (internal quotation marks omitted).  It

follows that, even if the submissions to the Court constituted waiver of the attorney-client privilege, the same would not be true for work-product protections.  *See, e.g.*, *S.E.C. v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 146 (S.D.N.Y. 2004) ("Disclosure of work-product material . . . results in a waiver of the protection only when the disclosure is to an adversary or is made in a manner that materially increases the likelihood of disclosure to an adversary.").

In any event, although the attorney-client privilege can be waived by "[v]oluntary disclosure to a party outside the attorney-client relationship," *id.*, the Court agrees with Defendants that their submission of the documents to the Court for its *in camera* review did not constitute waiver.  In general, "*in camera* review does not destroy the privileged nature" of contested documents.  *United States v. Zolin*, 491 U.S. 554, 569 (1989).  Consistent with that proposition, the Second Circuit has observed both that "[t]he Supreme Court has repeatedly looked with favor upon the practice of *in camera* review of various privileges against disclosure," *Est. of Fisher v. Comm'r*, 905 F.2d 645, 650 (2d Cir. 1990), and that "*in camera* review[] [is] a practice both long-standing and routine in cases involving claims of privilege," *Mercator Corp. v. United States* (*In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*), 318 F.3d 379, 386 (2d Cir. 2003).  Here, the Court did not actually *order* Defendants to submit the materials for *in camera* inspection — and, thus, it is not entirely accurate to say (as Defendants do, *see* Defs.' Mem. 17-19) that the decision to do so was "involuntary."   But the "comprehensive and detailed report" required by the *July 2020 Decision* necessarily required the compilation and presentation of privileged information.  2020 U.S. Dist. LEXIS 134512, at *8-9; *see, e.g.*, *id.* at *9 (mandating that the report "[s]ummarize[] with respect to each [inaccurate or misleading] statement, what due diligence, if any, counsel for Defendants conducted before filing the document(s) containing the statement to determine whether the statement was

accurate" and requiring declarants to explain "how the prior declaration came to include [inaccurate or misleading] statement[s]").

Under these circumstances, it would be unfair and unjust to construe submission of the documents for the Court's review as a waiver.  Indeed, as Defendants correctly note, "[h]ad [they] filed a report and declarations without addressing privileged communications, [they] would have been able to proffer no more than conclusory statements in response to the Court's order; such a response would have not only defied the Court's order, but also would have undermined the very purpose of the Court's inquiry."  Defs.' Mem. 21.  To be sure, the more prudent course may have been to file only redacted copies along with a privilege log articulating the specific basis for each assertion of privilege in the first instance.  Given the nature and purpose of the Court-ordered inquiry, however, the Court almost certainly would have then required that unredacted copies be submitted *ex parte* so the privilege assertions could be reviewed *in camera*.  Given that, and given that Defendants made their desire to invoke the privileges immediately clear, the Court cannot and will not deem Defendants' *ex parte* filings to be a waiver of their otherwise valid privileges.  *Cf. United States v. Treacy*, No. S2-08-CR-366 (JSR), 2009 WL 812033, at *1 (S.D.N.Y. Mar. 24, 2009) ("[R]ules relating to privilege in matters of governmental investigations must be crafted on a case-by-case basis and applied in a common sense way in light of reason and experience." (cleaned up) (quoting *United States v. Doe* (*In re Six Grand Jury Witnesses*), 979 F.2d 939, 944 (2d Cir. 1992))).

Plaintiffs' arguments to the contrary are unavailing.  Notably, they fail to cite a single example of a court finding waiver under circumstances similar to those here.  In fact, in each of the cases they cite, *see* Pls.' Opp'n 23, the court found that disclosure did *not* result in a waiver, *see White v. City of New York*, No. 09-CV-9901 (BSJ) (THK), 2010 WL 2899665, at *4

(S.D.N.Y. July 23, 2010); *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 70-73

(S.D.N.Y. 2009) (Lynch, J.); *Dipace v. Goord*, 218 F.R.D. 399, 406-07 (S.D.N.Y. 2003).  In

sum, Defendants did not waive any privileges by submitting documents *ex parte*.

### 2.  "At Issue" Waiver

As noted, Plaintiffs separately assert that Defendants "waive[d] the work product

protection by . . . placing privileged documents 'at issue' in a litigation."  Pls.' Opp'n 21

(quoting *N.Y. Times Co. v. U.S. Dep't of Just.*, 939 F.3d 479, 494 (2d Cir. 2019)).  It is true that a

party "impliedly waives work product protection if it places the substance of the documents for

which the protection is claimed at issue."  *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d

Cir. 2003) (internal quotation marks omitted).  "Specifically, in certain circumstances a party's

assertion of factual claims can, out of considerations of fairness to the party's adversary, result in

the involuntary forfeiture of privileges for matters pertinent to the claims asserted. . . .  [T]his

kind of unfairness may arise when a party advances a claim to a court . . . while relying on its

privilege to withhold from a litigation adversary materials that the adversary might need to

effectively contest or impeach the claim."  *N.Y. Times Co.*, 939 F.3d at 495 (cleaned up).  In

evaluating whether a party has impliedly waived work-product protection, courts "look for

specific instances of unfairness that undermine the adversarial process, and this is inherently a

case-by-case determination."  *Id.* at 496.  The Second Circuit has cautioned, however, that while

it has "sometimes used broad language in describing this doctrine, . . . [the] implied waiver of the

work product privilege based on the 'fairness' or 'at-issue' doctrine is not nearly so broad."  *Id.*

(cleaned up).  "[S]imply because privileged information is relevant to a claim or defense in the

case does not give rise to an implied waiver . . . ."  *Leviton Mfg. Co. v. Greenberg Traurig LLP*,

No. 09-CV-8083 (GBD) (THK), 2010 WL 4983183, at *4 (S.D.N.Y. Dec. 6, 2010), *objections*

*overruled,* 2011 WL 2946380 (S.D.N.Y. July 14, 2011); *accord Windsor Sec., LLC v. Arent Fox LLP*, 273 F. Supp. 3d 512, 518 (S.D.N.Y. 2017) ("[T]he question in at-issue waiver cases is not simply whether the requested information is relevant.").

The Court cannot find implied waiver here.  Plaintiffs contend that "Defendants placed the allegedly privileged information at issue when they filed their 'notice of correction' on July 23, 2020, withdrawing all dispositive motions and supporting materials."  Pls.' Opp'n 22.  But in order to find that a party impliedly waived any privileges by placing the relevant documents at issue, the "party must *rely* on privileged advice from his counsel to make his claim or defense." *Pritchard v. County of Erie* (*In re County of Erie*), 546 F.3d 222, 229 (2d Cir. 2008); *see also John Doe Co.*, 350 F.3d at 304 ("Forfeiture of this type is premised on the *unfairness* to the adversary of *having to defend* against the privilege holder's claim without access to pertinent privileged materials that might refute the claim.").  Defendants here did not rely on the purportedly protected communications in order to *defend* against Plaintiffs' claims.  If anything, they did essentially the opposite, relying on the purportedly protected communications to *reverse* the TTP Decision, *withdraw* their motions to dismiss and for summary judgment, and effectively *concede* Plaintiffs' APA claims.  As a result, Plaintiffs cannot claim unfairness from the non-disclosure of the purportedly protected communications.

Plaintiffs also argue that Defendants rely on the allegedly privileged communications in claiming that they did not issue the TTP Decision in bad faith — and that, in so doing, Defendants placed the privileged communications at issue because that contention "is certainly relevant to potential sanctions."  Pls.' Opp'n 22.  But the potential relevance of the communications to a sanctions motion does not constitute a waiver because "a party's assertion only triggers an at-issue waiver when it pertains to a claim or defense to which the party making

the assertion has the burden of proof," *Sparrow Fund Mgmt. LP v. MiMedx Grp., Inc.*, No. 18-CV-4921 (PGG) (KHP), 2021 WL 1930294, at *5 (S.D.N.Y. May 13, 2021); *accord Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 502-03 (S.D.N.Y. 2019) (rejecting at-issue waiver argument "because [the party asserting privilege] bears no burden"), and "the party seeking sanctions pursuant to . . . the court's inherent power bears the burden of proof to establish the existence of grounds for the requested sanctions," *Anhui Konka Green Lighting Co. v. Green Logic LED Elec. Supply, Inc.*, No. 18-CV-12255 (MKV) (KHP), 2021 WL 807209, at *2 (S.D.N.Y. Mar. 3, 2021) (cleaned up); *accord Bullock v. Reckenwald*, No. 15-CV-5255 (LTS) (DF), 2016 WL 5793974, at *17 (S.D.N.Y. Aug. 24, 2016) (explaining that "[t]he burden of proof lies with the moving party" to establish "[f]raud on the court . . . by clear and convincing evidence" (cleaned up)), *report and recommendation adopted,* 2016 WL 5719786 (S.D.N.Y. Sept. 30, 2016).  In sum, the Court declines to find an implied waiver of privilege in these circumstances.

### 3.  The Crime-Fraud Exception

Finally, Plaintiffs contend that Defendants' assertions of privilege and the work-product doctrine should be rejected pursuant to the "crime-fraud exception," which provides that communications cannot be protected where they were "made for the purpose of getting advice for the commission of a fraud or crime."  *United States v. Richard Roe, Inc.* (*In Re Richard Roe, Inc.*), 68 F.3d 38, 40 (2d Cir. 1995) ("*Roe I*") (internal quotation marks omitted).  Under federal law, which applies here, *see In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF) et al., 2015 WL 7574460, at *4 (S.D.N.Y. Nov. 25, 2015), a party seeking the production of otherwise privileged documents pursuant to the crime-fraud exception must make two showings.  First, the party "must at least demonstrate that there is probable cause to believe that a

crime or fraud has been attempted or committed"; and second, the party must show "that the communications were in furtherance thereof." *Roe I*, 68 F.3d at 40; *accord United States v. Richard Roe, Inc.* (*In re Richard Roe, Inc.*), 168 F.3d 69, 71 (2d Cir. 1999) ("*Roe II*"); *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997), *abrogated on other grounds by Loughrin v. United States*, 573 U.S. 351 (2014).  The "probable cause" standard requires the party seeking disclosure to show "that a prudent person [would] have a reasonable basis for believing that the objective of the client's communication with the attorney was to further a fraudulent scheme." *Sparrow Fund Mgmt.*, 2021 WL 1930294, at *3 (cleaned up).

Significantly, with respect to the second prong of the test, the Second Circuit has stressed that "the exception applies only when the court determines that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud" and "where there is probable cause to believe that the *particular* communication with counsel or attorney work product was *intended* in some way to facilitate or to conceal the criminal activity."  *Roe I*, 68 F.3d at 40 (initial emphasis in original); *see also Jacobs*, 117 F.3d at 88 ("*With strong emphasis on intent*, the crime-fraud exception applies only when there is probable cause to believe that the [documents in question] were intended in some way to facilitate or to conceal the criminal [or fraudulent] activity." (internal quotation marks omitted) (emphasis added)).  That is, to warrant disclosure of otherwise protected communications, a party must show a "purposeful nexus," *Roe I*, 68 F.3d at 40 (internal quotation marks omitted), that the communications were "*made with an intent to further*" the crime or fraud, *Jacobs*, 117 F.3d at 88 (internal quotation marks omitted); *see also, e.g., In re 650 Fifth Ave.*, No. 08-CV-10934 (KBF), 2013 WL 3863866, at *2 (S.D.N.Y. July 25, 2013) ("[T]he Government must provide particularized evidence that *each* challenged communication was made *in furtherance of* the crime or

fraud . . . ."). Mere relevance or temporal proximity does not suffice. *See Roe I*, 68 F.3d at 40;

*see also, e.g.*, *Roe II*, 168 F.3d at 71; *Corp. Grand Jury Witness v. United States* (*In re Grand*

*Jury Subpoenas Duces Tecum*), 798 F.2d 32, 34 (2d Cir. 1986) (per curiam).

Applying these standards here, the Court concludes that Plaintiffs fail to carry their

burden. They characterize the "fraud" at issue as "[i]mplementing and then defending a bad-

faith agency decision — with no evidence that agency decisionmakers ever believed the rationale

counsel advanced in litigation." Pls.' Opp'n 7. Notably, in setting aside the TTP Decision as

arbitrary and capricious, the Court did observe that it "may well have been pretextual" and found

that DHS had "offered an explanation for its decision that ran counter to the evidence before the

agency." *October 2020 Decision*, 2020 WL 6047817, at *6 (cleaned up). The Report and

associated declarations only reinforce these conclusions. But the conduct revealed by these

documents is ultimately best described as negligent and incompetent; it is not the sort of "fraud

upon the court," *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988) (internal quotation

marks omitted), or "calculated and purposeful litigation misconduct," *Abbott Lab'ys v. H&H*

*Wholesale Servs., Inc.*, No. 17-CV-3095 (CBA) (LB), 2018 WL 2459271, at *5 (E.D.N.Y. Mar.

9, 2018) (internal quotation marks omitted), that might warrant application of the crime-fraud

exception. Moreover, it is significant that Defendants ultimately came forward on their own,

admitting that their prior statements needed correction, retreating from their litigation positions,

and reversing the TTP Decision without being ordered by the Court to do so. To be sure, the fact

that Defendants' *own* belated admissions established "facts [that] contradict[ed] *the* rationale for

the TTP Decision, *i.e.*, that CBP is not able to assure itself of an applicant's low-risk status

because New York fails to share relevant DMV information with CBP for TTP purposes,"

*October 2020 Decision*, 2020 WL 6047817, at *6 (internal quotation marks omitted),

underscores that the TTP Decision should never have been made in the first place. But it also undermines any inference of a scheme to defraud the Court. In short, the Court does not find probable cause of a fraud sufficient to invoke the crime-fraud exception, "let alone [that] any *particular* communications or work product [Plaintiffs] seek . . . were made with the intent to further a crime or fraud." *In re Gen. Motors LLC*, 2015 WL 7574460, at *6. It follows that the crime-fraud exception does not apply.[4]

## B. Privileges

Having rejected Plaintiffs' "global" arguments for disclosure, the Court turns to the particular grounds on which Defendants withhold information. Defendants invoke three distinct privileges — namely, the attorney-client privilege, the deliberative-process privilege, and the law-enforcement privilege — as well as the work-product doctrine. In addition, they defend the redactions of certain officials' names on privacy grounds. For the reasons that follow, the Court concludes that the vast majority of Defendants' assertions are proper. For convenience, the redactions with which the Court disagrees are identified in a chart attached as Exhibit A.

### 1. The Attorney-Client Privilege

First, Defendants assert that portions of the documents are protected by the attorney-client privilege. "In civil suits between private litigants and government agencies, the attorney-

---

[4]     Similarly, the Court rejects Plaintiffs' request to vitiate the privilege on public policy grounds. In *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir. 1991), the Second Circuit observed that "[t]he [attorney-client] privilege cannot stand in the face of countervailing law or strong public policy." But the court there considered the potential tension between the privilege and a federal statute, 26 U.S.C. § 6050-I, not amorphous concerns about government transparency of the sort involved here. The Court has no doubt that there is a "strong public interest in knowing 'what the government is up to,'" Pls.' Opp'n 9 (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 37 (D.C. Cir. 2002)), but Plaintiffs do not cite, and the Court has not found, any case finding a public policy exception to the attorney-client privilege in circumstances such as those here.

client privilege protects most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance." *Pritchard*, 473 F.3d at 418. "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Id.* at 419. Notably, however, "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts." *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). Additionally, the privilege attaches only if "the predominant purpose of the communication is to render or solicit legal advice." *Pritchard*, 473 F.3d at 420. In the case of an internal investigation, that "does not require a showing that obtaining or providing legal advice was the *sole* purpose of [the] investigation or that the communications at issue 'would not have been made "but for" the fact that legal advice was sought.' . . . [Rather,] '[s]o long as obtaining or providing legal advice was one of the significant purposes of the internal investigation, the attorney-client privilege applies, even if there were also other purposes for the investigation . . . .'" *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 530 (S.D.N.Y. 2015) (quoting *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759 (D.C. Cir. 2014) (Kavanaugh, J.)).

Applying these standards, the Court concludes that the majority of Defendants' redactions made pursuant to the attorney-client privilege are valid. In doing so, the Court rejects Plaintiffs' argument that "communications made after this Court's July 29 Order directing preparation of a report are not privileged" because they were made "for the purpose of complying with the Court's order to provide additional information regarding Defendants' inaccurate and misleading statements, for the sake of ensuring an accurate record and to help the Court in deciding how to proceed down the line." Pls.' Opp'n 4 (cleaned up). The mere fact that

these communications were made for purposes of complying with the Court's order does not preclude a finding that "obtaining or providing legal advice was one of the significant purposes of" Defendants' investigation, *In re Gen. Motors LLC*, 80 F. Supp. 3d at 530 (internal quotation marks omitted), particularly given that, at the time of these communications, Plaintiffs' motion for summary judgment remained pending and Plaintiffs had indicated the possibility of seeking sanctions.  That said, the Court concludes that some of Defendants' redactions are improper for one of more of the following reasons: because the information at issue was not intended to be kept confidential; because the redaction does not appear to cover attorney-client communications at all or encompasses only underlying facts; or because substantially the same information has been stated publicly by Defendants elsewhere in this litigation.  *See, e.g.*, *Tower 570 Co. LP v. Affiliated FM Ins. Co.*, No. 20-CV-799 (JMF), 2021 WL 1222438, at *2 (S.D.N.Y. Apr. 1, 2021) (noting that "the privilege may be waived by voluntary disclosure of an otherwise privileged communication to a third party").  The chart attached as Exhibit A identifies the specific redactions that, for one or more of these reasons, must be unredacted.

## 2.  The Work-Product Doctrine

Next, Defendants invoke the work-product doctrine, which is based on the notion that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.  Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference."  *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).  As the Supreme Court acknowledged in *Hickman*, "[t]his work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways."  *Id.* at

511.  *Hickman* has since been codified in part in Rule 26(b)(3) of the Federal Rules of Civil

Procedure, which provides that, "[o]rdinarily, a party may not discover documents and tangible

things that are prepared in anticipation of litigation or for trial by or for another party or its

representative."  Fed. R. Civ. P. 26(b)(3).  That said, "[t]he work product doctrine, as originally

articulated in *Hickman v. Taylor*, is broader than Rule 26(b)(3), in that it also applies to

intangible work product: an attorney's analysis made in anticipation of litigation, but which has

not been memorialized."  *Obeid v. Mack*, No. 14-CV-6498 (LTS) (HBP), 2016 WL 7176653, at

*5 (S.D.N.Y. Dec. 9, 2016) (internal quotation marks omitted) (collecting cases).

Significantly, "[u]nlike the attorney-client privilege, which is absolute, the work product

doctrine is only qualified."  *Tower 570 Co.*, 2021 WL 1222438, at *3 n.2 (citing *United States v.

Nobles*, 422 U.S. 225, 239 (1975); *In re Gen. Motors LLC*, 80 F. Supp. 3d at 532-33).  The

"protection can be overcome where the party seeking discovery demonstrates its substantial need

for the materials, and its inability, without undue hardship, to obtain the substantial equivalent of

the materials by other means."  *In re Initial Pub. Offering Sec. Litig.*, 249 F.R.D. 457, 460

(S.D.N.Y. 2008).[5]  "A substantial need exists where the information sought is essential to the

party's defense, is crucial to the determination of whether the defendant could be held liable for

the acts alleged, or carries great probative value on contested issues."  *Gucci Am., Inc. v. Guess?,

Inc.*, 271 F.R.D. 58, 74-75 (S.D.N.Y. 2010) (internal quotation marks omitted).  Thus,

---

[5]      This test applies only to so-called "ordinary" or "fact" work product, which "may
encompass factual material, including the result of a factual investigation."  *In re Grand Jury
Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007).  "[O]pinion work product," on
the other hand, which "shows the mental impressions, conclusions, opinions or legal theories of
an attorney or other representative," *Adlman*, 134 F.3d at 1204 (internal quotation marks
omitted), "enjoys a near absolute immunity and can be discovered only in very rare and
extraordinary cases where weighty consideration of public policy and proper administration of
justice would militate against nondiscovery," *Madanes v. Madanes*, 199 F.R.D. 135, 150
(S.D.N.Y. 2001) (cleaned up).

"[d]isclosure is warranted only when the moving party makes a strong showing of the relevance and importance of the fact work product and that it is likely to be significantly more difficult, time-consuming or expensive to obtain the information from another source." *99 Wall Dev. Inc. v. Allied World Specialty Ins. Co.*, No. 18-CV-126 (RA) (KHP), 2020 WL 2730944, at *5 (S.D.N.Y. May 26, 2020) (internal quotation marks omitted).

In light of these standards, the Court concludes that most of Defendants' assertions of the work-product doctrine are valid as well. Once again, though, the Court concludes that some assertions are improper, either because the redactions cover underlying facts that do not themselves reflect attorney work product, *see, e.g.*, *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, No. 01-CV-9291 (JSM), 2002 WL 1998195, at *3 (S.D.N.Y. Aug. 29, 2002) ("The work product privilege does not protect underlying facts from discovery merely because they have been incorporated into a privileged document."), because the material does not appear to have been created in anticipation of litigation, or because the protection was waived through voluntary public disclosure. In addition, there are a few instances in which the Court concludes that the work-product doctrine applies but is nevertheless overcome — in particular, those passages that speak directly to the process by which the Government came to understand that its prior statements in this litigation required correction or clarification and how those steps differed from the due diligence undertaken earlier, which, by Defendants' own admission, resulted from additional information-gathering undertaken "in response to Plaintiffs' [summary judgment] memorandum [in] mid-July." Report 3. These passages have "great probative value" with respect to Plaintiffs' decisions whether to seek fees or sanctions and the information is not available elsewhere. *Gucci Am.*, 271 F.R.D. at 74-75. Once again, the chart attached as Exhibit A identifies the redactions that must be unsealed in whole or in part.

24

### 3. The Deliberative-Process Privilege

Defendants also invoke the deliberative-process privilege, which is designed to protect the "process by which governmental decisions and policies are formulated." *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 76 (2d Cir. 2002) (Sotomayor, J.) (internal quotation marks omitted). It does so "by preserving and encouraging candid discussion between officials." *Nat'l Council of La Raza v. Dep't of Just.*, 411 F.3d 350, 356 (2d Cir. 2005). The privilege permits the government to withhold "an inter- or intra-agency document . . . if it is: (1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.*, actually related to the process by which policies are formulated." *Id.* (cleaned up). "[W]hile the agency need not show *ex post* that a decision was made" based on the document, "it must be able to demonstrate that, *ex ante*, the document for which [the] privilege is claimed related to a specific decision facing the agency." *Tigue*, 312 F.3d at 80. Considerations informing whether a record is "deliberative" include "whether the document (i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (cleaned up). Accordingly, the privilege "focus[es] on documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 84-85 (2d Cir. 1991) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). It generally does not cover "purely factual" material. *Grand Cent. P'ship*, 166 F.3d at 482 (internal quotation marks omitted). Nor does it cover records that are "merely peripheral to actual policy formation; the record[s] must bear on the formulation or

exercise of policy-oriented judgment." *Id.* (internal quotation marks omitted).  Finally, in

assessing a claim of deliberative-process privilege, it is important "to understand 'the function of

the documents in issue in the context of the administrative process which generated them.'"

*Lead Indus. Ass'n, Inc. v. OSHA*, 610 F.2d 70, 80 (2d Cir. 1979) (Friendly, J.) (quoting *Sears,*

*Roebuck & Co.*, 421 U.S. at 138).

Defendants assert the deliberative-process privilege with respect to only a few redactions,

all but one of which — namely, a redaction that appears in the middle of the second paragraph

on page twelve of the Report — the Court has already found to be protected by either or both the

attorney-client privilege or the work-product doctrine.  The Court concludes that that passage is

protected by the privilege,[6] but weighing the relevant factors — i.e., "(1) the relevance of the

evidence the agency seeks to protect; (2) the availability of other evidence; (3) the seriousness of

the litigation; (4) the role of the agency in the litigation; and (5) the possibility that disclosure

will inhibit future candid debate among agency decision-makers," *New York v. U.S. Dep't of*

*Com.*, No. 18-CV-2921 (JMF), 2018 WL 4853891, at *2 (S.D.N.Y. Oct. 5, 2018) (internal

quotation marks omitted) — it concludes that the privilege is overcome.  In this context, where

the Government Defendants have admitted to making inaccurate representations on the record

and where Plaintiffs are considering whether to pursue fees or sanctions, the "litigation involves

a question concerning the intent of the governmental decisionmakers or the decisionmaking

process itself" and "the relevance of the deliberative documents, and [Plaintiffs'] corresponding

---

[6]     In doing so, the Court rejects — again — Plaintiffs' argument that "[t]he deliberative
process privilege does not shield Defendants' decision-making process from public scrutiny
where, as here, that very process is the central issue of the inquiry ordered by the Court."  Pls.'
Opp'n 13 (internal quotation marks omitted); *see June 2019 Decision*, 2020 WL 3073294, at *1
(noting that the Court was "not persuaded by Plaintiffs' assertion of a categorical rule").

need . . . outweigh the interest in promoting candid agency discussion." *In re Delphi*, 276 F.R.D. 81, 84-86 (S.D.N.Y. 2011) (internal quotation marks omitted).  It is noteworthy that the agency decision at issue concerned the policy response, if any, to the amendments to the Green Light Law, i.e. the very reason that DHS later offered for rescinding the TTP Decision in the TTP Renewal Announcement.  Accordingly, this redaction should be lifted.

### 4.  The Law-Enforcement Privilege

Next, Defendants invoke the law-enforcement privilege.  That privilege protects "information pertaining to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witnesses and law enforcement personnel or the privacy of individuals involved in an investigation, and information that would otherwise interfere with an investigation." *Dinler v. City of New York* (*In re City of New York*), 607 F.3d 923, 944 (2d Cir. 2010) (cleaned up).  Like the deliberative-process privilege, it is "qualified, not absolute," and thus subject to a balancing test. *Id.* at 945.  Significantly, however, the presumption against lifting the law-enforcement privilege is "pretty strong." *Goodloe v. City of New York*, 136 F. Supp. 3d 283, 294 (E.D.N.Y. 2015) (quoting *In re City of New York*, 607 F.3d at 945).  To rebut it, "the party seeking disclosure bears the burden of showing (1) that the suit is non-frivolous and brought in good faith, (2) that the information sought is not available through other discovery or from other sources, and (3) that the party has a compelling need for the privileged information.  If the presumption against disclosure is successfully rebutted (by a showing of, among other things, a 'compelling need'), the district court must then weigh the public interest in nondisclosure against the need of the litigant for

27

access to the privileged information before ultimately deciding whether disclosure is required."

*In re City of New York*, 607 F.3d at 948 (cleaned up).

Defendants assert the law-enforcement privilege with respect to only a limited number of

redactions, specifically, a passage on page six of the Report and paragraphs twenty and twenty-

one of the September 4, 2020 Acosta Declaration.  The Court finds that Defendants waived the

privilege with respect to the first and second lines of page eleven of the Acosta Declaration (in

the middle of the second sentence of paragraph twenty-one), beginning with "CBP may . . ." and

ending with ". . . not included," because substantially the same information was publicly filed in

Acosta's June 19, 2020 declaration.  *See* ECF No. 68-1 ¶ 20; *see also Kusuma Nio v. U.S. Dep't*

*of Homeland Sec.*, 314 F. Supp. 3d 238, 247 (D.D.C. 2018) ("The law enforcement privilege can

be waived through 'voluntary disclosure of a significant portion of the information claimed to be

privileged.'" (quoting 26A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE,

FEDERAL RULES OF EVIDENCE § 5692 (1st ed.))).  By contrast, the Court concludes that the other

redactions are proper — substantially for the reasons stated in the declaration of William A.

Ferrara, Executive Assistant Commissioner of CBP's Office of Field Operations, *see* ECF No.

117-1 — and that Plaintiffs do not overcome the privilege.  In contrast to information that the

Court ordered disclosed over an assertion of law-enforcement privilege earlier in this litigation,

*see June 2020 Decision*, 2020 WL 3073294, at *4, Plaintiffs cannot demonstrate a compelling

need for the information as it does not bear on whether to seek (or grant) fees or sanctions.

### 5.  Privacy

Finally, Defendants seek leave to redact from the documents at issue "the names of

certain low-level employees within CBP and DHS," arguing that "[n]ames of low-level

employees are 'largely unrelated to the public interest,' and may properly be withheld."  Defs.'

Ltr.-Mot. 4 (quoting *In re Savitt/Adler Litig.*, No. 95-CV-1842 (RSP) (DRH), 1997 WL 797511, at *4 (N.D.N.Y. Dec. 23, 1997) (Pooler, J.)).  Notably, the Court rejected a similar request from Defendants earlier in this very litigation, in reference to the Administrative Record, in support of which they cited the very same cases they do here.  *See* ECF No. 36, at 2-3 (citing *Massey v. F.B.I.*, 3 F.3d 620, 624 (2d Cir. 1993), *abrogated by Milner v. Dep't of Navy*, 562 U.S. 562 (2011); *Kelly v. City of New York*, No. 01-CV-8906 (AGS) (DF), 2003 WL 548400, at *6 (S.D.N.Y. Feb. 24, 2003); *In re Savitt*, 1997 WL 797511, at *4).  The Court allowed Defendants to redact "the email addresses, telephone numbers, and other contact information of the [CBP] employees at issue," but denied the motion "as to the names of those employees."  ECF No. 45. "Under *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006)," the Court explained, it "must balance the presumption in favor of public access to judicial documents such as the Administrative Record against 'countervailing factors' such as the CBP employees' privacy interests here."  *Id.*[7]  While "[t]hat balance justifie[d] redaction of the employees' contact information, given the risks highlighted by Defendants," those risks did "not apply . . . to the employees' names, at least not to the same degree."  *Id.*  "Thus, the balance weighs in favor of not redacting the names."  *Id.*  Furthermore, "[t]he cases cited by Defendants in which the redaction of employees' names was found appropriate predate *Lugosch* and, unlike this case,

---

[7]    In evaluating sealing or redaction requests, *Lugosch* requires courts to "(i) determine whether the documents in question are judicial documents; (ii) assess the weight of the common law presumption of access to the materials; and (iii) balance competing considerations against the presumption of access."  *United States v. Maxwell*, No. 20-CR-330 (AJN), 2021 WL 1063239, at *1 (S.D.N.Y. Mar. 18, 2021) (internal quotation marks omitted).

involved the disclosure of sensitive materials, not materials of the nature at issue here." *Id.*

(citing *Kelly*, 2003 WL 548400, at *5-6; *In re Savitt*, 1997 WL 797511, at *3).

Defendants acknowledge "that the Court rejected similar arguments at an earlier stage of

this litigation," but they contend that the documents at issue here "are 'ancillary to the court's

core role in adjudicating a case,' and are entitled to a lesser presumption of access" than was the

Administrative Record.  Defs.' Ltr.-Mot. 4 (quoting *Brown v. Maxwell*, 929 F.3d 41, 50 (2d Cir.

2019)).[8]  As *Brown* itself explains, however, "a court performs the judicial function not only

when it rules on motions currently before it, but also when properly exercising its inherent

supervisory powers.  A document is thus relevant to the performance of the judicial function if it

would reasonably have the *tendency* to influence a district court[] . . . in the exercise of its

supervisory powers, without regard to which way the court ultimately rules or whether the

document ultimately in fact influences the court's decision."  929 F.3d at 49 (cleaned up).

Therefore, there is no doubt that the Report and accompanying documents are "judicial

documents" to which the presumption of public access attaches.  *Lugosch*, 435 F.3d at 119.  And

the documents are clearly "of value to those monitoring the federal courts," so the presumption

of public access, even if weaker, is "still substantial."  *Brown*, 929 F.3d at 50, 53 (internal

quotation marks omitted).  Thus, the different posture of proceedings now does not change the

Court's earlier conclusion that the presumption of public access is not outweighed by any

---

[8]    Defendants urge the Court to find that Plaintiffs waived any arguments pertaining to the
privacy interests asserted by failing to include them in their letter opposing Defendants' initial
letter-motion.  *See* Defs.' Mem. 16 (citing *Felske v. Hirschmann*, No. 10-CV-8899 (RMB), 2012
WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012)).  The Court declines to do so, as Plaintiffs' position
on this issue was included in Defendants' initial letter-motion.  *See* Defs.' Ltr.-Mot. 1
("Plaintiffs' counsel state as follows: . . . ['[']Defendants' request did not explain how their request
to redact employee names is consistent with the Court's order of April 29, 2020, denying the
same request in connection with the administrative record.'").

privacy interest the relevant federal employees may have in their names alone. *See, e.g.*, *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995) (explaining that "[i]n determining the weight to be accorded an assertion of a right of privacy, courts should first consider the degree to which the subject matter is traditionally considered private rather than public" and that "family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access *than conduct affecting a substantial portion of the public*" (emphasis added)). Accordingly, the redactions on page eighteen of the Report and all of the redactions in the Privilege Log should be unsealed in their entirety.

## CONCLUSION

In short, having reviewed the documents at issue in their entirety, the Court agrees with Defendants on the propriety of most, but not all, of their redactions. The chart attached as Exhibit A specifies the portions of the documents that must be unredacted. **No later than two weeks from the date of this Opinion and Order**, Defendants shall file the Report, the Acosta Declaration, the Perez Declaration, the Privilege Log, and the Supplemental Acosta Declaration with revised redactions consistent with this Opinion and Order. Additionally, in light of that deadline, the parties' deadline to file a letter updating the Court on the status of settlement negotiations is ADJOURNED until **two weeks after the date** on which Defendants file more narrowly redacted copies of the relevant documents. The parties shall confer and in that letter address what, if any, additional steps are required in this litigation.

Finally, having reviewed Defendants' submissions with care, the Court declines to impose, on its own initiative, sanctions pursuant to its inherent authority. Although Defendants' legal defense of the TTP Decision was flawed from its inception, based on the present record the Court concludes — for many of the same reasons it concluded above that the crime-fraud

exception does not apply — that this is not a case in which "a party use[d] the judicial forum for improper purposes or abuse[d] the judicial process." *Carousel Foods of Am., Inc. v. Abrams & Co.*, 423 F. Supp. 2d 119, 124 (S.D.N.Y. 2006).  To be sure, Defendants should have undertaken more thorough inquiries into the nature of DMV information shared with CBP — and any restrictions thereon — when formulating their initial legal defense of the TTP Decision.  Indeed, it should go without saying — but, in this case, apparently cannot — that such inquiries should have been undertaken *before* adopting the TTP Decision in the first place.  Significantly, however, when Defendants, prompted by Plaintiffs' summary judgment papers, did undertake such inquiries and uncovered information that "undermined a central argument in [their] briefs and declarations to date," *October 2020 Decision*, 2020 WL 6047817, at *4 (cleaned up), they swiftly informed the Court, withdrew their motions, reversed the TTP Decision, and conceded this litigation.  Given the totality of these circumstances, including the thorough accounting that Defendants undertook in response to the Court's July 29, 2020 Order, the Court concludes that it is inappropriate to impose sanctions on its own initiative.

Needless to say, that should not be taken to mean that the Court condones Defendants' conduct, either in promulgating the TTP Decision or in initially undertaking to defend it.  This case was far from the Government's finest hour.  At nearly every turn, Defendants failed to live up to the standards to which those who take oaths to serve the public should adhere.  At the outset of the litigation, the Court ordered Defendants to supplement the Administrative Record, then "a mere sixty-four pages long," observing that it was "difficult to imagine that a decision as important as the one challenged here — to exclude every resident of the country's fourth largest state from enrolling or re-enrolling in a program mandated by the Intelligence Reform and Terrorism Prevention Act of 2004, 8 U.S.C. § 1365b(k)(3)(A) — would be made based upon a

factual record that sparse." *New York v. Wolf*, Nos. 20-CV-1127 (JMF) et al., 2020 WL 2049187, at *2 (S.D.N.Y. Apr. 29, 2020) (cleaned up).  And yet the corrected Administrative Record was only twelve pages longer, ECF No. 75-1 — perhaps an early indication of what the Court would later conclude: that the TTP Decision had not been "the product of reasoned decisionmaking," as required by the APA.  *State Farm*, 463 U.S. at 52.  And as the Court previously discussed in finding the TTP Decision arbitrary and capricious, the Administrative Record revealed that senior DHS leaders were aggressively looking for services they could "immediately pull back from [New York] as a result" of the Green Light Law's enactment and that the reason ultimately given for the TTP Decision — namely, that the "Green Light [L]aw would prevent CBP from receiving information relating to criminal convictions involving motor vehicles" — appears to have been raised internally for the first time only one day before the Decision was announced.  *October 2020 Decision*, 2020 WL 6047817, at *2-3 (cleaned up).  Given this approach to agency decision-making, it is unsurprising that it was not until months into this litigation that Defendants came to learn that "statements and representations" they had made were "inaccurate in some instances and g[a]ve the wrong impression in others," that "these revelations undermine[d] a central argument in [D]efendants' briefs and declarations to date," and that they "undermined *the* rationale for DHS's original decision and for Defendants' defense of that decision." *July 2020 Decision*, 2020 U.S. Dist. LEXIS 134512, at *3-4 (cleaned up).

The Clerk of Court is directed to terminate ECF Nos. 111, 118, and 131 in 20-CV-1127, and ECF Nos. 109, 116, and 129 in 20-CV-1142.

SO ORDERED.

Dated: July 8, 2021
       New York, New York

_____
JESSE M. FURMAN
United States District Judge

# Exhibit A

| Document | Location | Privilege | Text | Ruling |
|---|---|---|---|---|
| Report | P. 2, ¶ 2 | ACP/WPP | "Although Plaintiffs . . . from New York —" | Does not reflect attorney-client communications or attorney work product. |
| Report | P. 2, ¶ 2 | ACP/WPP | "That question . . . vetting procedures." | Does not reflect attorney-client communications. Work-product protection applies, but protection is overcome for reasons stated above. |
| Report | P. 2 n.3 | ACP/WPP | "For brevity . . . District of Columbia." | Does not reflect attorney-client communications or attorney work product |
| Report | P. 2 n.4 | ACP/WPP | "But the . . . History information." | Does not reflect attorney-client communications. Work-product protection applies, but protection is overcome for reasons stated above. |
| Report | P. 4 ¶ 3 | ACP/WPP | "a large . . . *to Exploitation.*" | Reflects only underlying facts. |
| Report | P. 7 ¶ 2 | WPP | "[T]he restrictions . . . such information." | Reflects only underlying facts. |
| Report | P. 12 ¶ 2 | DPP | "As far . . . not acceptable." | Privilege applies but is overcome for the reasons stated above. |
| Report | P. 12 ¶ 4 | ACP | "In anticipation . . . we did.'" | Privilege does not apply because "talking points" addressing a policy announcement would not have been intended to be kept confidential. |
| Report | P. 13 ¶ 2 | ACP/WPP | "Early drafts . . . 2020, decision." | Concerns publicly filed information so any privilege is waived. |
| Report | P. 18 | Priv. | "Laura . . . CBP" | Privacy interest outweighed for reasons stated above. |
| Acosta Decl. | ¶ 14 | ACP/WPP | "on July 10 . . . this case." | Reflects only underlying public information. |
| Acosta Decl. | ¶ 14 | ACP/WPP | "While I . . . vetting processes," | Reflects only underlying fact. |
| Acosta Decl. | ¶ 18 | WPP | "Prior to . . . TTP vetting," | Protection applies but is overcome for reasons stated above. |
| Acosta Decl. | ¶ 18 | WPP | "After reviewing . . . OIT research," | Protection applies but is overcome for reasons stated above. |

| Acosta Decl. | ¶ 21 | LEP | "CBP may . . . not included." | Privilege waived because substantially similar to information publicly filed at ECF No. 68-1, ¶ 20. |
|---|---|---|---|---|
| Acosta Decl. | ¶ 30 | ACP/WPP | "descriptions of . . . outside CBP." | Relays underlying facts. |
| Perez Decl. | ¶ 5 | ACP/WPP | "It is . . . were developed." | Privilege waived because relays same information that has been publicly filed, e.g., at ECF No. 117, at 9. |
| Perez Decl. | ¶ 5 | ACP/WPP | "based on . . . information," | Privilege waived because relays same information that has been publicly filed, e.g., at ECF No. 89, at 2. |
| Perez Decl. | ¶ 6 | ACP/WPP | "while unique . . . is shared." | Relays underlying facts. |
| Perez Decl. | ¶ 9 | ACP/WPP | "the operators . . . vetting process." | Relays underlying facts. |
| Perez Decl. | ¶ 17 | ACP/WPP | "The final . . . June 17, 2020." | Relays underlying facts. |
| Perez Decl. | ¶ 18 | ACP/WPP | "I specifically . . . CBP operations." | Appears to reflect only policy considerations, rather than legal advice or anticipation of litigation. |
| Perez Decl. | ¶ 21 | ACP/WPP | "Moreover . . . been considered." | Does not reflect attorney-client communications or attorney work-product. |
| Privilege Log | Passim | Priv. | | Privacy interest outweighed for reasons stated above. |
| Supp. Acosta Decl. | ¶ 6 | ACP/WPP | "sending queries . . . if any." | Does not reflect attorney-client communications; work-product protection applies, but is overcome for reasons stated above. |
| Supp. Acosta Decl. | ¶ 9 | ACP/WPP | "test query process" | Does not reflect attorney-client communications; work-product protection applies, but is overcome for reasons stated above. |
| Supp. Acosta Decl. | ¶ 12 | ACP/WPP | "NLets query results" | Does not reflect attorney-client communications; work-product protection applies, but is overcome for reasons stated above. |